## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REAL MEX RESTAURANTS, INC., *et al.*, | ) | Case No. 11-13122 (   ) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors.[1] | ) | |
| | ) | |

## DECLARATION OF RICHARD P. DUTKIEWICZ,
## EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL
## OFFICER OF THE DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS

I, Richard P. Dutkiewicz, declare as follows:

### Introduction

1.      I am the Executive Vice President and Chief Financial Officer (the "CFO") of Real Mex Restaurants, Inc. ("RMR") and each of its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 bankruptcy cases (collectively, "the Company" or the "Debtors"). I have served as the Company's CFO since April 2010. From 2003 to 2010, I served as the CFO of Einstein Noah Restaurant Group. Earlier in my career I was an audit manager with KPMG. I have more than 30 years of experience working for both private and publicly held companies in a variety of industries including the restaurant, technology and manufacturing businesses.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' federal tax identification numbers, are: Real Mex Restaurants, Inc. (2902); RM Restaurant Holding Corp. (2217); Acapulco Mark Corp. (3570); Acapulco Restaurant of Downey, Inc. (2910); Acapulco Restaurant of Moreno Valley, Inc. (4606); Acapulco Restaurant of Ventura, Inc. (3626); Acapulco Restaurant of Westwood, Inc. (1162); Acapulco Restaurants, Inc. (4897); ALA Design, Inc. (8584); Chevys Restaurants, LLC (2992); CKR Acquisition Corp. (8287); El Paso Cantina, Inc. (0112); El Torito Franchising Company (2754); El Torito Restaurants, Inc. (7059); Murray Pacific (1596); Real Mex Foods, Inc. (8585); and TARV, Inc. (8081). The Debtors' headquarters and mailing address is: 5660 Katella Avenue, Suite 100, Cypress, CA 90630.

2. I am familiar with the Debtors' books and records, day-to-day operations, business affairs and financial condition, and with the facts and circumstances surrounding the Debtors' First Day Motions, their debtor-in-possession financing commitment, the commencement of these Chapter 11 Cases, and the key operational and strategic decisions made by the Debtors' senior management in connection therewith. However, no one individual has personal knowledge of all the facts in this Declaration. The facts set forth herein are based upon (a) my personal knowledge of and familiarity with the Debtors' operations and finances, (b) information learned from my review of the relevant documents, and information supplied to me by other members of the Debtors' management, the Debtors' professionals and employees of the Debtors working under my supervision, and (c) my opinions based upon experience, knowledge and information concerning the Debtors and the industry in which the Debtors operate. If called upon to testify, I would and could testify competently to the facts set forth herein.

3. On October 4, 2011 (the "Petition Date"), the Debtors commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

4. In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business, the Debtors have requested various types of relief in "first-day" motions, as well as in motions and applications that will be filed shortly after the Petition Date and that will require hearing within the first thirty days of the cases (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things, maintaining the Debtors' existing cash management system and insurance policies, bolstering employee morale and vendor and customer confidence and ensuring that the Debtors

#4834-8280-2442
DOCS_DE:173655.1 73521-001

have sufficient resources and financial liquidity to continue to operate their business while in chapter 11. Although certain of the First Day Motions require hearings on an expedited basis (for the reasons set forth below) and the others are capable of being heard on regular notice during the first month of the Chapter 11 Cases, all of the First Day Motions are critical to the Debtors' success in chapter 11. In so proceeding, the Debtors instructed their officers, restructuring professionals and other agents to consider three primary factors: (i) maximizing the value of the Debtors' assets; (ii) ensuring that the Chapter 11 Cases proceed as efficiently and cost-effectively as possible; and (iii) preserving ongoing business operations for the benefit of all stakeholders.

5.    I submit this declaration in support of the Debtors' First Day Motions. Any capitalized terms not expressly defined herein have the meaning ascribed to them in the relevant First Day Motion. Part I of this declaration describes the Debtors' business and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II sets forth the relevant facts in support of the First Day Motions filed concurrently herewith.

## Part I

### The Debtors' Business and Brief History

6.    The Company is the largest full service Mexican casual dining restaurant chain operator in the United States in terms of number of restaurants. As of June 26, 2011, the Debtors (a) operated 178 restaurants, of which 149 are located in California and the remainder in 11 other states and (b) franchised or licensed 30 restaurants in ten states and two foreign countries. The states and foreign countries where the restaurants are located are: California, Missouri, Illinois, New Jersey, Oregon, Florida, Maryland, New York, Virginia, Arizona, Washington, Louisiana, Nevada, Minnesota, South Dakota, Japan and Turkey.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

7.     Our four primary restaurant concepts are:  El Torito; El Torito Grill; Chevys Fresh Mex; and Acapulco Mexican Restaurant:

(a)     El Torito and El Torito Grill (42.7% of fiscal year 2010 restaurant revenues).  El Torito was founded in 1954.  El Torito restaurants are primarily free standing buildings.  The restaurants average approximately 8,600 square feet with average seating of approximately 305 guests.  All of the El Torito properties are leased.

(b)     Chevys (37.4% of fiscal year 2010 restaurant revenues).  Chevys was founded in Alameda, California in 1986.  Chevys restaurants are primarily freestanding and located in high-traffic urban and suburban areas.  Chevys restaurants generally average approximately 7,700 square feet with average seating for approximately 322 guests in the dining room and cantina.  All of the Chevys properties are leased.

(c)     Acapulco (14.6% of fiscal year 2010 restaurant revenues).  The first Acapulco restaurant opened in Pasadena, California in 1960.  Acapulco restaurants are primarily freestanding and located in high-traffic urban and suburban areas.  Acapulco restaurants generally average approximately 8,300 square feet with average seating for approximately 245 guests.

(d)     Other Restaurant Concepts (5.3% of fiscal year 2010 restaurant revenues).  As of June 26, 2010, the Company operated additional restaurant locations, all of which are also full service Mexican formats, under the following brands: Las Brisas; Casa Gallardo; El Paso Cantina; and Who Song & Larry's.

8.     Founded in 1970, the Company's Real Mex Foods, Inc. ("Real Mex Foods") subsidiary provides purchasing and distribution services for the restaurant operations and manufactures specialty products for sales to outside customers.  Real Mex Foods has built

expertise in the procurement, manufacturing, distribution, and product development of Mexican foods, and provides a one-stop source of supply needs to the Company's restaurants on the West Coast and coordinates purchasing for all non-West Coast U.S. restaurants. Real Mex Foods generates significant purchasing economies of scale for the Company and ensures quality and consistency across the entire store base. This enables the restaurant managers to spend more time focusing on operations, without the burden of purchasing and supply management.

9.     In addition to the internal benefits it provides, Real Mex Foods has a customer base in the quick service restaurant, or "QSR," casual dining, retail, and foodservice channels, and provides Mexican food products to QSR brands such as El Pollo Loco, Del Taco, Rubio's, and Baja Fresh in addition to private label products for retailers such as Trader Joe's, Costco, Ralphs, Vons and Albertsons and a proprietary line of entrées under the Real Mex Foods label.

10.     The Company centralizes purchasing and distribution for the majority of its raw ingredients, fresh products and alcoholic beverages through two purchasing and distribution facilities, and manufactures food products in a manufacturing plant. The purchasing and distribution facilities encompass approximately 67,000 square feet in Buena Park, California, and 54,000 square feet in Union City, California.

11.     The Debtors employ approximately 11,000 full-time and part-time employees. The majority of the Debtors' employees, approximately 10,500 in all, work at one of the Debtors' restaurant locations. The remaining 500 of the Debtors' employees work at: (1) the corporate headquarters located in Cypress, California (the "Corporate Employees") and the restaurant support center located in Union City, California (these locations provide administrative support, including purchasing, human resources, financing and accounting

#4834-8280-2442
DOCS_DE:173655.1 73521-001

services); (2) the Buena Park, California, Real Mex Foods location which provides administrative support and warehousing to Real Mex Foods, Inc.; and (3) the Vernon, California, Real Mex Foods, Inc.'s manufacturing facility. The Debtors are not parties to any collective bargaining agreements.

12.     An organizational chart showing the ownership relationship amongst the Debtors is attached hereto as Exhibit 1.

## Summary of Obligations Under Principal Credit Facilities

13.     As of the Petition Date, the Debtors' principal liabilities and obligations were:

First Lien Credit Facility

14.     On January 29, 2007, the Company entered into the Second Amended and Restated Revolving Credit Agreement (the "First Lien Credit Facility"), dated as of January 29, 2007, by and among RMR, Acapulco Restaurants, Inc., El Torito Franchising Company, El Torito Restaurants, Inc., Tarv, Inc., Acapulco Restaurant of Ventura, Inc., Acapulco Restaurant of Westwood, Inc., Acapulco Mark Corp., Murray Pacific, ALA Design, Inc., Real Mex Foods, Inc., Acapulco Restaurant of Downey, Inc., Acapulco Restaurant of Moreno Valley, Inc., El Paso Cantina, Inc., CKR Acquisition Corp. and Chevys Restaurants, LLC, as borrowers, General Electric Capital Corporation and the other lending institutions listed on Schedule 1 thereto as lenders (the "First Lien Lenders") , and General Electric Capital Corporation as agent and administrative agent. The obligations of the Company under the First Lien Credit Facility are secured by first priority liens on and security interests in substantially all of the Debtors' assets, excluding certain of the Debtors' leasehold interests. The outstanding balance due under the First Lien Credit Facility as of the Petition Date is approximately $37.6 million, which is

comprised of $17.5 million in cash borrowings, $19.9 million in issued and outstanding Letters of Credit, and $0.2 million in accrued and unpaid interest.

Second Lien Notes

15.     Pursuant to an Indenture, dated as of July 7, 2009 (the "Second Lien Indenture"), by and among RMR, the guarantors party thereto, and Wells Fargo Bank, National Association, as trustee, the Company sold $130,000 aggregate principal amount of 14.0% Senior Secured Notes due January 1, 2013 (the "Second Lien Notes"), repayment of which is guaranteed by Holdco and all of the Company's existing and future domestic restricted subsidiaries. The obligations of the Company under the Second Lien Notes are secured by second priority liens on and security interests in substantially all of the Debtors' assets, excluding the Debtors' leasehold interests.

16.     The Second Lien Notes were offered and sold in a private placement to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933 (the "Securities Act"), and to a limited number of institutional accredited investors in the United States and outside the United States in reliance on Regulation S under the Securities Act. The net proceeds from the issuance of the Second Lien Notes were used to refinance a portion of existing indebtedness, including repayment of $105 million of existing senior secured notes due 2010. Effective June 28, 2010, the Company entered into a Supplemental Indenture, which amended the Indenture to permit affiliates of Sun Capital Partners, Inc. ("Sun Capital") to acquire a majority of the stock of Holdco without requiring the Company to make a change of control offer to repurchase the Second Lien Notes that would otherwise have been required under the Indenture. In addition, in late July 2011, the Debtors entered into a second supplemental indenture with respect to the Second Lien Notes which is discussed in greater detail below.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

17.     The outstanding balance due under the Second Lien Notes as of the Petition Date is approximately $134.3 million, which is comprised of $130 million in principal and $4.3 million in accrued but unpaid interest. US Bank, National Association currently serves as the indenture trustee under the Second Lien Indenture (the "Second Lien Trustee"). The Debtors believe that, as of the Petition Date, certain funds managed by Tennenbaum Capital Partners, Credit Suisse Asset Management and JP Morgan Investment Management, Inc. hold a majority of the Second Lien Notes.

RMR Unsecured Loan

18.     Pursuant to the Second Amended and Restated Credit Agreement, dated as of July 7, 2009, by and among RMR, Holdco, the lenders party thereto, and Credit Suisse, Cayman Islands Branch, as administrative agent, sole bookrunner and lead arranger, the Company is indebted to the lenders thereunder in the principal amount of $25 million (the "Opco Unsecured Loan"). The outstanding balance due under the Opco Unsecured Loan as of the Petition Date is approximately $36.0 million, which is comprised of $34.6 million in principal and $1.4 million in accrued but unpaid interest. The administrative agent under the Opco Unsecured Loan currently is Wilmington Trust, National Association. The Debtors believe that, as of the Petition Date, affiliates of Z Capital Partners hold a large position in the Opco Unsecured Loan.

Holdco Unsecured Loan

19.     Pursuant to a Credit Agreement, dated as of July 7, 2009, by and among Holdco, the lenders party thereto, and Credit Suisse, Cayman Islands Branch (as successor to Wilmington Trust FSB), as administrative agent, Holdco is indebted to the lenders thereunder in the principal amount of $25 million (the "Holdco Unsecured Loan"). The outstanding balance due under the Holdco Unsecured Loan as of the Petition Date is approximately $38.8 million,

#4834-8280-2442
DOCS_DE:173655.1 73521-001

which is comprised of $37.0 million in principal and $1.8 million in accrued but unpaid interest. The administrative agent under the Holdco Unsecured Loan currently is Wilmington Trust, National Association. The Debtors believe that, as of the Petition Date, affiliates of Sun Capital, Farralon Capital Management, L.L.C. and Kohlberg Kravis Roberts & Co. hold large positions in the Holdco Unsecured Loan.

Other Debt

20.    The Debtors owe approximately $400,000 in long-term debt relating to capital leases for equipment used in the Debtors' restaurants and corporate headquarters. In addition, as of the Petition Date, the Debtors owe approximately $34 million in trade, vendor and general unsecured debt (excluding payroll, the RMR Unsecured Loan and the Opco Unsecured Loan, accrued interest and liabilities related to self-insurance).

Intercreditor Agreements

21.    The rights of the foregoing lenders are governed by certain intercreditor and subordination agreements, specifically:

(i)    First Lien Credit Facility / Second Lien Notes intercreditor:  the Intercreditor Agreement, dated as of July 7, 2009, by and among General Electric Capital Corporation and Wells Fargo Bank, National Association, the First Lien Agent and the Second Lien Trustee, respectively;

(ii)    First Lien Credit Facility / RMR Unsecured Loan intercreditor: the Subordination and Intercreditor Agreement, dated as of January 29, 2007, by and among, General Electric Capital Corporation, as First Lien Agent, Credit Suisse, Cayman Islands Branch (as RMR Unsecured Loan Agent), Cocina Funding Corp LLC, KKR Financial CLO 2005-2, Ltd.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

Canpartners Investments IV LLC, RMR, Holdco and the other parties listed as obligors thereunder;

(iii)    <u>First Lien Credit Facility / Opco Unsecured Loan intercreditor</u>: the Subordination and Intercreditor Agreement, dated as of July 7, 2009, by and among General Electric Capital Corporation, as First Lien Agent, Credit Suisse, Cayman Islands Branch (as successor to Wilmington Trust FSB) as Holdco Unsecured Loan Agent, Cocina Funding Corp LLC, KKR Financial CLO 2005-2, Ltd., RMR, Holdco and the other parties listed as obligors thereunder; and

(iv)    <u>Second Lien Notes / RMR Unsecured Loan intercreditor</u>: the Subordination and Intercreditor Agreement, dated as of July 7, 2009, by and among Wells Fargo Bank, National Association, as Second Lien Trustee, Credit Suisse, Cayman Islands Branch, as Opco Unsecured Loan Agent, Cocina Funding Corp L.L.C., KKR Financial CLO 2005-2, Ltd., RMR, Holdco and the other parties listed as obligors thereunder.

<u>Debtors' Equity Holders and Board of Directors</u>

22.    The principal equity holders of Debtor Holdco are various affiliates of Sun Capital. Holdco's board of directors is comprised of (i) David Goronkin, the Debtors' Chief Executive Officer, who also serves as Chairman of the board, (ii) four directors appointed by Sun Capital, and (iii) two independent directors.

**Events Leading to Chapter 11 Filings**

<u>National Economic Downturn and Impact on Debtors' Performance</u>

23.    Despite the Debtors' efforts to expand and increase revenues, in 2008 the Debtors began to experience a downturn in their revenues and profits, coinciding with the broader economic downturn in the United States. The Debtors have experienced fewer dining

guests in their restaurants, and consequently sales have declined since 2008, including a 2.3%

decrease in comparable store sales in fiscal year 2010. As a result of declining sales, annual

revenues of approximately $553 million in 2008 diminished to $500 million in 2009 and to $478

million in 2010.

24.     The deterioration in the Debtors' revenues and profits can be attributed to

several factors. Many of the states where the Debtors' restaurants are located have seen

significant increases in unemployment and have been hit particularly hard by the home mortgage

crisis. The Debtors also believe that the recent national recession has left much of the general

public less prone to spending their disposable income, including on dining at restaurants of the

caliber of those operated by the Debtors. The Company does not expect a meaningful

improvement in the economy in 2011.

25.     In addition, the profitability of the Debtors' Real Mex Foods division has

been negatively impacted by a variety of factors. Similar to other companies in the food

preparation industries, Real Mex Foods has experienced a significant increase in commodity

costs. Furthermore, Real Mex Foods' revenues have decreased over the past several years due to

the loss of certain key customers.

26.     The Company, nevertheless, continues to generate meaningful cash flow

from its profitable restaurants. Indeed, the Debtors overall earnings remain strong, and the

Debtors are confident that earnings can be further improved with the implementation of various

cost reductions in connection with underperforming stores, as discussed in greater detail below.

The Debtors' Liquidity Issues and Prepetition Discussions with Principal Lenders

27.     In July 2011, the Debtors notified their principal lenders that the Debtors

were in default of certain financial covenants under the First Lien Credit Facility, and that the

Debtors did not expect to satisfy the covenants on a go-forward basis. The Debtors further advised the holders of the Second Lien Notes that they were facing liquidity issues sooner than they had previously anticipated. As such, the Debtors advised the Second Lien Noteholders that they would not be able to make the $9 million interest payment, scheduled July 1, 2011, in full without impairing the Debtors' ability to conduct day-to-day operations, nor would the Debtors be able to satisfy the financial covenant set forth in the Second Lien Indenture. In addition, the Debtors were concerned that these pending defaults ultimately could result in cross-defaults throughout the Debtors' entire capital structure that could precipitate an exercise of remedies by the Debtors' various lenders.

28.     As a result of these defaults, and to avoid a free-fall bankruptcy filing, the Debtors commenced discussions with all of the lenders in the capital structure regarding a potential short-term solution that would give the Debtors some breathing room and permit them to explore broader restructuring transactions that would best maximize the value of the Debtors' business and assets, including potential out-of-court transactions. In connection with these discussions, the Debtors entered into a number of non-disclosure agreements with their various prepetition lenders. In addition, the Debtors engaged Milbank, Tweed, Hadley & McCloy LLP ("Milbank") as their counsel and Imperial Capital LLC ("Imperial Capital") as their investment banker to assist the Debtors with respect to the short-term solution and exploring the various strategic restructuring alternatives.

29.     In late July 2011, the Debtors were able to reach a consensual short-term resolution with all of the various prepetition lenders. As part of that compromise, the Debtors and their prepetition agents and/or lenders entered into various waivers and amendments with respect to the four principal prepetition credit facilities, pursuant to which the prepetition lenders

#4834-8280-2442
DOCS_DE:173655.1 73521-001

agreed to waive the various existing covenant defaults and the existing or potential resulting cross-defaults.

30.    In connection with those waivers and amendments, the Debtors also agreed to pay the July 2011 interest payment on the Second Lien Notes. In order to have the required liquidity to make the July interest payment and fund ongoing operations, the Debtors entered into an amendment of the First Lien Credit Facility whereby the sub-limits for the revolver and letter-of-credit subfacilities were reallocated to provide additional borrowing availability under the revolver subfacility. With the consent of the various prepetition lenders, this additional availability was funded by affiliates of the Debtors' ultimate equity holder, Sun Capital, on a last-out and subordinated basis with respect to the other First Lien Lenders.

31.    Furthermore, the Debtors entered into a second supplemental indenture for the Second Lien Notes (the "Second Supplemental Indenture") which provided that an event of default would occur if the Debtors did not (i) submit to the Second Lien Noteholders on or before September 15, 2011 a proposal for a comprehensive restructuring plan and (ii) deliver to the Second Lien Noteholders on or before October 31, 2011 a binding term sheet or agreement regarding a comprehensive restructuring plan executed by the Debtors' prepetition lenders. The Debtors consulted with each of their principal prepetition lenders regarding the timeline set forth in the Second Supplemental Indenture, and each of these parties agreed to this extension.

The Debtors' Decision to Commence the Chapter 11 Cases

32.    Following the short-term compromise with the prepetition lenders, the Debtors' management and board of directors, along with the Debtors' advisors, spent the next several weeks in August and September 2011 evaluating their various options and potential restructuring alternatives. On or about September 15, 2011, in compliance with the deadline set

#4834-8280-2442
DOCS_DE:173655.1 73521-001

forth in the Second Supplemental Indenture, the Debtors delivered a term sheet regarding a proposed restructuring transaction to be implemented through a chapter 11 plan (the "September Proposal").

33.     The September Proposal, unfortunately, did not gain the necessary traction with the Second Lien Noteholders. Thus, the Debtors determined that they were not likely to meet the Second Supplemental Indenture's October 31, 2011 deadline for delivery of an executed biding term sheet for a comprehensive restructuring, which would result in an event of default under the Second Lien Notes and cross-defaults under the rest of the capital structure.

34.     In addition, in conjunction with its advisors, the Debtors concluded that their forecasted revenues were, and would continue to be, insufficient to both fund the Debtors' business operations and service their debt, and that the Debtors would face a liquidity crisis beginning in late September. Specifically, the Debtors' continued to be hampered by their overly leveraged financial position and, despite their commencement of lease renegotiations prepetition, were still burdened by the over-market rent being paid on many of their stores.

35.     Accordingly, following additional consultations with their advisors and discussions with their prepetition lenders, the Debtors determined that the most cost-effective way to preserve their going concern value and maintain uninterrupted business operations for the benefit of all stakeholders would be to commence these chapter 11 cases and pursue a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and/or confirm a chapter 11 plan for the Debtors.

36.     As also discussed in the declarations of Marc Bilbao of Imperial Capital (the "Bilbao Declaration") and Michael Jerbich of DJM Realty Services, LLC (the "Jerbich Declaration"), the chapter 11 process will permit the Debtors to realize significant cost savings,

#4834-8280-2442
DOCS_DE:173655.1 73521-001

both through the closing of and rejection of leases related to unprofitable stores, and the renegotiation of (i) the Debtors' leases with respect to stores that would remain open upon emergence from bankruptcy and (ii) the Debtors' key vendor contracts. Through this process, I believe the Debtors can achieve a significant increase in their annual EBITDA, thereby improving the overall going concern value of the Debtors' business for the benefit of all stakeholders.

**Part II**

A.     **Debtors' Motion For Order Directing Joint Administration Of Related Chapter 11 Cases**

37.     The Debtors in these cases are affiliated entities operating related businesses under common ownership. The Debtors' financial affairs and business operations are closely related. Joint administration of these Chapter 11 Cases will (a) ease the administrative burden on the court and the parties; and (b) simplify the United States Trustee's supervision of the administrative aspects of these Chapter 11 Cases.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

**B.**   **Debtors' Motion For Order: (I) Authorizing Debtors To Continue Using Existing Cash Management System, Business Forms, Bank Accounts, And Intercompany Arrangements; And (Ii) Granting Superpriority Administrative Expense Status To Postpetition Intercompany Claims ("Cash Management Motion")**

38.    In the ordinary course of business, the Debtors maintain two primary bank accounts and 16 "subaccounts" through which RMR manages cash receipts, transfers and disbursements for the Debtors' entire corporate enterprise (the "Cash Management System"). A schedule identifying all of the Debtors' prepetition bank accounts (collectively, the "Prepetition Bank Accounts") is attached as Exhibit A to the Cash Management Motion.

39.    The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between such accounts by various methods, including checks, automatic clearing house ("ACH") and other electronic funds transfers, and direct deposits. The principal Prepetition Bank Accounts are maintained at Wells Fargo Bank ("Wells Fargo"), and the remainder at Bank of America, JPMorgan Chase Bank, Citibank and Union Bank of California, all of which are financially stable banking institutions where the deposits are protected by various government backed deposit protection insurance programs. The principal components of the Debtors' current consolidated cash management system are as follows:

(a)    Concentration Account. The Debtors' main concentration account is maintained at Wells Fargo, Account No. 4296911928 (the "Concentration Account"). All funds from the Debtors' Main Depository Account (defined below) are swept to the Concentration Account on a nightly basis. Funds are automatically transferred from the Concentration Account to other zero-balance accounts maintained by the Debtors as checks are presented on those accounts. Pursuant to a master repurchase agreement between RMR and Wells Fargo, excess funds, if any, in the Concentration Account automatically are invested each

night in money market securities held in the same account. The funds remain invested in such securities overnight, earning interest, and then are released back into to the Concentration Account as cash.

(b)  <u>Disbursement Account</u>. The Debtors make ACH transfers from the disbursement account maintained at Wells Fargo, Account No. 4121350516 (the "<u>Disbursement Account</u>"), to pay taxes, insurance premiums and other obligations. The Debtors also authorize ADP, a third party processing company, to fund direct deposit payments for Employee payroll from the Payroll Account (defined below) and related payroll taxes for all Employees from the Disbursement Account.

(c)  <u>Main Depository Account and Sub-Accounts</u>. Cash and credit car proceeds from purchases made by the Debtors' customers at the various restaurant locations are deposited into individual sub-accounts for each restaurant location. The deposits made into the individual restaurant sub-accounts are deposited into the Debtors' main depository account at Bank of America, Account No. 1459236007 (the "<u>Main Depository Account</u>") and then on to the Main Concentration Account at Wells Fargo on a nightly basis. Credit card proceeds from purchases made by the Debtors' customers are transferred to Debtors' Account No. 4121350482 at Wells Fargo and then swept into the Concentration Account on a nightly basis.

(d)  <u>Accounts Payable Accounts</u>. The Debtors' main account, from which they pay their general accounts payable obligations, is maintained at Wells Fargo, Account No. 9600081015 (the "<u>A/P Disbursement Account</u>"). The A/P Disbursement Account is a zero-balance account. Checks that are drawn on this account are paid by automatic transfers from the Concentration Account.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

(e) <u>Liquor Account</u>. The Debtors maintain a separate account at Wells Fargo, Account No. 4121350490 (the "<u>Liquor Account</u>"), from which certain restaurant managers can write checks to pay for liquor purchases in order to comply with "cash-on-delivery" requirements imposed in certain states. The Liquor Account is a zero-balance account. Checks that are drawn on this account are paid by automatic transfers from the Concentration Account.

(f) <u>The Debtors' Payroll Account</u>. The Debtors maintain a separate account at Wells Fargo, Account No. 4121237572 (the "<u>Payroll Account</u>") from which the Debtors pay their payroll obligations, except for payroll taxes, as noted in (b) above. The Payroll Account is in the name of El Torito Restaurants, Inc., which is the legal employer of all of the Debtors' employees. The Payroll Account is a zero-balance account. Checks that are drawn on, and direct deposits made from this account, are paid by automatic transfers from the Concentration Account.

40. The Cash Management System is similar in form to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. Large, complex, multiple-entity businesses tend to use such systems because of the numerous benefits they provide, including the ability to (i) accurately track, and thus control, all corporate funds through an ability to provide near-continuous status reports on the location and amount of all such funds; (ii) ensure cash availability; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. These controls are particularly important here, given the significant amount of cash that flows through the Debtors' integrated Cash Management System on a daily basis.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

41.     In addition, given the corporate and financial structure of the Debtors, it would be impractical, if not impossible, for the Debtors to establish an entirely new system of accounts and a new cash management system for each separate legal entity.  The delays that would result from opening new accounts and revising cash management procedures would disrupt the Debtors' business operations while pursuing these arrangements, at a time when vendors are closely scrutinizing the Debtors for deviations from "business as usual."  Preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' efforts to effectuate a speedy chapter 11 reorganization.

42.     In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms.  To minimize expenses to the estates, the Debtors believe they should be authorized to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession.  The Debtors also believe they should be authorized to use their existing check stock, provided, however, as soon as practicable the Debtors will imprint or stamp the legend "DIP" on such existing checks.  Upon depletion of the Debtors' check stock and/or business forms stock, the Debtors will obtain new check stock and/or business forms stock reflecting their status as debtors-in-possession.

Credit Card and Debit Card Processing

43.     Credit card and debit card receipts (collectively, the "Credit Card Receipts") from purchases made by the Debtor's customers at the various restaurant locations are deposited into individual sub-accounts for each restaurant location.  The Credit Card Receipts are

then deposited into the Debtors' Account No. 4121350482 at Wells Fargo and then swept into the Concentration Account on a nightly basis.

44.     Credit Card Receipts from VISA and MasterCard transactions are processed by Chase Paymentech usually within a day and transferred to the Debtors' accounts on each business day. Credit Card Receipts for Fridays, Saturdays and Sundays are processed and transferred on Mondays and can be as high as $4 million. Chase Paymentech's fees for these credit card processing services amount to approximately $700,000 per month and are deducted from the credit card receipts on a periodic basis.

45.     Credit Card Receipts from American Express transactions take two to three days to process and deposit. The fees charged by American Express are deducted from the Credit Card Receipts on a periodic basis and average approximately $130,000 per month.

46.     The Credit Card Receipts account for approximately 75% of the revenues generated by the Debtors' various restaurant locations. Thus, any disruption to the transfer of the Credit Card Receipts to the Debtors would have a disastrous effect on the Debtors' liquidity and uninterrupted operations of the Debtors' business.. It is essential, therefore, that the Debtors be permitted to continue to receive their Credit Card Receipts and pay any and all claims of their credit card processors, including prepetition claims, in the ordinary course.

47.     The Debtors also believe they should be granted further relief from the United States Trustee's guidelines to the extent that they require the Debtors to make all disbursements by check. Considering the nature of the Debtors' operations, and their historical practice of using electronic fund transfers for certain accounts payable, it is necessary for the Debtors to continue to conduct transactions by debit, wire or ACH payments and other similar methods, as discussed above. To deny the Debtors the opportunity to conduct transactions by

debit, wire or ACH payments or other similar methods would substantially interfere with the Debtors' performance of their obligations, negatively impacting liquidity, unnecessarily disrupting the Debtors' business operations and likely increasing the Debtors' costs.

48.     In the ordinary course of business, the Debtors automatically fund the Payroll Account from the Concentration Account for the cost of employee payroll, tax withholdings, and other employee benefits. The Debtors provide their employees with paychecks written by ADP and drawn on the Payroll Account. If the Debtors are not authorized to continue this practice it could result in a disruption of the Debtors' employee payroll, which could lead to a significant erosion of the Debtors' employees' morale. Accordingly, the Debtors believe they should be authorized to continue these practices in order to avoid interference with the Debtors' ability to pay its employees' and fund employee benefits.

49.     During the ordinary course of the business, the Debtors maintain business relationships with each other, and as a result, there are intercompany claims that reflect intercompany receivables and payments made in the ordinary course of the Debtors' businesses (the "Intercompany Claims"). The Debtors maintain records of all fund transfers and can ascertain, trace and account for the foregoing transactions (the "Intercompany Transactions"). If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would disrupt the Debtors' business operations, ultimately to the detriment of all parties in interest.

50.     The Debtors engage in certain usual and customary business practices in the ordinary course of their businesses relating to the use and payment of the Debtors' employees (the "Intercompany Arrangements"). The Debtors believe that continued performance under the Intercompany Arrangements is not only important to the successful restructuring of the Debtors'

entities, but is absolutely integral to ensure the Debtors' ability to operate their businesses as debtors-in-possession. Were the Debtors required to restructure their employment and payroll process at this critical time, aside from incurring unnecessary time delays and costs in appropriately modifying the system, the Debtors would be required to divert their attention and efforts from ensuring a smooth transition into the chapter 11 process. Moreover, the services provided under the Intercompany Arrangements are ordinary course type employee and payroll functions.

C.  **Debtors' Motion For Order: (I) Authorizing Debtors To (A) Pay Prepetition Wages, Salaries, And Other Compensation, Employee Medical And Similar Benefits, And Reimbursable Employee Expenses, (B) Continue Their Existing Employee Benefit Plans And Programs, And (C) Pay Prepetition Claims Of Third Party Payroll Processors; And (II) Authorizing And Requiring Banks And Other Financial Institutions To Pay All Checks And Electronic Payment Requests Relating To The Foregoing ("Employee Motion")**

The Debtors' Workforce; Wages, Salaries
and Bonuses; Vacation Pay and Other Paid Time Off

51.  The Debtors employ approximately 11,000 full-time and part-time employees. The majority of the Debtors' employees, approximately 10,500 in all, work at one of the Debtors'' restaurant locations. The remaining approximately 500 of the Debtors' employees work at: (1) the corporate headquarters located in Cypress, California (the "Corporate Employees") and the restaurant support center located in Union City, California (these locations provide administrative support, including purchasing, human resources, financing and accounting services); (2) the Buena Park, California, Real Mex Foods location which provides administrative support and warehousing to Real Mex Foods, Inc.; and (3) Vernon, California – Real Mex Foods, Inc.'s manufacturing facility. The Debtors are not parties to any collective bargaining agreements.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

52.    The Debtors pay their employees in arrears, on a bi-weekly basis, with direct deposits or checks issued on every other Friday. Payroll checks, in the aggregate approximate amount of $8 million, are scheduled for distribution beginning Friday, October 7, 2011, covering the payroll period September 19, 2011 through October 2, 2011. None of the paychecks issued in connection with the October 7 payroll exceed $11,725.

53.    The Debtors provide vacation time to salaried and hourly employees as a paid time-off benefit. Vacation time for the majority of the Debtors' employees accrues on an hourly basis. The maximum accrued vacation time at any one time for these employees is capped at 20 days for employees with up to four years seniority, and capped at 30 days for employees with five or more years seniority. In addition, there is a subset of the Debtors' hourly restaurant employees who accrue vacation time each year, which vacation time, if unused during the year, is paid out in cash to the employee on each anniversary of the employee's hiring date. Separately, employees of Debtor Real Mex Foods receive vacation pay of up to 6 weeks depending on date of hire.

54.    All managers and Corporate Employees receive 6 paid sick days per year that are forfeited if not used during that year. In addition, the restaurants located in the City of San Francisco provide the following benefit: for every 30 hours worked, an employee shall accrue one hour of paid sick leave. There is a cap of 72 hours of accrued paid sick leave. Debtors' Corporate employees and certain RMF employees are eligible for holiday pay for up to eight (8) or nine (9) company observed holidays and personal days off. Certain Real Mex Foods employees also receive up to 15 days paid time off, depending on date of hire.

55.    As of August 21, 2011, the Debtors' aggregate prepetition obligations to its employees for accrued vacation and paid-time off totaled approximately $3.7 million.

-23-

56. The Debtors offer their store managers performance based bonuses based on quarterly performance in specific target areas, not to exceed $25,000. Regional Directors and Regional Vice Presidents can receive bonuses up to 30% of their quarterly salary.

57. The Debtors reimburse employees for certain reasonable out-of-pocket business expenses incurred in the ordinary course of business such as necessary and authorized travel expenses, parking and automobile mileage, cell/smart phone reimbursements, and relocation expenses. The Debtors typically pay or reimburse their employees approximately $100,000 in such expenses each month. In addition, certain employees receive either a company leased vehicle or a car allowance.

Payroll Taxes and Processing Fees

58. The Debtors regularly deduct amounts from the employees' paychecks for local, state and federal taxes, employee benefits and employee programs that the Debtors have historically sponsored. As of the Petition Date, the Debtors held in trust approximately $1 million in such payroll deductions that were deducted prepetition.

59. The Debtors use ADP Services ("ADP") to process their bi-weekly payroll. ADP issues invoices to the Debtors for its services with each bi-weekly payroll that it processes. As of the Petition Date, the Debtors owe ADP approximately $50,000.

Employee Benefit Plans and Programs

60. The Debtors provide employees, in the ordinary course of business, with a number of employee benefits, including, but not limited to (a) medical insurance, (b) dental insurance, (c) life insurance, (c) retirement plans, (d) long-term disability, and (e) miscellaneous employee benefits ((a) through (e) collectively, the "Employee Benefit Programs"), as described in greater detail below.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

61. <u>Medical Plan</u>: Anthem Blue Cross and Kaiser provide medical insurance coverage to approximately 1275 of the Debtors' active employees. This coverage costs the Debtors approximately $393,000 per month in premiums. An executive medical plan for the Debtors' Directors and Vice Presidents costs the Debtors approximately $3,300 per employee.

62. <u>Dental Plan</u>: The Debtor provides a dental plan through United Concordia and Cigna, which provides dental insurance coverage to approximately 1,375 of the Debtors' active employees. This coverage costs the Debtor approximately $37,000 per month in premiums.

63. <u>Life Insurance & AD&D</u>: The Debtors provide group life insurance coverage at no cost to the employees for employees enrolled in their medical insurance plan. Approximately 1,275 employees receive such coverage, which costs the Debtor approximately $77,816 annually.

64. <u>Employee Savings Plans</u>: The Debtors maintain a 401(k) plan for the benefit of their employees. The Debtors do not provide any matching contributions under the 401(k) plan. The Debtors do no pay any annual plan administration fee, but the Debtors pay for an annual audit of the plan.

65. <u>Long-Term Disability</u>: The Debtors provide group long-term disability insurance through UNUM for employees that are Vice Presidents and above.

66. In addition to the employee benefits identified above, the Debtors offer their employees a number of voluntary benefits, including: (i) vision insurance, (ii) short-term disability, (iii) critical illness insurance, (iv) accident insurance, (v) Group LTD for Directors level and below, Whole Life Insurance and Group Voluntary Term Life, and (vi) Hyatt Legal membership. Aside from incidental administrative expenses and the costs identified above, the

#4834-8280-2442
DOCS_DE:173655.1 73521-001

Debtors do not incur any other costs with such benefit programs, and all premiums are paid in full by the participating employee. The Debtors also offer their employees certain incidental benefits. These include an Employee Assistance Plan, complimentary meal cards, employee meals during work shifts, uniform allowances, and meal discounts.

### Severance Policy for Restaurant and Restaurant Support Center Employees

67.    The Debtors have a general severance policy program for their restaurant, restaurant support center and corporate employees.

68.    Restaurant Employees Severance Policy

(a)    A severance policy (the "Hourly Employee Severance Policy") for hourly employees working at the Debtors' restaurant locations was implemented in 2009. The Hourly Employee Severance Policy provides for the payment of three days to four weeks pay at minimum wage depending on a particular employee's length of employment with the Debtors, in the event a restaurant closes and an employee is unable to transfer to another restaurant within 30 days. Severance checks totaling the entire amount owed under the Hourly Employee Policy are sent automatically to such employees who are not transferred to another restaurant within 30 days.

(b)    A severance policy for restaurant management (the "Managers Severance Policy") was implemented by the Debtors in 2001. The Managers Severance Policy provides for the following payments in the event a manager's employment is terminated: (i) eight weeks' pay for a restaurant's general manager, plus continued benefits for eight weeks; (ii) two-to-six weeks' pay for department and/or unit managers at the restaurants depending on a particular manager's length of employment with the Debtors, plus continued benefits for the same time

#4834-8280-2442
DOCS_DE:173655.1 73521-001

period as the severance payments' length. Severance payments under the Managers Severance Policy are made bi-weekly.

(c) The Debtors estimate that the average severance payout under the Hourly Employee Severance Policy and the Managers Severance Policy at a particular restaurant if such restaurant was closed and employees were unable to transfer to another location is approximately $10,000.

69. Severance Policy for Restaurant Support Center Employees and Corporate Personnel. A severance policy for the Debtors' restaurant support center employees and corporate personnel (the "RSC/Corporate Severance Policy") was implemented by the Debtors in 2001. The RSC/Corporate Severance Policy provides for the following payments in the event a support center or corporate employee's employment is terminated: (i) twelve weeks' pay for a regional chef; (ii) thirteen weeks' pay for a director level employee; (iii) sixteen weeks' pay for a vice president level employee; (iv) six months' pay for a senior vice president; and (v) two-to-six weeks' pay for hourly staff at the restaurant center depending on a particular employee's length of employment with the Debtors.

70. Although the RSC/Corporate Severance Policy historically applied to the Debtors' senior officers as well, the Debtors at this time are not seeking authority to and will not make any severance payments to any senior officers or any insider of the Debtors.

71. The Debtors believe that continuing the severance policy (including, but not limited to, honoring the prepetition obligations associated with the severance policy) will help alleviate some of the negative stigma and preserve the value of the Debtors' business during the contemplated restructuring and sale process. Specifically, the severance policy will help maintain employee morale and provide some financial comfort to employees who otherwise may

have left the Debtors immediately to seek what may be perceived as more stable employment. Clearly, if the Debtors' employees were to leave en masse, it would have a catastrophic impact on the Debtors' operations. Continuing the severance policy helps minimize this risk.

72.     In addition, as part of the Debtors' contemplated sale process, the Debtors may need to close additional restaurants unless they obtain certain concessions from the Debtors' landlords. The discussions regarding those potential concessions will take some time, and it is critical that the restaurants that are in question continue to operate uninterrupted until such discussions have been concluded and a decision with respect to each restaurant has been made.

73.     In light of the foregoing, the Debtors believe their general severance policy is reasonable, appropriately tailored, and in the best interests of the Debtors' estates.

**D.      Debtors' Motion For Order: (I) Authorizing Debtors To Remit And Pay Prepetition Sales, Use, And Franchise Taxes And Certain Other Government Fees And Charges; And (II) Authorizing Banks And Other Financial Institutions To Receive, Process, Honor, And Pay Checks Issued And Electronic Payment Requests Made Relating To The Foregoing**

74.     In the ordinary course of business, the Debtors (i) collect sales taxes from their restaurant customers and incur on their own behalf taxes, including, but not limited to, use taxes, franchise taxes, personal property taxes and other taxes necessary to operate their businesses (collectively, the "Taxes"), and (ii) pay on their own behalf certain fees for licenses, permits, and other similar assessments (the "Fees"), including business licenses, liquor licenses, and health permits. The Debtors are required to remit the Taxes and Fees to the appropriate governmental entities either on a weekly, monthly, quarterly or annual basis. The principal Taxes and Fees collected or incurred by the Debtors are:

(a)     Sales and Use Taxes.  The Debtors collect sales taxes and/or incur use taxes in approximately 16 different municipalities, counties and states.  The aggregate monthly payment made by the Debtors for these types of taxes is approximately $3.4 million.

(b)     Business Tax/Licenses.  The Debtors are required to pay certain taxes or fees to obtain business licenses in the various municipalities or counties in which they operate their restaurants.  The Debtors' average annual cost to maintain these licenses is approximately $200,000.

(c)     Franchise Taxes.  The Debtors incur certain franchise taxes in the various states in which they operate.  The Debtors average annual obligation for these franchise taxes is approximately $150,000.

(d)     Personal Property Taxes.  Certain counties in which the Debtors operate restaurants require the payment of personal property taxes for certain furniture and equipment owned and/or operated by the Debtors.  These personal property taxes are generally paid on annual or bi-annual basis.

(e)     Health Permits.  The Debtors are required to pay certain fees in order to obtain health and other related permits in various municipalities and counties in which they operate restaurants.  The Debtors' average annual cost to maintain these health permits is approximately $300,000.

(f)     Liquor Licenses.  In order to serve alcoholic beverages in their restaurants, the Debtors are required to obtain liquor licenses in various municipalities and counties in which they operate restaurants.  The Debtors' pay for these liquor licenses on an annual or quarterly basis.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

75.     Although the Debtors' records reflect that they are current on all of their Taxes and Fees that were due and payable as of the Petition Date, the Debtors estimate that the total amount of Taxes and Fees that relate to the prepetition period, including property taxes, but either have not yet been billed to the Debtors or are not yet due will not exceed approximately $9 million.

76.     In all cases, I believe that the Debtors' failure to pay the Taxes and Fees would have a material adverse impact on their ability to operate in the ordinary course of business. Any disputes that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole. If the Debtors do not pay such amounts in a timely manner, the governmental authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estates. In addition, I am informed and believe that some of these outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the applicable governmental authority. Therefore, such funds do not constitute property of the estate and could not otherwise be used by the estates. Finally, any prepetition amounts that are or will become due, but have not yet been paid to the relevant governmental authorities because of the bankruptcy filings, represent a very small fraction of the Debtors' total obligations.

**E.      Debtors' Motion For Order Authorizing: (I) Payment Of Prepetition Obligations Incurred In The Ordinary Course Of Business In Connection With Workers' Compensation, Liability, Property, And Other Insurance Programs, Including Payment Of Policy Premiums; And (II) Continuation Of Insurance Premium Financing Programs (the "Insurance Motion")**

77.     In connection with the operation of their businesses, the Debtors maintain insurance programs for workers' compensation, directors' and officers' liability, employment

practices liability, general liability, automobile, property, perils, umbrella and food-borne illness/trade-name restoration (collectively, the "Insurance Programs") through several different insurance carriers (the "Insurance Carriers") under insurance contracts listed on Exhibit A attached to the Insurance Motion. To the extent the Debtors are parties to insurance contracts that were not listed on Exhibit A, the Debtors will provide supplemental disclosure to creditors and the Court.[2]

### Workers' Compensation Program

78.     Under applicable law, the Debtors are required to maintain workers' compensation policies and programs to provide their employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors (the "Workers' Compensation Program"). The current Workers' Compensation Program is provided through affiliates of Zurich Financial Services Group ("Zurich") and insures losses arising through May 9, 2012. The Workers' Compensation Program includes a $500,000 per occurrence deductible and the deposit premium payable for such coverage is approximately $630,000 per year (the "Workers' Compensation Premium").

### Directors and Officers Insurance and Employment Practices Liability Insurance.

79.     As is common with large businesses of this kind, the Debtors maintain insurance coverage for all of their directors and officers that covers, among other things, defense costs, settlements, court awards and pre- and post-judgment interest arising from claims brought by third parties alleging an insured is liable for an error, misstatement, misleading statement, improper act, omission, neglect or breach of duty (the "D&O Programs"). The directors and

---

[2] In addition to the Insurance Programs listed on Exhibit A of the Insurance Motion, the Debtors maintain several other insurance policies and programs with respect to employee benefits, including health, dental, disability, and life insurance. These programs and policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employee wage policies and benefit programs.

officers liability policy also includes coverage for employment practices liability claims ("EPL"). The D&O and EPL policies provide $25 million in primary coverage, plus $15 million of excess D&O coverage and $5 million of excess EPL coverage. The aggregate annual premium is approximately $180,000.

80.    In addition, the Debtors recently purchased a "Side A" insurance policy for the Company's directors and officers, which provides $5,000,000 in coverage and has an annual premium of $95,000 (pro-rated to $87,500 for a shortened term).

81.    The Debtors also maintain $20 million of fiduciary liability insurance. The aggregate annual premium paid by the Debtors for fiduciary liability coverage is $3,500.

<u>Liability, Automobile, Property and Umbrella Insurance Programs</u>.

82.    The Debtors maintain general liability insurance that insures premises liability, operations liability, personal injury and products liability (the "Liability Insurance Programs"). The aggregate annual premium for the Liability Insurance Programs coverage is approximately $185,000.

83.    The Debtors maintain automobile insurance that insures automobile liability, medical payments, uninsured and underinsured motorists and physical damage to owned and hired vehicles (the "Automobile Insurance Programs"). The total aggregate annual premium paid by Debtors for automobile insurance coverage approximately $183,000.

84.    The Debtors maintain property insurance that insures the Debtors' property for perils such as, but not limited to, fire, earthquake, flood and theft (the "Property Insurance Program"). The aggregate annual premium for the Property Insurance Program coverage is approximately $910,000.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

85.     The Debtors maintain umbrella insurance that insures the Debtors for certain losses in excess of the coverage provided by the Debtors' primary policies (the "Umbrella Insurance Program"). The aggregate annual premium for the Umbrella Insurance Program coverage is approximately $160,000.

86.     The Debtors maintain "food-borne illness/trade-name restoration" insurance that insures the Debtors for damages to the Debtors' trade name resulting from the occurrence and public reaction to an accidental contamination, malicious tampering, or extortion attempt, and is intended to restore the Debtors' trade name following such an event (the "Food-Borne Illness Insurance Program"). The aggregate annual premium for the Food-Borne Illness Insurance Program is approximately $107,000.

### Insurance Premium Financing Programs

87.     As part of their existing cash management system, the Debtors regularly finance the payment of premiums on certain insurance policies (the "Financing Arrangements"), such as their D&O, Fiduciary, General Liability, Auto, Property and Foodborne Illness/Trade Name Restoration insurance programs, through the insurance premium finance companies Flatiron Capital, Zurich, and AFCO ("Premium Finance Companies"). The Debtors make monthly payments to the Premium Finance Companies in the aggregate amount of $215,000. The Debtors' obligations to Premium Finance Companies are secured by sums payable to the Debtors under the Insurance Program covered by the financing agreement.

**F.     Debtors' Motion For Order: (I) Authorizing Debtors To (A) Honor And Pay Prepetition Obligations To Its Customers, (B) Continue Customer Programs And Practices In The Ordinary Course Of Business, And (C) Pay The Prepetition Claims Of Its Customer Programs Processors, And (II) Authorizing Financial Institutions To Receive, Process, Honor And Pay All Checks And Electronic Payment Requests Made Relating To The Foregoing**

#4834-8280-2442
DOCS_DE:173655.1 73521-001

88.     The Debtors maintain several customer programs in the ordinary course of their business which are designed to enhance the satisfaction and encourage the continued patronage of the Debtors' customers.  The customer programs consist of the following (collectively, the "Customer Programs"):

(a)     Gift Cards.  The Debtors directly and indirectly sell gift cards to consumers which are eligible for redemption at the Debtors' restaurants.

(b)     Incentive Programs.  The Debtors sometimes provide customers with a card or coupon with a value of five to twenty-five dollars that can be redeemed at the Debtors' restaurants.  These cards are generally provided to customers as a "thank you" or in consideration for participating in various research studies, surveys or email programs, or to encourage return visits through a "Bounceback Coupon".

89.     Certain vendors manage these and certain other miscellaneous customer programs:  Paymentech, Tell Us About Us, Customer Connection and Blue Hornet (collectively, the "Program Providers").

90.     The Debtors estimate that, as of the Petition Date, the total amount of the Debtors' prepetition obligations to customers and vendors under the Customer Programs is approximately $2.2 million.

**G.     Debtors' Motion For Interim And Final Orders: (I) Prohibiting Utilities From Discontinuing, Altering Or Refusing Service; (II) Establishing Procedures For Determining Adequate Assurances Of Payment; And (III) Establishing Procedures For Utilities To Opt Out Of Proposed Adequate Assurance Procedures (the "Utilities Motion")**

91.     In the operation of their restaurants, the Debtors incur utility expenses for, among other things, water, sewer service, electricity, natural gas, steam, waste disposal, local and long-distance telephone service, cell phone service, cable television and internet service in the

ordinary course of business. On average, the Debtors spend approximately $1.7 million each month on utility costs. These utility services are provided by approximately 325 Utility Providers, including those listed on Exhibit A attached to the Utilities Motion. Uninterrupted utility services are essential to the ongoing operations of the Debtors' restaurants and, therefore, vital to the success of the Debtors' reorganization. Should any of the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. Without electricity, natural gas and water services, for example, the Debtors would not be able to operate various equipment in their restaurants' kitchens, nor provide lighting, air conditioning or heating services for their restaurant facilities. Similarly, the timely and proper disposal of the waste that accumulates at the Debtors' restaurants is critical to ensure compliance with applicable health codes and keep the restaurants open. It is therefore critical that utility services continue uninterrupted.

92.     The Debtors intend to use the proposed DIP Facility and cash collateral to fully pay all postpetition obligations owed to the Utility Providers in a timely manner and to provide the Utility Providers with adequate assurance as set forth in the Utilities Motion.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

**H.** **Debtors' Motion For Order Authorizing Payment Of Section 503(b)(9) Claims And Claims Incurred In Connection With Postpetition Delivery Of Goods And Services**

93.     As the operators of a multi-unit restaurant chain, the Debtors, in the ordinary course of their business, receive various goods, including restaurant specialty items and food products on a daily basis. Many of these goods are used by the Debtors in the preparation of the Debtors' various menu items that are served to the Debtors' customers later that same day. Thus, the uninterrupted supply of these goods is essential to the Debtors' business operations.

94.     The Debtors believe that certain of the vendors and suppliers who delivered goods to the Debtors during the twenty-day period prior to the Petition Date but have not received payment for such goods (the "503(b)(9) Claimants") likely will seek the allowance and payment of those claims (the "503(b)(9) Claims") through individual motions to this Court. As a result, the 503(b)(9) Claimants, the Debtors and other parties in interest will be forced to divert resources in these cases toward drafting, filing, prosecuting and defending such individual motions and related responses. The Debtors believe such motion practice is an unnecessary burden on the estates and seek authority to pay such claims in the ordinary course of business. The requested relief will have a positive effect on the ability of the Debtors to access favorable trade terms and ensure the uninterrupted supply of goods to the restaurants. The Debtors estimate that the amount owing to 503(b)(9) Claimants for goods delivered in the twenty days prior to the Petition Date is approximately $5 million.

95.     As of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "Purchase Orders") with certain suppliers (collectively, the "Suppliers") for critical goods and services. The delivery of such goods and services by the Suppliers is essential to the continued operation of the Debtors' businesses. However, as a result of the

commencement of these chapter 11 cases, Suppliers may perceive a risk that they will be treated as prepetition general unsecured creditors for the cost of any shipments made or services provided pursuant to the Purchase Orders, and may refuse to deliver such goods to the Debtors or provide such services to the Debtors unless the Debtors issue substitute postpetition purchase orders or provide other assurances of payment. The revised postpetition purchase orders may, however, include trade terms less favorable than the terms in existing Purchase Orders. Alternatively, some Suppliers may refuse to do business with the Debtors after the Petition Date due to the failure to honor the existing Purchase Orders, thereby forcing the Debtors to find alternate suppliers with less favorable trade terms.

96.     Requiring the Debtors to issue substitute purchase orders on a postpetition basis also would be administratively burdensome, time-consuming, and counterproductive to the Debtors' reorganization, and would inevitably lead to delays in the Debtors' receipt of goods and services, ultimately resulting in the disruption of the Debtors' businesses.

97.     The Debtors estimate that the Suppliers will be owed approximately $3 million for goods and services delivered after the Petition Date pursuant to the Purchase Orders.

**I.      Debtors' Motion For Order: (I) Establishing Procedures For Resolution Of Reclamation Claims; And (II) Prohibiting Sellers Of Goods From Reclaiming Or Otherwise Interfering With Debtors' Possession Of Goods**

98.      In the ordinary course of their businesses, the Debtors purchase on credit from several vendors and suppliers (the "Sellers") various food products, including meat, poultry, seafood, produce and other staple food items (collectively, the "Goods"). The Debtors receive these Goods on a daily basis and, in many instances, use the Goods in the preparation of the Debtors' various menu items to be served to the Debtors' customers later during that same day. Accordingly, any disruption in the Debtors' receipt and use of the Goods could have disastrous consequences on the Debtors' business operations.

99.      As of the Petition Date, the Debtors were in possession of certain Goods that had been delivered to them, but for which they had not yet been invoiced or made payment to the Suppliers. Accordingly, as a result of the commencement of these Chapter 11 Cases, the Debtors may receive claims for reclamation of the goods under applicable state law (the "Reclamation Claims") from various Sellers with respect to the Goods. I believe that piecemeal litigation of Reclamation Claims would interfere with the Debtors' efforts to preserve enterprise value. I believe the proposed procedures to address reclamation claims set forth in the Reclamation Motion will effectively and efficiently streamline the process of resolving Reclamation Claims to the benefit of both the Debtors and Sellers.

**J.      Debtors' Motion For Order Setting Procedures For Treatment Of Claims Arising Under The Packers And Stockyards Act Of 1921 And The Perishable Agricultural Commodities Act Of 1930 ("PACA Motion")**

100.      As the operators of a multi-unit restaurant chain, the Debtors purchase a variety of consumable goods essential for the operations of their restaurants. In many instances, the consumable goods that are received daily by the Debtors are used in the preparation of the

various menu items to be served later during that same day. These consumable goods include among other things, beef, poultry, dairy products, produce and general merchandise purchased from a diverse range of vendors, including agricultural growers. The Debtors' purchase of certain of these consumable goods likely is subject to the requirements of PACA. As a result, the Debtors anticipate that a significant number of their vendors may file notices to preserve and assert claims under PACA (the "PACA Claims").

101.    I believe that the Debtors should be authorized to pay PACA claims in the ordinary course of business, including prepetition claims, because (i) payment of such claims at this time will not prejudice or affect the amounts available for distribution to the Debtors' other creditors, and (ii) instead will ensure that the flow of Perishable Commodities, which are vital to the Debtors' operations, continues unhindered. As of the Petition Date, the Debtors believe that its PACA Claimants have prepetition claims in the amount of approximately $500,000. The Debtors propose to make payments on account of the PACA Claims pursuant to the procedures described in the PACA Motion.

### K.    Debtors' Motion For Order Authorizing Debtors To Pay Prepetition Claims Of Alcoholic Beverage Vendors

102.    The Debtors serve a wide range of alcoholic beverages at their restaurants, and such sales are critical to the Debtors' business. The Debtors depend upon beverage distributors (the "Beverage Vendors") for their supply of alcoholic drinks. Many, if not all, of the Beverage Vendors are the exclusive purveyors of an alcoholic beverage in a particular sales area. If a single Beverage Vendor refuses to deliver its product to the Debtors' restaurants within its sales area, the Debtors' restaurants in that sales area will experience a drop in revenues and the Debtors' reputation as a full service restaurant chain would be impaired.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

103.    The Debtors believe that certain of the Beverage Vendors will curtail delivery of product after the Petition Date and/or put the Debtors on C.O.D. payment terms if their prepetition invoices are not paid current, notwithstanding that some or all of those invoices may be entitled to section 503(b)(9) administrative expense priority.  In addition, I understand that state liquor laws may limit the Debtors' flexibility in reaching compromises with their Beverage Vendors.  For example, in California, where the majority of the Debtors' restaurants are located, state law forbids beverage distributors from delivering alcoholic beverages to a retailer on trade credit, if such retailer has an outstanding invoice more than 30 days past-due. The Debtors believe that they may be subject to similar state regulation in the other states in which they operate.

104.    As of the Petition Date, approximately 160 Beverage Vendors were owed, in the aggregate, approximately $300,000 in excess of amounts payable as administrative expenses under section 503(b)(9) (the "Beverage Claims").

**L.     Debtors' Motion For Order: (I) Authorizing Debtors To Obtain Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), And 364(D)(1), And Use Cash Collateral Pursuant To 11 U.S.C. § 363; (II) Granting Adequate Protection To Pre-Petition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363, And 364; And (III) Scheduling Interim And Final Hearings Pursuant To Bankruptcy Rules 4001(B) And (C) ("DIP Motion")**

105.    The Debtors intend to finance ongoing operations of their business during these Chapter 11 Cases through a postpetition secured credit facility (the "DIP Facility") in the amount of up to $49 million, which will be provided by General Electric Capital Corporation, the First Lien Agent and one of the First Lien Lenders, but which ultimately may be syndicated among several banks and financial institutions.

#4834-8280-2442
DOCS_DE:173655.1 73521-001

106. I believe that the proposed DIP Facility and use of Cash Collateral are critical to the Debtors' successful reorganization efforts. The Debtors currently have approximately $1.0 million of cash on hand with no additional borrowing capacity under the First Lien Credit Facility. The proposed DIP Facility and the use of Cash Collateral will provide liquidity for working capital and other general corporate purposes of the Debtors subject to a monthly budget, thereby permitting the Debtors to preserve ordinary course business operations. In addition, the proposed DIP Facility and use of Cash Collateral will permit the Debtors to pay the administrative costs of these chapter 11 cases. In turn, I believe the contemplated bankruptcy and sale process, as discussed in the Bilbao Declaration and the Jerbich Declaration, ultimately will allow the Debtors to realize significant cost savings based on, among other things, a significantly deleveraged capital structure and the various rent reductions and eliminations of costs in connection with the Debtors' leases. I believe these that these cost savings ultimately will maximize the Debtors' overall going concern value for the benefit of all stakeholders.

107. In contrast, without the DIP Facility, the Debtors will lack sufficient funding to operate, much less remain in chapter 11 to achieve any costs savings or to run a robust sale process and/or confirm a chapter 11 plan, and the value of the Debtors' business almost assuredly would suffer immediate and catastrophic deterioration.

108. I believe that the Debtors' financial advisor and investment banker, Imperial Capital, adequately marketed the proposed DIP financing, as set forth more fully in the Bilbao Declaration. In connection with those marketing efforts, the Debtors entered into non-disclosure agreements with a number of potential DIP lenders in the hopes of soliciting meaningful DIP proposals. I also believe that, given the Debtors' capital structure, and as borne out by Imperial Capital's marketing efforts, the only viable DIP financing would be through a

#4834-8280-2442
DOCS_DE:173655.1 73521-001

priming DIP facility. Thus, based on my consultations with the Debtors' advisors, I believe that the proposed DIP Facility was the best available postpetition financing option for the Debtors at this time.

109. In addition, during the weeks leading up to the Petition Date, the Debtors worked closely with the DIP Agent and certain creditors holding a majority in amount of the Debtors' Second Lien Notes to negotiate appropriate adequate protection of the Second Lien Secured Parties' interests in connection with the proposed DIP Facility's priming feature and the Debtors' use of Cash Collateral. Ultimately, the parties agreed that the Second Lien Secured Parties would receive the adequate protection replacement liens and superpriority claims as well as payment of the Second Lien Majority Holders' professional fees and expenses (subject to a cap). Furthermore, the Debtors suggested and the Second Lien Secured Parties agreed to, certain case milestones that would help ensure that these chapter 11 cases and the sale process would be run as efficiently and as cost effectively as possible, yet at the same time provide the Debtors with sufficient time to fully market and maximize the value of the Debtors' assets, for the benefit of all stakeholders.

**M.** **Debtors' Motion for Order (A) Approving Bid Procedures, (B) Approving Cure Procedures, (C) Establishing Date for Auction and Approving Related Procedures, (D) Scheduling Sale Hearing and Related Deadlines, (E) Approving Form and Manner of Notices, and (F) Granting Related Relief**

110. As discussed above, based on a combination of general economic factors, the Debtors' overly leveraged capital structure, and certain long-term costs that saddle the their businesses, the Debtors do not have sufficient cash resources or committed long-term financing to operate their businesses and service their existing debt obligations for an extended period.

111. While the Debtors spent the last few months actively discussing their financial condition with their principal prepetition lenders in an attempt to formulate a

comprehensive debt restructuring plan, those discussions ultimately were not successful. In addition, the Debtors faced the very real possibility that they would be in default under their prepetition credit facilities by the end of October 2011 as a result of various covenant breaches and cross-defaults, with minimal likelihood of any of their prepetition lenders agreeing to an extended forbearance agreement.

112.    Based on the foregoing, the Debtors, after consultation with their advisors and additional discussions with their prepetition lenders, ultimately determined that the best course of action to preserve operations and maximize value would be to commence chapter 11 cases and a marketing process for the sale of substantially all of the Debtors' assets pursuant to Bankruptcy Code section 363.

113.    I believe that a prompt sale process will permit the Debtors to utilize the bankruptcy to achieve significant cost reductions—both through (i) the rejection of leases related to and termination of operations at unprofitable stores and (ii) the negotiation of concessions with respect to leases related to go-forward stores and other key vendor contracts—which ultimately will serve to increase the Debtors' overall going concern value. Additional discussion regarding the Debtors' efforts to realize these costs savings and increase in value can be found in the Bilbao Declaration and the Jerbich Declaration.

114.    As part of the sale process, the Debtors have recommended, and the Debtors' prepetition secured lenders have agreed on certain case milestones that attempt to achieve three goals that are important to the Debtors: (i) maximize the value of the assets, (ii) preserve ongoing operations, and (iii) ensure that the cases proceed as efficiently and cost-effectively as possible. Specifically, the milestones envision that:

#4834-8280-2442
DOCS_DE:173655.1 73521-001

(a)     the Debtors would have bid procedures for the sale of their assets approved within 30 days of the Petition Date;

(b)     following the approval of the Bid Procedures, the Debtors would commence a 60-day marketing of their assets and require bids for the purchase of the Assets be submitted by a date that is approximately 90 days after the Petition Date;

(c)     if two or more qualified bids are submitted, the Debtors would conduct an auction by a date that is approximately 95 days after the Petition Date;

(d)     the Court would hold a hearing to approve the sale of the Debtors' assets approximately 100 days after the Petition Date; and

(e)     the contemplated sale would close approximately 130 days after the Petition Date.

115.     The Debtors and I, after consultation with the Debtors' advisors, believe that the foregoing timeline will provide the Debtors with sufficient time to fully market and maximize the value of the Assets. At the same time, the Debtors and I believe that a prompt sale process helps preserve value by minimizing the costs associated with a prolonged bankruptcy case.

116.     While the Debtors do not currently have a "stalking horse" purchaser for their Assets, they are in active discussions with certain creditors holding a majority in amount of the Second Lien Notes regarding a potential stalking horse transaction by the Second Lien Secured Parties. To the extent the Debtors identify and select a stalking horse purchaser, the Debtors will notify the Court and other parties in interest of such selection prior to any hearing set on the Bid Procedures Motion, and concurrent therewith provide an executed copy of the

#4834-8280-2442
DOCS_DE:173655.1 73521-001

purchase agreement executed with the stalking horse purchaser and describe any bid protections afforded to the stalking horse purchaser.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

#4834-8280-2442
DOCS_DE:173655.1 73521-001

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of October 2011, at Cypress, California.

Richard P. Dutkiewicz,
Executive Vice President and Chief Financial
Officer of the Debtors and Debtors-in-
Possession

# EXHIBIT 1

## RM RESTAURANT HOLDING CORP. ORGANIZATION CHART

