# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REAL MEX RESTAURANTS, INC., *et al.*, | ) | Case No. 11-13122 ( ) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors.[1] | ) | |
| | ) | |

## DECLARATION OF MICHAEL JERBICH IN
## SUPPORT OF DEBTORS' FIRST DAY MOTIONS

I, Michael Jerbich, declare as follows:

1. I am a senior managing director of DJM Realty Services, LLC ("DJM"), which maintains its principal offices at 445 Broad Hollow Road, Suite 225, Melville, NY 11747. I am authorized to execute this declaration (the "Declaration") on behalf of DJM. Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

2. I make this Declaration in support of the above-captioned debtors' (the "Debtors") various "first day" motions filed in these cases, including the *Debtors' Motion for Order: (i) Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364(d), and Use Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' federal tax identification numbers, are: Real Mex Restaurants, Inc. (2902); RM Restaurant Holding Corp. (2217); Acapulco Mark Corp. (3570); Acapulco Restaurant of Downey, Inc. (2910); Acapulco Restaurant of Moreno Valley, Inc. (4606); Acapulco Restaurant of Ventura, Inc. (3626); Acapulco Restaurant of Westwood, Inc. (1162); Acapulco Restaurants, Inc. (4897); ALA Design, Inc. (8584); Chevys Restaurants, LLC (2992); CKR Acquisition Corp. (8287); El Paso Cantina, Inc. (0112); El Torito Franchising Company (2754); El Torito Restaurants, Inc. (7059); Murray Pacific (1596); Real Mex Foods, Inc. (8585); and Tarv Incorporated (8081). The Debtors' headquarters and mailing address is: 5660 Katella Avenue, Cypress, CA 90630.

#4850-1908-8138
DOCS_DE:173657.1 73521-001

*364; and (III) Scheduling Interim and Final Hearings Pursuant to Bankruptcy Rules 4001(b) and (c),* as well as the Debtors' motion for approval of bidding procedures in connection with the Debtors' contemplated sale of substantially all of their assets.

3. To the extent that any information stated herein requires amendment or modification as additional information becomes available to DJM, I intend to submit, or cause to be submitted, a supplemental Declaration to the Court reflecting the same.

4. I have more than 12 years of experience in real estate consulting and have extensive experience working with financially troubled companies on real estate matters in complex financial restructurings, both in and out of court. I currently serve as a Senior Managing Director and the head of the Chicago office of DJM, where I specialize in restructuring, bankruptcy, and facilitating M&A activity on behalf of retailers, including interfacing and negotiating all aspects of leases (including rent and term) with real estate lessors. I have worked with numerous companies on acquisitions, and out-of-court and in-court restructuring projects, including, but not limited to, Loehmann's, Miss Sixty, Gottschalk's, Blockbuster, Borders, Shopko, Whitehall Jewelers, Linens n' Things.

5. Prior to joining DJM, I was the President and founder of RDA Advisors, LLC, a real estate consulting firm based out of Chicago, where I represented several retailers in the acquisition of leasehold interests both in and outside of bankruptcy. Prior to forming RDA, I was a Vice President at Hilco Real Estate, LLC, where I was involved in various real estate projects, including Factory 2 U, Norstan Apparel dba Fashion Cents, and Amazing Savings, Anna's Linens, Archibald/Fannie May Candies, Bonus Stores, Camelia Foods, Clothestime, Crescent Jewelers, Dollar Tree, Florsheim Shoes, One Price Clothing, Peebles, Pharmor,

Rainbow, Scotty's, Skin Nuvo, Stage Stores, Stambaugh's Hardware, Strouds, Walking Company, Weathervane, and Wolf Camera.

6. I received my Bachelor's Degree from De Paul University. I am an active member of the International Council of Shopping Centers, the American Bankruptcy Institute and the Turnaround Management Association.

7. Based on my experience, I have developed an understanding of the general range of lease concessions (including rent reductions) that a debtor in possession can expect to achieve through a reorganization process, particularly through bankruptcy, in various economic climates. In particular, I believe that real estate lessors are much more willing to accommodate lease modifications and rent concessions in a depressed economic climate—both in the general economy and more specifically in the real estate industry—as currently exists today.

8. In August 2011, prior to the Petition Date, DJM (through its affiliate DJM Asset Management, LLC) was retained to act as the Debtors' real estate consultant in connection with the analysis and renegotiation of the Debtors' more than 175 real estate leases. I have been the DJM representative principally responsible for advising the Debtors since that time.

9. As part of DJM's services to the Debtors, I have reviewed and become intimately familiar with the key terms (including rent and duration) of each of the Debtors' real estate leases. I have determined that the Debtors' approximate annual base rent obligations for their restaurants are approximately $40,000,000. In addition, based on my discussions with the Debtors and a review of their business plan and historical financial performance, I am familiar with the general profitability of each of the Debtors' restaurant locations and therefore have an understanding of which locations the Debtors consider "good", "bad" or "marginal." Based on my past experience and the lease and market data to which DJM has access, I also am familiar

with the market rental rates in the various locales in which the Debtors currently do business, including the market rates for buildings with similar size, age and condition as the Debtors' restaurants.

11. Shortly after DJM's prepetition engagement by the Debtors, I commenced initial discussions with the Debtors' various landlords, pursuant to which the landlords were informed of the Debtors' desire to renegotiate the terms of their various real estate leases. These communications were in the form of an initial, general conference call to which all of the Debtors' landlords were invited, as well as subsequent individual communications that I have had with various landlords. To date, I or other DJM personnel have spoken with landlords of more than 150 of Debtors' leases, and have commenced substantive negotiations regarding lease concession with a substantial portion thereof.

11. Based on these initial conversations, as well my review of the Debtors' financial projections and my consultations with the Debtors' management, I identified three principal categories for the Debtors' leases: (i) approximately 12 leases that should be rejected immediately because no amount of lease concessions would render those stores profitable enough to warrant continued operations; (ii) as many as approximately 40 leases that, but for significant lease concessions, most likely would be rejected sometime during the bankruptcy case given their very low profitability; and (iii) the remaining leases that most likely would be assumed through the bankruptcy process in connection with certain lease concessions.

12. After further consultations between management and me, the Debtors ultimately closed 12 of their restaurant locations prior to the Petition Date and surrendered possession of those premises to the respective landlords.

13. My general conclusion based on various conversations I've had with the Debtors' remaining landlords has been that many of them are prepared to provide significant lease concessions and/or modifications to the Debtors as part of the bankruptcy process. In addition, although some landlords were not willing to discuss lease modifications with the Debtors prepetition, based on my past experience, I believe that the commencement of these bankruptcy cases will persuade many of the reluctant landlords to engage in the negotiating process given the potential threat of rejection of their leases.

14. On some leases, I anticipate that the Debtors will receive immediate rent relief based on short-term documentation pending assumption of the modified lease, while in other cases, I expect that the Debtors' will realize rent relief in connection with ultimate assumption of the modified lease.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 4th day of October, 2011 at Chicago, Illinois.

_/s/ Michael Jerbich_

Michael Jerbich