# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REAL MEX RESTAURANTS, INC., *et al.*, | ) | Case No. 11-13122 ( ) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors.[1] | ) | |
| | ) | |

## DECLARATION OF MARC A. BILBAO IN SUPPORT OF DEBTORS' MOTION FOR ORDER: (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(l), 364(c)(2), 364(c)(3), AND 364(d), AND USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (III) SCHEDULING INTERIM AND FINAL HEARINGS PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)

I, Marc A. Bilbao, declare as follows:

1. I am a managing director of Imperial Capital, LLC ("Imperial") which maintains its principal offices at 2000 Avenue of the Stars, 9th Floor South, Los Angeles, California 90067. I am authorized to execute this declaration (the "Declaration") on behalf of Imperial. Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.

2. Imperial was retained in this case to act as the Debtors' financial advisor and investment banker in June 2011. As part of my duties, I have led the Imperial team

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' federal tax identification numbers, are: Real Mex Restaurants, Inc. (2902); RM Restaurant Holding Corp. (2217); Acapulco Mark Corp. (3570); Acapulco Restaurant of Downey, Inc. (2910); Acapulco Restaurant of Moreno Valley, Inc. (4606); Acapulco Restaurant of Ventura, Inc. (3626); Acapulco Restaurant of Westwood, Inc. (1162); Acapulco Restaurants, Inc. (4897); ALA Design, Inc. (8584); Chevys Restaurants, LLC (2992); CKR Acquisition Corp. (8287); El Paso Cantina, Inc. (0112); El Torito Franchising Company (2754); El Torito Restaurants, Inc. (7059); Murray Pacific (1596); Real Mex Foods, Inc. (8585); and Tarv Incorporated (8081). The Debtors' headquarters and mailing address is: 5660 Katella Avenue, Cypress, CA 90630.

#4819-2664-0650
DOCS_DE:173658.1 73521-001

principally responsible for advising the Debtors since that time. By virtue of this engagement, I have become and remain intimately familiar with the Debtors' financial statements and records, business affairs, operations and capital structure. To the extent that any information stated herein requires amendment or modification as additional information becomes available to Imperial, I intend to submit, or cause to be submitted, a supplemental Declaration to the Court reflecting the same

3. I make this Declaration in support of the *Debtors' Motion for Order: (i) Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364(d), and Use Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (III) Scheduling Interim and Final Hearings Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "DIP Motion"), as well as the Debtors' motion for approval of bidding procedures in connection with the Debtors' contemplated sale of substantially all of their assets. Any capitalized term used but not defined herein shall have the meaning ascribed to it in the DIP Motion.

4. I have approximately 20 years of experience in corporate restructuring, corporate finance and transactional matters. I have extensive experience working with financially troubled companies in complex financial restructurings, both in and out of court. I have been involved as advisor to troubled companies with respect to financial restructuring, raising of capital, mergers and acquisitions and other advisory assignments. I joined Imperial in 2006 and currently serve as Co-Head of the Restructuring Group and a Managing Director in the Los Angeles office. Prior to joining Imperial, I was a Managing Director in the Los Angeles office of Giuliani Capital Advisors and was a member of Giuliani Capital's Board of Managers. Prior to joining Giuliani Capital, I served as a Managing Director of E&Y Capital Advisors, a

subsidiary of Ernst and Young, and as a member of its Board of Managers. I received a B.S. in Business Administration from Seattle University and am a Chartered Financial Analyst. I am currently a member of the New York and Los Angeles Societies of Security Analysts, the Turnaround Management Association, and the American Bankruptcy Institute, and am a frequent speaker and panelist on turnaround issues.

5. Imperial has worked closely with the Debtors' management to assist the Company in the preparation of financial projections, a business plan and in the performance of numerous other financial analyses. Furthermore, the Imperial team has worked closely with the Debtors' management to develop and prepare the Budget to the Motion. In addition, I have assisted the Debtors in the securing and negotiation of the proposed DIP Facility with the proposed DIP Lenders.

6. The Debtors have determined, with the assistance of Imperial, and after substantial investigation and analysis, that the proposed DIP Facility and use of Cash Collateral is essential to provide the Debtors with the necessary working capital to operate the Debtors' businesses uninterrupted during, and to fund the costs of administering, these chapter 11 cases, including the costs of running a successful Section 363 sale process. For the reasons discussed below, I believe that the DIP Facility will also allow the Debtors to use the chapter 11 process to realize significant cost-savings that ultimately will increase the overall going-concern value of the Debtors' business, which value would inure to the benefit of all of the Debtors' stakeholders. Without the DIP Facility, however, the Debtors would be unable to fund their operations, leading to an immediate and drastic reduction in value, and their chapter 11 reorganization efforts would fail even before they are able to get started.

7.  After reviewing the Debtors' current liquidity constraints and overly leveraged capital structure, and having discussed them with the Debtors' prepetition secured and unsecured lenders, and having been unable to reach consensus on a comprehensive consensual restructuring with those lenders, it appears that the Debtors' best option at this time to maximize the value of their assets is through a Section 363 sale. I understand this to be consistent with the conclusions of the Debtors' senior management and board of directors. To that end, Imperial is prepared to commence, in conjunction with the Debtors' management, an aggressive campaign to market the Debtors' assets for sale pursuant to Bankruptcy Code section 363. The proposed DIP Facility is essential to implementing this sale process.

A. **Marketing of DIP Financing and Selection of Proposed DIP Facility**

8.  The Debtors negotiated the terms of the DIP Facility in good faith and at arms' length. In fact, before the Debtors agreed to enter into the DIP Facility, I, on behalf of the Debtors, solicited DIP financing proposals from 16 potential lenders, including four of the current, principal secured and unsecured lenders in the Debtors' capital structure (collectively, the "Potential Lenders").

9.  Imperial's marketing effort resulted in formal and informal DIP loan proposals from four Potential Lenders. With one exception, each of the Potential Lenders was emphatic that given the nature of the Debtors' assets and the amount of debt secured by such assets, that they would provide postpetition financing only if they were given a priming lien ahead of the Prepetition Secured Parties. The sole exception to the otherwise universal priming requirement was a proposal that the Debtors received from certain creditors holding a majority in amount of the Second Lien Notes (the "Alternative DIP Lenders"), which proposal provided that it would prime the Second Lien Notes but not the First Lien Credit Facility. Although the

#4819-2664-0650
DOCS_DE:173658.1 73521-001

4

Debtors engaged in extensive negotiations with the Alternative DIP Lenders (which also submitted a term sheet for a stalking horse bidder in a Section 363 sale of the Debtors' assets), the parties were unable to agree on terms for a DIP loan.

10. I also was one of the primary persons that negotiated the terms of the proposed DIP Facility with General Electric Capital Corporation, the proposed DIP Agent. The terms of the DIP Facility were negotiated in good faith and at arm's length. I believe that its terms are fair and reasonable under the circumstances, and are favorable in light of the Debtors' working capital needs and goals to effectuate an orderly sale process in the time required to maximize the value of the Debtors assets for all constituents. The combination of key terms of the DIP Facility, including interest rate, fees, availability, financial covenants and other terms and conditions are competitive in the marketplace for debtor in possession financing of this type for companies in similar situations. Further, the economic terms of the DIP Facility are within the range of the economic indications I received from the various Potential Lenders during my discussions with them.

11. In addition, I understand that, after additional negotiations with the Debtors, and the inclusion of certain protections and case milestones in the proposed DIP Order, the majority of holders of the Debtors' Second Lien Notes have consented to the proposed DIP Facility, including the priming of the Second Lien Secured Parties' prepetition liens and security interests, and the use of Cash Collateral.

12. Based on the foregoing process, I concur with the Debtors' business judgment that the proposed DIP Facility was the best offer they received for DIP financing.

B. **Adequate Protection of Prepetition Secured Parties' Interests**

13. The proposed Interim Order provides that the Prepetition Secured Parties will receive certain adequate protection, including, with respect to the Second Lien Secured Parties, (a) superpriority claims under section 364(c)(1) of the Bankruptcy Code junior to the superpriority claims of the DIP Lenders and the Carve Out and (b) replacement liens junior to those of the DIP Lenders and the prepetition First Lien Credit Facility, on substantially all of the Debtors' assets (excluding avoidance action recoveries). Although the proposed DIP Facility could result in up to $11.5 million (to the extent the Debtors fully draw on the DIP Facility) in new, secured money placed ahead of the Second Lien Notes in the capital structure, I understand that the Second Lien Secured Parties have consented (or will consent) to the proposed DIP Facility based on the various adequate protection liens, superpriority claims and adequate protection payments provided to the Second Lien Secured Parties pursuant to the proposed Interim Order.

### C. The Debtors' Cost Savings Program

14. As discussed in the DIP Motion, the DIP Facility, together with the use of Cash Collateral, will provide the Debtors with the necessary working capital to fund these bankruptcy cases. Based on their business plan, I believe the chapter 11 process will permit the Debtors to shed significant long-term costs that would otherwise continue to burden the Debtors absent bankruptcy. In turn, the Debtors expect that the cost-savings from the bankruptcy process will increase their overall going concern value—ultimately to be realized through the contemplated sale process—in an amount that would substantially exceed the new money that is priming the Second Lien Secured Parties.

15. Based on my discussions with the Debtors' proposed real estate consultant, DJM Realty Services, LLC ("DJM"), I understand that, prior to the Petition Date, the

Debtors have already negotiated rent concessions from certain of their landlords. In addition, I understand that the Debtors, with the aid of DJM, will continue negotiating with landlords following the commencement of these cases and that, through that process, the Debtors can expect to receive additional, material rent concessions in connection with restaurant locations that ultimately would remain open following the consummation of a Section 363 sale and/or a chapter 11 plan for the Debtors.

16. Based on my review of the Debtors' business plan, their past performance and the costs of operating their various restaurants, I believe that, through the rejection of leases related to and the closing of the Debtors' most underperforming restaurants, the Debtors will shed significant net losses associated with those restaurants. As discussed in the concurrently filed declaration of Michael Jerbich of DJM (the "Jerbich Declaration"), the Debtors already have closed 12 restaurants prepetition. Furthermore, the Debtors anticipate that additional leases relating to unprofitable restaurant locations will be rejected during the bankruptcy case, thereby eliminating operating losses associated with those restaurants. I also expect the Debtors to realize substantial additional savings from the renegotiation of various supply and service contracts with the Debtors' various trade vendors.

17. The foregoing cost savings will have a significant positive result on the Debtors' EBITDA, which will only serve to increase the overall going concern value of the Debtors' enterprise. Accordingly, I believe that the proposed DIP Facility is critical to ensure that the Debtors have the appropriate opportunity to implement their cost savings plan, and consummate a Section 363 sale and/or a chapter 11 plan for the Debtors. Absent the DIP Facility (a) the Debtors will lack sufficient funding to operate, much less remain in chapter 11 to achieve

costs savings and run a robust sale process, and, as a result, the value of the Debtors' business would suffer immediate and catastrophic deterioration.

18. For all of the foregoing reasons, I believe that the proposed DIP Facility is critical to the survival of the Debtors' business and to maximizing value for the benefit of all stakeholders.

*[The remainder of this page intentionally left blank.]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 4th day of October, 2011 at Los Angeles, California.

/s/ Marc A. Bilbao

Marc A. Bilbao