IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REAL MEX RESTAURANTS, INC., *et al.*, | ) | Case No. 11-13122 ( ) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ORDER: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(l), 364(c)(2), 364(c)(3), AND 364(d), AND USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364; AND (III) SCHEDULING INTERIM AND FINAL HEARINGS PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

1.      The above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company") hereby move for entry of interim and final orders, pursuant to sections 105(a), 361, 362, 363; and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtors to enter into a debtor in possession financing facility, use cash collateral, provide adequate protection to prepetition secured lenders and schedule interim and final hearings with respect to the relief requested herein, all as more fully described herein (the "Motion"). In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Rick Dutkiewicz in Support of First Day Motions,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' federal tax identification numbers, are: Real Mex Restaurants, Inc. (2902); RM Restaurant Holding Corp. (2217); Acapulco Mark Corp. (3570); Acapulco Restaurant of Downey, Inc. (2910); Acapulco Restaurant of Moreno Valley, Inc. (4606); Acapulco Restaurant of Ventura, Inc. (3626); Acapulco Restaurant of Westwood, Inc. (1162); Acapulco Restaurants, Inc. (4897); ALA Design, Inc. (8584); Chevys Restaurants, LLC (2992); CKR Acquisition Corp. (8287); El Paso Cantina, Inc. (0112); El Torito Franchising Company (2754); El Torito Restaurants, Inc. (7059); Murray Pacific (1596); Real Mex Foods, Inc. (8585); and TARV, Inc. (8081). The Debtors' headquarters and mailing address is: 5660 Katella Avenue, Suite 100, Cypress, CA 90630.

the supporting declaration of Marc Bilbao (the "Bilbao Declaration") and the supporting declaration of Michael Jerbich (the "Jerbich Declaration"), which were filed with the Court concurrently herewith.

## PRELIMINARY STATEMENT

2.     The Debtors intend to finance ongoing operations of their business during their chapter 11 restructuring and contemplated section 363 sale process (discussed below) through a postpetition secured credit facility (the "DIP Facility") in the amount of up to $49 million, which will be provided pursuant to the DIP Credit Agreement (as defined in the Interim Order) under a $20 million LC Facility and a $29 million Revolver Facility (each as defined in the Interim Order).

3.     The reasons supporting the Debtors' request for authority to obtain postpetition financing under the DIP Facility and to use Cash Collateral[2] are compelling. The Debtors currently have approximately $1.0 million of cash on hand with no additional borrowing capacity under the Prepetition First Lien Credit Agreement (as defined in the Interim Order). The proposed DIP Facility will provide liquidity for working capital and other general corporate purposes of the Debtors subject to a monthly budget, thereby permitting the Debtors to continue business operations in the ordinary course.

4.     As set forth in greater detail in the Dutkiewicz Declaration, in an attempt to develop a comprehensive debt restructuring plan, the Debtors have spent the last few months discussing with their principal creditors and equityholders the fact that the Debtors' capital structure requires significant deleveraging, and that such deleveraging, plus significant cost savings from renegotiating lease terms and closing some stores, is best accomplished in a chapter

---

[2]     Unless indicated otherwise, capitalized terms used but not immediately defined herein have the meanings ascribed to such terms later in this Motion and the Interim Order (as defined below).

11 bankruptcy case. As those discussions developed, it also became more clear that the deleveraging, and the preservation of the going concern value of the Debtors' businesses, may best be accomplished by the marketing of and sale of the Debtors' assets under the aegis of chapter 11. It is the Debtors' intention to use the chapter 11 process to do just that, and to consummate the overall restructuring through a sale pursuant to section 363 of the Bankruptcy Code. Thus, the proposed DIP Facility provides the Debtors with the necessary funds to pay the administrative costs associated with these chapter 11 cases and pursue a sale process that ultimately will maximize the value of the Debtors' assets for the benefit of all stakeholders.

5.     The Debtors also hereby seek authority to use Cash Collateral, and it is a condition to the DIP Lenders' obligation to lend that the Debtors receive authority to use Cash Collateral.

6.     The proposed DIP Facility will prime the Second Lien Notes (defined below). As established in the Bilbao Declaration, the Debtors were unable to obtain debtor-in-possession financing on better terms than that provided under the DIP Facility; and the proposed lenders under the DIP Facility, who are also the lenders under the Debtors' Prepetition First Lien Credit Agreement (as defined in the Interim Order), would not provide the DIP Facility unless they remained in a first lien priority position. As a result, the proposed DIP Facility primes both the Prepetition First Lien Credit Facility (which would be rolled-up into the DIP Facility) and the Second Lien Notes.

7.     After extensive prepetition discussions between the parties, the Debtors, the DIP Lenders and the Second Lien Secured Parties ultimately were able to reach a compromise on the DIP Facility's priming features and the Debtors' consensual use of Cash Collateral. Among other things, the Interim Order provides that the Second Lien Parties will be

entitled to certain adequate protection of their interests in the form of replacement liens and payment of fees and costs. In addition, to ensure that these cases proceed as efficiently as possible, the Debtors suggested various case milestones (discussed below) to be included in the interim DIP order regarding the contemplated sale process, and the Second Lien Secured Parties have agreed to these milestones.

        8.     By this Motion, the Debtors hereby seek entry of two (2) orders necessary to satisfy the conditions to borrowing under that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement, dated as of October 5, 2011 (the "DIP Credit Agreement")[3]:

- **Interim Order** On the date hereof or as soon as reasonably practical thereafter, the Debtors seek entry of an order entitled: Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying Automatic Stay, and (VI) Scheduling a Final Hearing (the "Interim Order"), a proposed form of which is annexed hereto as Exhibit A, (i) scheduling an interim hearing (the "Interim Hearing"), (ii) granting the Debtors the authority to (A) use Cash Collateral, and (B) borrow up to an aggregate of $20 million under the LC Facility (defined below) and $5 million under the Revolver Facility (defined below), on an interim basis, and (iii) scheduling a final hearing (the "Final Hearing") to consider the entry of the Final Order (as defined below);

- **Final Order**[4] Following the Final Hearing, the Debtors shall seek entry of an order granting final approval of the borrowings and letters of credit under the DIP Credit Agreement, the use of Cash Collateral and the payment of certain Obligations (as defined below) owed under the DIP Credit Agreement (the "Final Order").

---

[3]    A copy of the DIP Credit Agreement is attached as Exhibit B to the Interim Order.

[4]    A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing.

## JURISDICTION

9.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of these cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001 and 6004.

## BACKGROUND

A.     General Background

10.     The Debtors own and operate restaurants primarily under the trade names El Torito Restaurant, Chevys Fresh Mex, and Acapulco Mexican Restaurant y Cantina.  As of June 26, 2011, the Debtors (a) operated 178 restaurants, of which 149 are located in California and the remainder in 11 other states, and (b) franchised or licensed 30 restaurants in ten states and two foreign countries.  Debtor Real Mex Foods, Inc. ("RMF") provides production, purchasing and distribution services for the restaurant operations, and manufactures products for sale to outside customers.  Additional information regarding the business operations of the Debtors can be found in the Dutkiewicz Declaration.

11.     Debtor RMR is a wholly owned subsidiary of Debtor RM Restaurant Holding Corp. ("Holdco").  A chart showing the ownership structure of the Debtors is included in the Dutkiewicz Declaration.

B.     Principal debt Obligations

(a)     First Lien Credit Facility

12.     On January 29, 2007, the Company entered into the Second Amended and Restated Revolving Credit Agreement (the "First Lien Credit Facility"), dated as of January 29, 2007, by and among RMR, Acapulco Restaurants, Inc., El Torito Franchising Company, El Torito Restaurants, Inc., Tarv, Inc., Acapulco Restaurant of Ventura, Inc., Acapulco Restaurant

of Westwood, Inc., Acapulco Mark Corp., Murray Pacific, ALA Design, Inc., Real Mex Foods, Inc., Acapulco Restaurant of Downey, Inc., Acapulco Restaurant of Moreno Valley, Inc., El Paso Cantina, Inc., CKR Acquisition Corp. and Chevys Restaurants, LLC, as borrowers, General Electric Capital Corporation as agent (the "First Lien Agent") and the other lending institutions listed on Schedule 1 thereto as lenders (the "First Lien Lenders"; together with the First Lien Agent, the "First Lien Secured Parties"). The obligations of the Company under the First Lien Credit Facility are secured by first priority liens on and security interests in substantially all of the Debtors' assets (the "First Lien Collateral"), excluding certain of the Debtors' leasehold interests. As of the Petition Date, the Debtors were in default of certain financial covenants under the First Lien Credit Facility. The outstanding balance due under the First Lien Credit Facility as of the Petition Date is approximately $37.6 million, which is comprised of $17.5 million in cash borrowings, $19.9 million in issued and outstanding Letters of Credit and $0.2 million in accrued and unpaid interest. All loans, obligations, letters of credit, other liabilities and other extensions of creditor and other financial accommodations in respect of the First Lien Credit Facility are referred to herein as the "First Lien Secured Obligations."

    (b)    Second Lien Notes

    13.    Pursuant to an Indenture, dated as of July 7, 2009 (the "Second Lien Indenture"), by and among RMR, the guarantors party thereto, and Wells Fargo Bank, National Association, as trustee (the "Second Lien Trustee"), the Company sold $130,000,000 aggregate principal amount of 14.0% Senior Secured Notes due January 1, 2013 (the "Second Lien Notes"), repayment of which is guaranteed by Holdco and all of the Company's existing and future domestic restricted subsidiaries. The obligations of the Company under the Second Lien Notes are secured by second priority liens on and security interests in substantially all of the Debtors' assets, but excluding the Debtors' various leasehold interests (the "Second Lien

Collateral"). The holders of the Second Lien Notes are hereinafter referred to as the "Second Lien Noteholders", and together with the Second Lien Agent, the "Second Lien Secured Parties". The First Lien Credit Facility and Second Lien Indenture are hereinafter referred to collectively as the "Prepetition Secured Credit Facilities."

14.     The Second Lien Notes were offered and sold in a private placement to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933 (the "Securities Act"), and to a limited number of institutional accredited investors in the United States and outside the United States in reliance on Regulation S under the Securities Act. The net proceeds from the issuance of the Second Lien Notes were used to refinance a portion of existing indebtedness, including repayment of $105 million of existing senior secured notes due 2010. Effective June 28, 2010, the Company entered into a Supplemental Indenture, which amended the Indenture to permit affiliates of Sun Capital to acquire a majority of the stock of Holdco without requiring the Company to make a change of control offer to repurchase the Second Lien Notes that would otherwise have been required under the Indenture. The outstanding balance due under the Second Lien Notes as of the Petition Date is approximately $134.3 million, which is comprised of $130 million in principal and $4.3 million in accrued but unpaid interest.

15.     The loan, security, pledge and related documents attendant to the First Lien Credit Facility and the Second Lien Indenture are hereinafter referred to as the "Prepetition Secured Credit Documents." The First Lien Agent and Second Lien Trustee are hereinafter referred to collectively as the "Prepetition Secured Agents." The First Lien Lenders and Second Lien Noteholders are hereinafter referred to collectively as the "Prepetition Secured Lenders."

(c)     RMR Unsecured Loan

16.     Pursuant to the Second Amended and Restated Credit Agreement, dated as of July 7, 2009, by and among RMR, Holdco, the lenders party thereto, and Credit Suisse, Cayman Islands Branch, as administrative agent, sole bookrunner and lead arranger (the "RMR Unsecured Loan Agent"), the Company is indebted to the lenders thereunder in the principal amount of $25 million (the "Opco Unsecured Loan").  The outstanding balance due under the Opco Unsecured Loan as of the Petition Date is approximately $36.0 million, which is comprised of $34.6 million in principal and $1.4 million in accrued but unpaid interest.

(d)     Holdco Unsecured Loan

17.     Pursuant to a Credit Agreement, dated as of July 7, 2009, by and among Holdco, the lenders party thereto, and Credit Suisse, Cayman Islands Branch (as successor to Wilmington Trust FSB) as administrative agent (the "Holdco Unsecured Loan Agent"), Holdco is indebted to the lenders thereunder in the principal amount of $25 million (the "Holdco Unsecured Loan"). The outstanding balance due under the Holdco Unsecured Loan as of the Petition Date is approximately $38.8 million, which is comprised of $37.0 million in principal and $1.8 million in accrued but unpaid interest.

(e)     Other Debt

18.     The Debtors owe approximately $400,000 in long-term debt relating to capital leases for equipment used in the Debtors' restaurants and corporate headquarters.  In addition, as of the Petition Date, the Debtors owe approximately $34 million in trade, vendor and general unsecured debt (excluding payroll, the RMR Unsecured Loan and the Opco Unsecured Loan, accrued interest and liabilities related to self-insurance).

(f)     Intercreditor Agreements

19.     The rights of the foregoing lenders are governed by certain intercreditor and subordination agreements, specifically:

(i)     First Lien Credit Facility / Second Lien Notes intercreditor:  the Intercreditor Agreement, dated as of July 7, 2009, by and among General Electric Capital Corporation and Wells Fargo Bank, National Association, the First Lien Agent and the Second Lien Trustee, respectively.

(ii)     First Lien Credit Facility / RMR Unsecured Loan intercreditor: the Subordination and Intercreditor Agreement, dated as of January 29, 2007, by and among, General Electric Capital Corporation, as First Lien Agent, Credit Suisse, Cayman Islands Branch (as RMR Unsecured Loan Agent), Cocina Funding Corp LLC, KKR Financial CLO 2005-2, Ltd. Canpartners Investments IV LLC, RMR, Holdco and the other parties listed as obligors thereunder;

(iii)     First Lien Credit Facility / Opco Unsecured Loan intercreditor: the Subordination and Intercreditor Agreement, dated as of July 7, 2009, by and among General Electric Capital Corporation, as First Lien Agent, Credit Suisse, Cayman Islands Branch (as successor to Wilmington Trust FSB) as Holdco Unsecured Loan Agent, Cocina Funding Corp LLC, KKR Financial CLO 2005-2, Ltd., RMR, Holdco and the other parties listed as obligors thereunder; and

(iv)     Second Lien Notes / RMR Unsecured Loan intercreditor: the Subordination and Intercreditor Agreement, dated as of July 7, 2009, by and among Wells Fargo Bank, National Association, as Second Lien Trustee, Credit Suisse, Cayman Islands Branch, as Opco Unsecured Loan Agent, Cocina Funding Corp L.L.C., KKR Financial CLO 2005-2, Ltd., RMR, Holdco and the other parties listed as obligors thereunder.

(g)     July Amendments, Consents and Waivers

20.     As discussed in greater detail in the Dutkiewicz declaration, in late July 2011, the Debtors entered into various amendments, waivers and consent agreements with its

various principal prepetition creditors in respect of each their prepetition credit facilities. The purpose of these transactions was to address certain then-existing defaults and pending cross-defaults and to provide all parties with additional time to discuss and perhaps implement a consensual comprehensive restructuring plan. In connection with those short-term transactions, the Debtors obtained additional borrowing availability under their First Lien Credit Facility to make their July 2011 interest payment on the Second Lien Notes.

21.     In addition, in connection with a supplemental indenture with respect to the Second Lien Notes, the Debtors agreed to deliver a comprehensive restructuring proposal to the Second Lien Secured Parties by the middle of September. While the Debtors ultimately delivered a term sheet to the Second Lien Secured Parties and complied with this deadline, The Debtors' restructuring proposal did not gain the necessary traction with the Second Lien Secured Parties. Facing another round of potential defaults and cross-defaults, following additional discussions with the Debtors' advisors and each of their prepetition lenders, the Debtors determined that the best way to maximize the value of the Debtors' assets would be to commence these chapter 11 cases and pursue a sale pursuant to Bankruptcy Code section 363.

## TERMS AND CONDITIONS OF THE
## POSTPETITION FINANCING ARRANGEMENTS

A.     DIP Credit Agreement and Interim Order

22.     The significant elements of the DIP Credit Agreement and the Interim Order and the related documents to be executed in connection therewith and to which the DIP Credit Agreement refers (collectively, the "DIP Facility Documentation") are as follows:[5]

- **Borrowers**:  each of the Debtors (excluding Holdco).

---

[5]     This summary is qualified in its entirety by reference to the provisions of the DIP Credit Documents, as defined in the text. The DIP Credit Documents will control in the event of any inconsistency between this motion and the DIP Credit Documents. Unless otherwise defined herein, capitalized terms used in this section shall have the meanings ascribed to such terms in the DIP Credit Documents.

- **Guarantor**: Holdco (together with the Borrowers, the "Obligors").

- **Administrative DIP Agent**: General Electric Capital Corporation ("GE Capital") or an affiliate thereof ("DIP Agent").

- **Lenders**: GE Capital and certain other banks and financial institutions that may participate in the syndication of the DIP Facility.

- **Commitment**: A senior secured priming and superpriority postpetition financing of $49,000,000, which if approved on a final basis, would consist of (i) a letter of credit facility for up to $20,000,000 (the "LC Facility") and (ii) a revolving credit facility for up to $29,000,000 (the "Revolver Facility," and together with the LC Facility, the "DIP Facility"), provided however that following entry of the Interim Order but prior to entry of the Final Order advances under the Revolving Credit Facility shall be limited to $5,000,000 and utilization under the LC Facility shall be limited to $20,000,000.

- **Term**: The earliest to occur of (a) March 31, 2012, (b) the effective date of a plan or reorganization in the Chapter 11 Cases, (c) the Termination Declaration Date (as defined in the DIP Credit Agreement), (d) the date of the consummation of the sale of all or substantially all of the assets and Equity Interests of the Debtors pursuant to section 363 of the Bankruptcy Code, and (e) the date all Obligations (as defined in the DIP Credit Agreement) are indefeasibly paid in full in cash and the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement) are terminated. *See* DIP Credit Agreement, pg. 20, definition of "Maturity Date".

- **Interest Rate**: The outstanding loans and other obligations under the Revolver Facility shall bear interest at a fluctuating rate equal to the "Base Rate" plus 6.00% per annum. All undrawn letters of credit under the LC Facility shall be subject to a letter of credit fee at a rate equal to 4.50% per annum. Such fees will be paid on the first day of each calendar month to the DIP Agent for prompt distribution in accordance with the terms of the DIP Facility Documentation (as defined below). "Base Rate" will be a floating rate defined as the highest of (a) the "Prime Rate" as quoted in the Wall Street Journal, (b) the Federal Funds Rate plus 0.5%, and (c) the sum of three-month LIBOR (to be no less than 2.0% per annum) plus 1.50%.

- **Purpose/Use of Proceeds**: The DIP Facility shall be used solely for (a) working capital (excluding capital expenditures) to the extent set forth in, and in accordance with, the Budget (as defined in the Interim Order),[6] (b) capital expenditures to the extent set forth in, and in accordance with, the Budget and permitted by the financial covenants, (c) for payment of (i) costs of administration of the Cases to the extent set forth in, and in accordance with, the Budget, (ii) the fees and expenses described under the heading "Expenses" below, (iii) the Debtors' Professional Fees (as defined below), and (iv) such pre-petition obligations as the DIP Agent consent to and the Bankruptcy Court approves, in each case in a manner consistent with the terms and conditions contained herein, and to the extent set forth in the Budget, and (d) the DIP Roll-Up.

---

[6] A true and correct copy of the Budget is attached as Exhibit A to the Interim Order.

- **Covenants**: The DIP Credit Agreement contains certain affirmative and negative covenants customary in debtor-in-possession financing facilities. *See* DIP Credit Agreement, Sections 9.1-10.18. In addition, the Interim Order sets forth certain milestones in connection with the Debtors' contemplated sale process:

    o  on the Petition Date, file the Bid Procedures Motion and proposed form of Bid Procedures Order;

    o  hearing on the Bid Procedures Motion on or prior to November 3, 2011 (with the form asset purchase agreement to be filed not less than five days prior to such hearing);

    o  entry of the Bid Procedures Order on or prior to November 8, 2011;

    o  on or prior to 4:00 p.m. (Pacific Time) on January 4, 2012, all qualified bids (which bids, among other things, shall not contain any financing or diligence conditions) shall be due (which bid deadline shall not be extended without the consent of each of the DIP Agent, the Prepetition First Lien Secured Agent, and the Majority Prepetition Second Lien Secured Noteholders, except as otherwise provided below) (the "Qualified Bid Deadline");

    o  the auction shall, if necessary, be conducted on or prior to January 9, 2012 at 10:00 a.m. (Pacific Time);

    o  hearing to approve the sale to the winning bidder on or prior to January 13, 2012 at 2:00 p.m. (Eastern Time);

    o  on or prior to February 13, 2012, such sale shall have been consummated.

    Notwithstanding the foregoing, provided that no Termination Event has occurred and is continuing, the Debtors shall have the right to extend, for not more than two weeks, the Qualified Bid Deadline if the Debtors determine in their reasonable business judgment that doing so could reasonably be expected to result in a higher purchase price; provided, that if the Qualified Bid Deadline is so extended, each subsequent deadline set forth above shall also be increased by the same number of days as the extension of the Qualified Bid Deadline. *See* Interim Order, ¶ 2(f)(v).

- **Debtor Stipulations**: The Interim Order contains stipulations by the Debtors regarding, among other things, the Prepetition First Lien Secured Credit Facility (as defined in the Interim Order), the validity, perfection, and priority of the Prepetition First Liens (as defined in the Interim Order), the Prepetition First Lien Collateral (as defined in the Interim Order), amounts owed under the Prepetition First Lien Loan Documents (as defined in the Interim Order), Prepetition Second Lien Secured Notes (as defined in the Interim Order), the validity, priority, and perfection of the Prepetition Second Liens (as defined in the Interim Order), the Prepetition Second Lien Collateral (as defined in the Interim Order), and amounts owed under the Prepetition Second Lien Loan Documents (as defined in the Interim Order). *See* Interim Order, ¶ D-E(iv).

- **Budget**: The DIP Facility is subject to the Debtors' compliance with the Budget (as defined in the Interim Order) and certain covenants entered into by the Debtors in connection with the Budget, including that the sum of all operating disbursements of the Debtors for each month-long "Test Period" starting on October 21, 2011 shall not exceed

110% of the sum of the "Total Operating Disbursements" budgeted for such period in the Approved Budget. *See* Interim Order, ¶ 2(d)-(e); DIP Credit Agreement, section 11.1.

- **Termination Events/Events of Default**: The Interim Order contains a variety of Termination Events (as defined in the Interim Order) that constitute termination events under the Interim Order. *See* Interim Order, ¶ 2(f). The DIP Credit Agreement contains a variety of Events of Default (as defined in the DIP Credit Agreement), including, but not limited to, failure to comply with the Debtors' covenants in the DIP Credit Agreement, including the sale milestones. *See* DIP Credit Agreement, Section 14.1.

- **Fees, Costs and Expenses**: In connection with entry into the DIP Credit Agreement, the Debtors will incur certain fees, costs, and expenses. *See* Interim Order, ¶ 2(g); DIP Credit Agreement, section 2.2. In addition, the Debtors and the DIP Agent, the DIP Lenders, and various side-parties have agreed to the payment of certain fees in connection with the DIP Facility as set forth in separate fee letters executed by the parties (the "Fee Letters"), with up-front fees that in the aggregate total $1,230,000 and a monthly Administrative Agent Fee. The Debtors have agreed to keep the specific terms of the Fee Letters confidential because it contains closely-guarded proprietary and commercial information that is highly sensitive to the DIP Agent, the DIP Lenders and the Debtors. The Debtors concurrently have filed a motion for an order authorizing the filing of the DIP Letter under seal so that the Court, the Office of the United States Trustee and any counsel or financial advisor to any statutory committee of unsecured creditors appointed in these cases, on a "professionals' eyes only" basis, may review and consider the proposed fees.

- **Roll-Up**: The Interim Order and the DIP Credit Agreement contain a "roll up" feature that converts Pre-Petition Revolving Credit Loans and Pre-Petition Letters of Credit (each as defined in the DIP Credit Agreement) into Revolving Credit Loans (as defined in the DIP Credit Agreement) Letters of Credit under the DIP Credit Agreement, respectively, under the DIP Credit Agreement. *See* DIP Credit Agreement, section 2.1(c).

- **DIP Liens**: As security for the DIP Obligations, the DIP Agent (as defined in the Interim Order, for its own benefit and the ratable benefit of the DIP Secured Parties (as defined in the Interim Order), is granted security interests and liens on substantially all of the Debtors' assets (excluding only Avoidance Actions (as defined in the Interim Order) other than Postpetition Transaction Avoidance Actions (as defined in the Interim Order)) with (i) first priority over all unencumbered assets of the Debtors (excluding the Avoidance Actions), (ii) junior priority on all assets encumbered by the Prepetition Prior Liens (as defined in the Interim Order), and (iii) first priority priming liens on all DIP Collateral (as defined in the Interim Order) that is senior to the Adequate Protection Replacement Liens (as defined in the Interim Order) and senior and priming to (x) the Prepetition Liens (as defined in the Interim Order) and (y) any Liens that are junior to the Prepetition Liens and the Adequate Protection Replacement Liens, after giving effect to any Intercreditor or subordination agreements, and provided that the liens described in (iii) shall be junior solely to the Carve-Out (as defined in the Interim Order) and the Prepetition Prior Liens (as defined in the Interim Order). *See* Interim Order, ¶ 2(j); DIP Credit Agreement, sections 7.2-7.3.

- **Superpriority Administrative Claim Status**: The DIP Obligations shall constitute allowed superpriority administrative expense claims, subject only to the payment of the Carve-Out, over all administrative expense claims, adequate protection and other diminution claims, unsecured claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever. *See* Interim Order, ¶ 2(m).

- **Challenge Period**: The Debtors' Stipulations (as defined in the Interim Order) will bind all other party in interest, including the Committee (as defined in the Interim Order), unless such Committee or any other party in interest other than the Debtors (1) commences, by the earlier of (x) with respect to any Committee, 60 calendar days from the formation of any Committee, and (y) solely if no Committee is formed, with respect to other parties in interest 75 calendar days following the date of entry of the Interim Order, a challenge to the Debtors' Stipulations or any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Secured Obligations, or the actions or inactions of any of the Prepetition Secured Parties arising out of or related to the Prepetition Secured Obligations or otherwise, and (2) obtains a final, non-appealable order in favor of such party in interest sustaining any such challenge. *See* Interim Order, ¶ 7.

- **Carve-Out**: "Carve-Out" shall mean: (i) the amount of actual unpaid expenditures and disbursements for fees, costs, and disbursements of the Debtors' retained professionals (the "Debtors' Professional Fees") incurred before the delivery of a Carve-Out Trigger Notice that are ultimately allowed, (ii) all unpaid Committee's Professional Fees and reasonable unpaid expenses of Committee members incurred before the delivery of a Carve-Out Trigger Notice that are ultimately allowed, but solely to the extent the same are incurred in accordance with the Budget and remain unpaid after application of any retainers being held by such professional in the aggregate amount not to exceed $750,000, (iii) all allowed and unpaid Debtors' Professional Fees (including Debtors' ordinary course professionals) that are incurred from and after the delivery of a Carve-Out Trigger Notice in an aggregate amount not in excess of $1,000,000, (iv) all allowed and unpaid Committee's Professional Fees that are incurred from and after the delivery of a Carve-Out Trigger Notice in an aggregate amount not in excess of $200,000, and (v) the payment of fees pursuant to 28 U.S.C. § 1930(a). The Carve-Out shall also include, to the extent approved by the Court, (y) amounts due and owing on account of the management incentive program, and (z) any success fee due and owing to the Debtors' financial advisor, Imperial Capital, LLC ("Imperial"), set forth in its engagement letter, dated June 13, 2011, with the Debtors, and (z) provided that the DIP Agent, the Prepetition First Lien Secured Agent, and the Majority Prepetition Second Lien Secured Noteholders shall have the right to object to any motion seeking to approve any such success fee, any management incentive program as well as the Debtors' application to employ Imperial. *See* Interim Order, ¶ 8.

- **Waiver of Section 506(c) Claims**: Subject to entry of the Final Order, the costs of administration of the Chapter 11 Cases may not be recovered from or against any of the Prepetition Secured Parties, the Prepetition Collateral, and the Cash Collateral (each as defined in the Interim Order). *See* Interim Order, ¶ 9.

- **Rights and Remedies**: The Interim Order and the DIP Credit Agreement set forth certain rights and remedies that may be exercised upon the occurrence and during the continuance of any Termination Event or Event of Default, respectively. *See* Interim Order, ¶ 15; DIP Credit Agreement, Section 14.3. These rights and remedies include, but are not limited to, the ability of the DIP Agent to accelerate and declare a termination under the DIP Credit Agreement and foreclose against the DIP Agent's collateral without seeking relief from the automatic stay.

- **Restrictions on Use of Proceeds**: No loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral, Prepetition Collateral (each as defined in the Interim Order), or any portion of the Carve-Out may be used by (a) any Committee or trustee or any other person to investigate or prosecute any litigation in connection with the value of the Prepetition Collateral or DIP Collateral; and (b) any of the Debtors, any Committee, and any trustee or any other person to (i) request authorization to obtain postpetition loans or other financial accommodations, other than from the DIP Secured Parties; (ii) investigate or assert any action for any claim against any or all of the DIP Secured Parties and the Prepetition Secured Parties with respect to any transaction or occurrence or omission including, without limitation, (A) any Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations and/or the Prepetition Secured Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Liens, or the Adequate Protection Replacement Liens; (C) any action seeking to invalidate the DIP Liens, the other DIP Protections, the Prepetition Liens, the Adequate Protection Replacement Liens, or the other Prepetition First Lien Secured Parties' Adequate Protection or Prepetition Second Lien Secured Parties' Adequate Protection; (D) except to contest the occurrence or continuance of any Termination Event as permitted in the Interim Order, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Secured Parties' assertion, enforcement, or realization on the Cash Collateral or the DIP Collateral; and/or (E) any action seeking to modify any of the rights granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties hereunder or under the DIP Loan Documents or the Prepetition Secured Loan Documents; provided, however, up to $50,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition Collateral, any Cash Collateral or proceeds of the DIP Facility may be used by the Committee to investigate (but not prosecute) the extent, validity, and priority of the Prepetition Secured Obligations, the Prepetition Liens, or any other claims against the Prepetition Secured Parties so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Agent; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral without the consent of the DIP Secured Parties or the Prepetition Secured Parties. *See* Interim Order, ¶ 16.

- **Indemnification**: The Debtors will indemnify the DIP Agent and the DIP Lenders, and their respective shareholders, directors, agents, advisors, officers, subsidiaries and affiliates (each, an "Indemnified Person") and hold them harmless from and against all damages, losses, liabilities, obligations and claims resulting from the DIP Facility, the

transactions contemplated thereby or an litigation related to the foregoing except to the extent resulting from the gross negligence or willful misconduct of such Indemnified Person as more fully set forth in the DIP Credit Agreement. *See* DIP Credit Agreement, Section 18.2.

B.      Use of Cash Collateral

23.     During the ordinary course of operations, the Debtors generate cash from the use of the collateral pledged under the First Lien Credit Facility and the Second Lien Notes ("Cash Collateral"). The Debtors use Cash Collateral in the normal course of their business in order to continue to finance their operations, make essential payments, such as employee payroll, taxes, and purchase of goods. As of the Petition Date, the Debtors have a cash balance of less than $1 million. It is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion as failure to do so could prevent the DIP Lenders from funding the DIP Facility. Thus, in order to obtain the much-needed funds under the DIP Credit Agreement, the Debtors require Court authority to use Cash Collateral.

## ADEQUATE PROTECTION

24.     The Debtors, the DIP Lenders and the Second Lien Secured Parties have agreed that the Prepetition Secured Agents and Prepetition Secured Lenders (collectively, the "Prepetition Secured Parties") should receive the following as adequate protection of their interests in the Prepetition Collateral of the Prepetition Secured Parties' respective Prepetition Collateral (collectively, the "Adequate Protection Obligations"):[7]

| First Lien Secured Parties<br><br>*See* Interim Order, ¶ 4(i)-(vii) | To the extent, and during the period, the First Lien Secured Obligations are not rolled up into the DIP Facility pursuant to the DIP Roll-Up:<br><br>Adequate Protection Liens. Solely to the extent of any diminution in value of their prepetition liens and security interests, a valid, perfected replacement security interest |
|---|---|

---

[7]     The following description takes into account the terms of the Intercreditor Agreement, which governs the rights and priorities of the Prepetition Secured Parties with respect to such adequate protection.

#4836-6925-2362
DOCS_DE:173669.1 73521-001

and liens upon all of the DIP Collateral (as defined in the Interim Order), except Avoidance Actions (as defined in the Interim Order) other than Postpetition Transfer Avoidance Actions (as defined in the Interim Order), which shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens (as defined in the Interim Order), and the Carve-Out.

Superpriority Claim. Solely to the extent of any diminution in value of their prepetition liens and security interests, pursuant to section 507(b) of the Bankruptcy Code allowed superpriority administrative claims with priority over all administrative expense claims and unsecured claims now existing or hereafter arising of any kind or nature, junior only to the DIP Superpriority Claims (as defined in the Interim Order) and the Carve-Out.

Further Adequate Protection. (A) the Debtors commitment to adhere to the Sale Process Deadlines (as defined in the Interim Order) and (B) the Debtors shall simultaneously provide copies of any reports sent to the DIP Agent or the Prepetition Second Lien Secured Parties as may be required under the Interim Order or the DIP Credit Agreement to the Prepetition First Lien Secured Agent.

Payment of Fees and Expenses. Timely payment of the fees and expenses of the First Lien Secured Parties including, but not limited to, the reasonable fees and expenses of professionals retained by the First Lien Agent and the First Lien Lenders (including without limitation reasonable attorneys' fees and costs and reasonable consulting, accounting, appraisal, investment banking and similar professional fees and charges) to the extent required under the First Lien Credit Facility.

Payment of Interest. Payment of all interest under the First Lien Credit Facility at the non-default rate, from and after the Petition Date, in accordance with the terms of the First Lien Credit Facility without prejudice to the rights of the First Lien Secured Parties to seek and obtain payment of all or any of such interest at the default rate.

**Second Lien Secured Parties**

Adequate Protection Liens. Solely to the extent of any diminution in value of their prepetition liens and security interests, a valid, perfected replacement security interest

*See* Interim Order, ¶ 5(i)-(vii)

in and lien upon all DIP Collateral (as defined in the Interim Order), except Avoidance Actions (as defined in the Interim Order) other than Postpetition Transfer Avoidance Actions (as defined in the Interim Order), which replacement liens shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens (as defined in the Interim Order), the Carve-Out, the First Lien Adequate Protection Replacement Liens (as defined in the Interim Order), and the Prepetition First Liens (as defined in the Interim Order) and shall be senior to the Prepetition Second Liens (as defined in the Interim Order).

Superpriority Claim. Solely to the extent of any diminution in value of their prepetition liens and security interests, pursuant to section 507(b) of the Bankruptcy Code allowed superpriority administrative claims with priority over all administrative expense claims and unsecured claims now existing or hereafter arising of any kind or nature, junior only to the DIP Superpriority Claim (as defined in the Interim Order), the Carve-Out, the First Lien Adequate Protection Superpriority Claims (as defined in the Interim Order), and the Prepetition First Lien Obligations (as defined in the Interim Order).

Payment of Fees and Expenses: As further adequate protection, the Debtors shall pay the reasonable fees, costs, expenses, and charges, whether accrued prepetition or postpetition, of (a) one lead counsel and one local counsel, for the Majority Prepetition Second Lien Secured Noteholders, in an amount not to exceed, collectively and in the aggregate, $1,050,000 (exclusive of amounts paid prepetition), but no more than $210,000 per month shall be payable from the Approved Budget, (b) one financial advisor, for the Majority Prepetition Second Lien Secured Noteholders, in an amount not to exceed, in the aggregate, $900,000 (exclusive of amounts paid prepetition and not inclusive of such financial advisor's reasonable and documented expenses), but no more than $150,000 per month plus such financial advisor's reasonable and documented expenses shall be payable from the Approved Budget, and (c) one lead counsel and one local counsel, for the Second Lien Trustee, in an amount not to exceed, collectively and in the aggregate, $75,000 (exclusive of amounts paid prepetition except for retainers and payments for future services), but no more than $15,000 per month shall be payable from the

Approved Budget; provided, however, that in the event that the Majority Prepetition Second Lien Secured Noteholders counsel shall be retained as the Second Lien Trustee's counsel, then the Debtors shall instead pay currently, the reasonable fees, costs, expenses, and charges, whether accrued prepetition or postpetition, of the Second Lien Indenture Trustee's Counsel in an amount not to exceed, collectively, and in the aggregate, $1,125,000 (inclusive of amounts already paid, at the time of such retention, to both the Majority Prepetition Second Lien Secured Noteholders' counsel and the Second Lien Trustee's Counsel), and the Debtors shall have no further obligation to pay, as adequate protection, the reasonable fees, costs, expenses, and charges of the Majority Prepetition Second Lien Secured Noteholders' counsel.

## BASIS FOR RELIEF

A.  The DIP Credit Agreement Should be Approved Pursuant to Section 364(d) of the Bankruptcy Code.

25.  Bankruptcy Code section 364 states that a debtor in possession may obtain financing either in the ordinary course of business or outside the ordinary course of business. First, Bankruptcy Code section 364(a) allows the debtor to obtain unsecured credit and to incur unsecured debt in the ordinary course of business. 11 U.S.C. § 364(a). Second, after notice and a hearing, the Court may authorize a debtor to obtain financing outside the ordinary course of business. Id. at § 364(b).

26.  Bankruptcy Code section 364 is structured with an escalating series of inducements that a debtor may offer to attract postpetition credit outside of the ordinary course of business. In re Photo Promotion Assoc., Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d Cir. 1989). Specifically, when a debtor cannot obtain "basic" unsecured postpetition credit, more specialized forms of credit may be obtained under certain prescribed conditions. See In re T.M. Sweeney & Sons LTL Servs., Inc., 131 B.R. 984, 989 (Bankr. N.D. Ill. 1991). Initially, Bankruptcy Code section 364(b) states that the postpetition financing may

#4836-6925-2362
DOCS_DE:173669.1 73521-001

be allowable as an administrative expense under Bankruptcy Code section 503(b)(1). 11 U.S.C. § 364(b). If lenders are unwilling to extend credit to a debtor on a general administrative expense priority basis, then, upon notice and a hearing, further inducements can be offered, including (i) superpriority administrative expense status for the postpetition credit, (ii) liens on any unencumbered property of the estate, and (iii) liens junior to existing liens on property of the estate. Id. at § 364(c)(1)-(3).

27.    Should the debtor be unable to obtain credit under either Bankruptcy Code section 364(b) or (c), then the Court, after notice and a hearing, may authorize the debtor to obtain credit secured by a lien on estate property that primes or is equal in priority to existing liens on such property, provided that the debtor can provide any existing lienholder with adequate protection of its interests. Id. at § 364(d)(1)(A) and (B).

28.    As discussed in greater detail below, the DIP Facility satisfies the requirements of section 364(d) because (a) despite extensive marketing efforts, the Debtors were unable to obtain credit on an unsecured, superpriority, junior lien or *parri passu* lien basis on acceptable terms to the Debtors prior to the Petition Date and (b) the interests of the Debtors' secured creditors will be adequately protected. Moreover, the Second Lien Secured Parties whose, interests will be primed by the DIP Facility have consented to such priming and have agreed to the adequate protection liens and payments set forth in the Interim Order and discussed above.

(i)   No Unsecured, Administrative Priority or Junior Lien Credit is Available to the Debtors.

29.    To demonstrate that the requisite credit is not obtainable on an unsecured, superpriority or junior lien basis, the trustee need only demonstrate "by good faith effort that

credit was not available" without the protections afforded to potential lenders by section 364(b) or (c) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id. at 1088; see also In re Ames Dept. Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the two remaining lenders); In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."). Where few lenders are likely to be able and willing to extend the necessary credit to a trustee, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

30.     This threshold test is certainly satisfied here. Prior to the Petition Date, the Debtors engaged in an extensive process to identify potential sources of postpetition financing. Specifically, the Debtors' investment banker, Imperial Capital ("Imperial") solicited DIP loan proposals from 16 potential lenders, including four of the current, principal secured and unsecured lenders in the Debtors' capital structure. This marketing effort resulted in formal and informal DIP loan proposals from three potential lenders, each of which contained a requirement that the DIP financing would prime all of the Prepetition Secured Parties' existing liens. The sole exception to the otherwise universal priming requirement was a fourth proposal that the Debtors received from a group holding a majority in amount of the Second Lien Notes (the "Second Lien Majority Group"), which proposal provided that it would prime the Second Lien Notes but not the First Lien Credit Facility. The Debtors engaged in extensive negotiations with the Second

Lien Majority Group (which group also submitted a term sheet for a proposal to be a stalking horse bidder in the contemplated section 363 sale of the Debtors' assets) but ultimately were unable to agree on terms regarding a DIP loan proposal.

31.     Based on this process, the Debtors in their business judgment determined that the proposed DIP Facility was the best offer they received, because among other things, the amount of the loan, interest rate, fees, covenants, ability to issue letters of credit and other terms and conditions were the best deal available in the marketplace at this time.

(ii) The Prepetition Secured Parties' Interests in their Collateral are Adequately Protected and the Second Lien Secured Parties have Consented to the DIP Facility's Priming Feature.

32.     Bankruptcy Code section 361 states that adequate protection may be provided by a cash payment or periodic cash payments to the secured creditor, the grant of an additional or replacement liens, or such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest." Id. at § 361. Courts have noted that this definition of adequate protection "confers upon the parties and the courts flexibility." In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); see also Resolution Trustee Corp. v. Swedeland Development Group (In re Swedeland Development Group), 16 F.3d 552, 564 (3rd Cir. 1994) ("Whether protection is adequate 'depends directly on how effectively it compensates the secured creditor for loss of value' caused by the superpriority given the post-petition loan."). Furthermore, where the secured creditor's interest in the value of the collateral is not diminishing by its use, sale or lease, it follows that the secured creditor's interest is adequately protected. See U.S. Savings Assoc. of Tex. v. Timbers of Inwood Forest Assoc. Ltd., 484 U.S. 365, 369-73 (1988). The determination of adequate protection, thus, is a fact-specific

inquiry to be decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "'Its application is left to the vagaries of each case ... but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."' Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

33.     As discussed above, the Debtors have concluded that financing on terms better than that provided by the DIP Lenders under the DIP Credit Agreement is currently unobtainable.  Moreover, the Debtors have worked closely with the DIP Agent, the DIP Lenders, and the Second Lien Secured Parties to develop an adequate protection package that would allow the Second Lien Parties to consent to the priming of their prepetition security interests and the use of their cash collateral.

34.     Ultimately, the parties agreed that the Second Lien Secured Parties would receive the adequate protection replacement liens (solely to the extent of any diminution in value of their prepetition interests) in all Collateral, superpriority claims (solely to the extent of any diminution in value of their prepetition interests) and payment of the Second Lien Majority Group's professional fees and expenses (subject to a cap).  In addition, the Debtors suggested and the Second Lien Secured Parties agreed to, certain case milestones that would help ensure that these chapter 11 cases and the sale process would be run as efficiently and as cost effectively as possible, yet at the same time provide the Debtors with sufficient time to fully market and maximize the value of the Debtors' assets, for the benefit of all stakeholders.

35.     In addition, the Debtors believe that the DIP Facility, together with the use of Cash Collateral, will provide the Debtors with the necessary working capital to preserve business operations and fund the costs of administering these bankruptcy cases.  As discussed in the Bilbao Declaration and Jerbich Declaration, based on their business plan, the chapter 11

process will permit the Debtors to shed significant long-term costs that would otherwise continue to burden the Debtors absent bankruptcy. In turn, the Debtors expect that the cost-savings from the bankruptcy process will increase their overall going concern value significantly—ultimately to be realized through the contemplated sale process.

36. Absent the DIP Facility, however, the Debtors will lack sufficient funding to operate, much less remain in chapter 11 to achieve costs savings or to run a robust sale process and/or confirm a chapter 11 plan. Consequently, without the DIP Facility, the value of the Debtors' business almost assuredly would suffer immediate and catastrophic deterioration.

37. Accordingly, consistent with the purposes underlying the provision of adequate protection, and based on the Second Lien Secured Parties consent to the DIP Facility and the use of Cash Collateral, the Debtors' submit that the proposed Interim Order provides the Prepetition Secured Parties with the requisite adequate protection.

B. The Debtors Use of Cash Collateral Should be Authorized.

38. Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[8] Section 363(c)(l) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section ... 1108 ... of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(l).

39. Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the

---

[8] Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

estate in the ordinary course set forth in section 363 of the Bankruptcy Code. Specifically, a

trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under

subsection (c)(l) unless:

> (A)    each entity that has an interest in such collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. §363(c)(2).

40.    The Debtors submit that, under the circumstances here, their request to use

Cash Collateral should be approved. As noted above, the DIP Lenders' obligation to lend under

the DIP Credit Agreement is conditioned upon the Debtors' receiving authority to use Cash

Collateral. Hence, absent such authority, the Debtors would not have access to any additional

liquidity, which would imperil their ability to reorganize. In addition, as discussed above, the

Second Lien Secured Parties have consented to the use of their Cash Collateral in exchange for

the adequate protection provided under the Interim Order, thereby satisfying section

361(c)(2)(A).

C.    The DIP Credit Agreement Terms are Fair, Reasonable, and Appropriate

41.    As discussed in the Bilbao Declaration, the proposed terms of the DIP

Credit Agreement are fair, reasonable, and adequate in that these terms neither (a) tilt the

conduct of these chapter 11 cases and prejudice the powers and rights that the Bankruptcy Code

confers for the benefit of all creditors, nor (b) prevent motions by parties-in-interest from being

decided on their merits. The purpose of the DIP Credit Agreement is to enable the Debtors to

meet ongoing operational expenses.

42.     The proposed DIP Credit Agreement provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out. In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40. Similarly, the various fees and charges required by the DIP Lenders under the DIP Credit Agreement are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. See, e.g., In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

43.     Furthermore, as discussed in the Bilbao Declaration, the terms and conditions of the DIP Agreement were negotiated by the parties in good faith and at arm's length. Accordingly, the DIP Lenders under the DIP Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

44.     The fairness and reasonableness of the terms of the DIP Agreement will be further shown at the Interim Hearing and Final Hearing as necessary.

D.     Local Rule 4001-2 Highlighted Provisions

45.     Local Rule 4001-2 requires that the Debtors highlight Section 7.2 of the DIP Credit Agreement and Paragraph 2(k) of the Interim Order, each of which provide that the DIP Lenders will receive priming liens senior to those liens granted to the Prepetition Secured Parties under the Prepetition Secured Credit Documents. At this time, it is unclear if all the Second Lien Secured Parties will consent to be primed. Hence, the Debtors anticipate seeking authority to grant to the DIP Lenders nonconsensual priming liens senior to the Second Lien Secured Parties.

#4836-6925-2362
DOCS_DE:173669.1 73521-001

46. In addition, although not required to be highlighted pursuant to Local Rule 4001-2, the following terms of the DIP Facility Documentation and the Interim Order fall within the spirit of that Rule, and therefore are highlighted:

- Paragraph 4(i) of the Interim Order provides for a "roll-up" of the First Lien Secured Obligations into the DIP Facility.

- Paragraphs D(ii) and E(ii) of the Interim Order contains findings as to the validity, perfection and amount of the Prepetition Secured Parties' prepetition liens and claims, subject to an investigation period (set forth in Paragraph 7 of the Interim Order) that expires on the earlier of (x) with respect to any Committee, 60 calendar days from the formation of any Committee, and (y) solely if no Committee is formed, with respect to other parties in interest 75 calendar days following the date of entry of the Interim Order. *See* Interim Order, ¶ 7.

- Paragraph 9 of the Interim Order provide that the Debtors will waive their rights under section 506(c) of the Bankruptcy Code pursuant to the Final Order.

- Paragraph 8 of the Interim Order sets forth a specific budget for the payment from the Carve-Out of the fees of any professionals retained by any statutory committee of unsecured creditors.

47. The DIP Lenders are unwilling to provide postpetition financing to the Debtors absent the foregoing terms. For the reasons set forth above, and given the importance of the liquidity provided under DIP Facility, without which the Debtors would be unable to operate much less reorganize, the Debtors submit that authorizing the senior priming liens on a non-consensual basis, waiving the Debtors' section 506(c) rights pursuant to a Final Order, and approving the Roll-Up each are appropriate and request that such relief be granted.

E. Request for Modification of Automatic Stay.

48. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition pursuant to the Bankruptcy Code. The Interim Order and DIP Credit Agreement contemplate a modification of the automatic stay (to the extent applicable), to: (a) authorize, but not require, the DIP Agent to file financing statements, deeds of trust, mortgages, or other similar documents to evidence, validate, and perfect the DIP Lenders'

security interests granted to them under the DIP Credit Agreement; (b) give the Debtors any notice provided for in the DIP Credit Agreement; (c) allow the DIP Agent and DIP Lenders to execute upon their security interests or exercise other remedies under the DIP Credit Agreement upon the occurrence of an Event of Default, after giving five business days notice of such Event of Default; and (d) take such other actions required or permitted by the Interim Order, the DIP Credit Agreement. Stay modification provisions of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

### INTERIM APPROVAL OF THE POSTPETITION CREDIT FACILITY, AND IMMEDIATE USE OF CASH COLLATERAL SHOULD BE GRANTED

49.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize use of Cash Collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

A.      The Interim Order and Hearing

50.     Pursuant to Bankruptcy Rules 4001(b) and 4001(c), the Debtors request that the Court conduct an expedited interim hearing on the date hereof or as soon as practicable (the "Interim Hearing") to consider entry of the Interim Order authorizing the Debtors to use Cash Collateral and borrow an amount sufficient to fund operating expenses pending the Final Hearing.

51.     Even with the ability to use Cash Collateral pursuant to the Interim Order, pending entry of the Final Order, the Debtors will require $5 million in available revolving credit

financing and $20 million in letter of credit availability. Such interim availability will avoid a disruption in the Debtors' operations pending the Final Hearing and will provide the necessary level of confidence in their vendors, employees and customers.

52.    Pursuant to the Interim Order, the Debtors propose to grant to the DIP Lenders the liens described in the DIP Credit Agreement on account of the interim borrowing amount. Furthermore, as discussed above, pursuant to the Interim Order, the Prepetition Secured Parties will be adequately protected from any diminution in the value of their collateral that results from the Debtors' use of Cash Collateral and the liens granted under the DIP Agreement.

B.    The Final DIP Order

53.    The Debtors also respectfully request that the Court schedule the Final Hearing on this Motion no later than 30 days after the Petition Date, as the DIP Lenders' commitment will terminate unless the Final Order is entered by that date. Such relief is necessary in order to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' respective estates.

## NOTICE

54.    Notice of the Motion will be given by hand delivery or facsimile to: (i) the Office of the United States Trustee for the District of Delaware, (ii) those entities or individuals included on the Debtors' list of 20 largest unsecured creditors on a consolidated basis, (iii) First Lien Agent and its counsel, (iv) the DIP Agent and its counsel, (v) the Second Lien Trustee and its counsel, (vi) counsel to the Majority Prepetition Second Lien Secured Noteholders, and (vii) Wilmington Trust, National Association, as administrative agent under the Opco Unsecured Loan and its counsel (collectively, the "Initial Notice Parties"). The Debtors submit that no other or further notice need be provided.

55.     Following entry of the Interim Order, the Debtors propose to provide notice of the Motion, the Interim Order, the DIP Credit Agreement and the Final Hearing by overnight delivery service or hand delivery to each of the Initial Notice Parties and, without duplication, to; (i) if practicable, the applicable state and local taxing authorities; (ii) parties who have filed a request for service prior to such date; (iii) counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases; and (iv) other secured parties as shown by UCC searches conducted prepetition or on title reports procured by the Debtors. Prior to the Final Hearing on the Motion, the Debtors also will provide actual notice of the Motion whether by telephone, telecopy, overnight courier, or by hand delivery, to counsel for any official committee appointed in these Chapter 11 Cases.

56.     Any objections to the proposed Final Order shall be in writing and shall be filed with the Court and served by overnight mail service on:  (a) Milbank, Tweed, Hadley & McCloy LLP, Co-Counsel for the Debtors, 601 South Figueroa Street, 30th Floor, Los Angeles, California 90017-5735, Attention:  Mark Shinderman, Esq. / Fred Neufeld, Esq.; (b) Pachulski Stang Ziehl & Jones LLP, Co-Counsel for the Debtors, 919 North Market Street, 17th Floor, Wilmington, DE 19899-8705, Attention:  Laura Davis Jones, Esq.; and (c) the United States Trustee.

57.     The Debtors respectfully submit that, except as described above, no other or further notice need be provided.

58.     No previous motion for the relief sought herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE the Debtors respectfully request (i) entry of an order substantially in the form of the proposed Interim Order annexed hereto as Exhibit A; (ii) after the Final Hearing, entry of the Final Order substantially in the form that shall be filed with the Court; and (iii) such other and further relief as is just.

Dated: October 4, 2011

MILBANK, TWEED, HADLEY & McCLOY LLP
Mark Shinderman (CA Bar No. 136644)
Fred Neufeld (CA Bar No. 150759)
Haig M. Maghakian (CA Bar No. 221954)
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017-5735
Telephone:     (213) 892-4000
Facsimile:     (213) 629-5063
Email: mshinderman@milbank.com
          fneufeld@milbank.com
          hmaghakian@milbank.com

and

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Curtis A. Hehn (DE Bar No. 4264)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email: ljones@pszjlaw.com
          chehn@pszjlaw.com

Proposed Counsel for Debtors
and Debtors in Possession