# **EXHIBIT B**

# **DIP CREDIT AGREEMENT**

(see attached)

**SENIOR SECURED PRIMING AND SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

dated as of October 5, 2011

by and among

**REAL MEX RESTAURANTS, INC.
ACAPULCO RESTAURANTS, INC.
EL TORITO FRANCHISING COMPANY
EL TORITO RESTAURANTS, INC.
TARV, INC.
ACAPULCO RESTAURANT OF VENTURA, INC.
ACAPULCO RESTAURANT OF WESTWOOD, INC.
ACAPULCO MARK CORP.
MURRAY PACIFIC
ALA DESIGN, INC.
REAL MEX FOODS, INC.
ACAPULCO RESTAURANT OF DOWNEY, INC.
ACAPULCO RESTAURANT OF MORENO VALLEY, INC.
EL PASO CANTINA, INC.
CKR ACQUISITION CORP.
CHEVYS RESTAURANTS, LLC**
as Debtors and Debtors-in-Possession
(collectively, the "Borrowers")

**RM RESTAURANT HOLDING CORP.**
as Debtor and Debtor-in-Possession
("Parent")

the financial institutions from time to time
party hereto
(the "Lenders")

and

**GENERAL ELECTRIC CAPITAL CORPORATION**
as agent and administrative agent
(the "Agent")

\* \* \*

**GE CAPITAL MARKETS, INC.**
as Sole Lead Arranger and Sole Book Runner

**GENERAL ELECTRIC CAPITAL CORPORATION**
as Syndication Agent

CH\1299468.13

# TABLE OF CONTENTS

**PAGE**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND RULES OF INTERPRETATION | 9 |
| | 1.1 Definitions | 9 |
| | 1.2 Rules of Interpretation | 27 |
| 2. | THE REVOLVING CREDIT FACILITY | 28 |
| | 2.1 Commitment to Lend, Exit Financing Fee Reserve and Roll-Up of the Pre-Petition Revolving Credit Loans | 28 |
| | 2.2 Commitment Fee | 30 |
| | 2.3 Reduction of Total Revolving Credit Commitment | 30 |
| | 2.4 The Revolving Credit Notes | 30 |
| | 2.5 Interest on Revolving Credit Loans | 30 |
| | 2.6 Requests for Revolving Credit Loans | 31 |
| | 2.7 [Intentionally Omitted] | 31 |
| | 2.8 Funds for Revolving Credit Loans | 31 |
| 3. | REPAYMENT OF THE REVOLVING CREDIT LOANS | 32 |
| | 3.1 Maturity | 32 |
| | 3.2 Mandatory Repayments of Revolving Credit Loans | 32 |
| | 3.3 Optional Repayments of Revolving Credit Loans | 32 |
| 4. | [Intentionally Omitted] | 33 |
| 5. | LETTERS OF CREDIT | 33 |
| | 5.1 Letter of Credit Commitment and Roll-Up of the Pre-Petition Letters of Credit | 33 |
| | 5.2 Reimbursement Obligation of the Borrowers | 36 |
| | 5.3 Letter of Credit Payments | 36 |
| | 5.4 Obligations Absolute | 37 |
| | 5.5 Reliance by Issuer | 38 |
| | 5.6 Letter of Credit Fee | 38 |
| 6. | CERTAIN GENERAL PROVISIONS | 39 |
| | 6.1 Fees | 39 |
| | 6.2 Funds for Payments | 39 |
| | 6.3 Computations | 42 |

| | | |
|---|---|---|
| 6.4 | [Intentionally Omitted] | 42 |
| 6.5 | [Intentionally Omitted] | 42 |
| 6.6 | Additional Costs, etc | 42 |
| 6.7 | Capital Adequacy | 44 |
| 6.8 | Certificate | 45 |
| 6.9 | [Intentionally Omitted] | 45 |
| 6.10 | Interest After Default | 45 |
| 6.11 | Concerning Joint and Several Liability of the Borrowers. | 45 |
| 7. | PARENT GUARANTY; Super Priority Nature of Obligations and Lenders' Liens | 48 |
| 7.1 | Parent Guaranty | 48 |
| 7.2 | Super Priority of Obligations and Agent's Liens | 51 |
| 7.3 | Grant of Liens | 51 |
| 8. | REPRESENTATIONS AND WARRANTIES | 52 |
| 8.1 | Corporate Authority | 52 |
| 8.2 | Governmental Approvals | 53 |
| 8.3 | Title to Properties; Leases | 53 |
| 8.4 | Financial Statements | 53 |
| 8.5 | No Material Changes, etc | 53 |
| 8.6 | Laws, Licenses; Franchises, Patents, Copyrights, etc | 54 |
| 8.7 | Litigation | 55 |
| 8.8 | No Materially Adverse Contracts, etc | 55 |
| 8.9 | Compliance with Other Instruments, etc | 55 |
| 8.10 | Tax Status | 55 |
| 8.11 | No Event of Default | 55 |
| 8.12 | Investment Company Act | 55 |
| 8.13 | Absence of Financing Statements; Perfection of Security Interests | 55 |
| 8.14 | Employee Benefit Plans | 56 |
| 8.15 | Use of Proceeds | 57 |
| 8.16 | Disclosure | 58 |
| 8.17 | Environmental Compliance | 58 |
| 8.18 | Subsidiaries, etc | 60 |
| 8.19 | [Intentionally Omitted] | 60 |
| 8.20 | [Intentionally Omitted] | 60 |

CH\1299468.13

|       | 8.21 | Certain Transactions | 60 |
|-------|------|----------------------|----|
|       | 8.22 | Bank Accounts | 60 |
|       | 8.23 | Stores | 60 |
|       | 8.24 | Franchise Agreements | 60 |
|       | 8.25 | Leases | 60 |
|       | 8.26 | Foreign Assets Control Regulations | 61 |
|       | 8.27 | Bankruptcy Matters | 61 |
| 9.    |      | AFFIRMATIVE COVENANTS | 61 |
|       | 9.1  | Punctual Payment | 61 |
|       | 9.2  | Maintenance of Office | 62 |
|       | 9.3  | Records and Accounts | 62 |
|       | 9.4  | Financial Statements, Supplemental Approved Budgets, Certificates and Information | 62 |
|       | 9.5  | Notices | 64 |
|       | 9.6  | Corporate Existence; Maintenance of Properties | 66 |
|       | 9.7  | Insurance | 66 |
|       | 9.8  | Taxes | 67 |
|       | 9.9  | Inspection of Properties and Books, etc. | 67 |
|       | 9.10 | Compliance with Laws, Contracts, Licenses, and Permits | 68 |
|       | 9.11 | Employee Benefit Plans | 69 |
|       | 9.12 | Use of Proceeds | 69 |
|       | 9.13 | Mortgaged Property | 69 |
|       | 9.14 | Further Assurances | 69 |
|       | 9.15 | Conduct of Business; Stores | 69 |
|       | 9.16 | [Intentionally Omitted] | 69 |
|       | 9.17 | Bank Accounts | 69 |
|       | 9.18 | Bankruptcy Covenants | 70 |
|       | 9.19 | Chapter 11 Cases | 70 |
|       | 9.20 | Sales Process Timeline | 70 |
|       | 9.21 | Agent Affiliate Lease Assumptions | 72 |
|       | 9.22 | Post-Closing Matters | 72 |
| 10.   |      | CERTAIN NEGATIVE COVENANTS | 72 |
|       | 10.1 | Restrictions on Indebtedness | 72 |

CH\1299468.13

|        |                                                                           |    |
|--------|---------------------------------------------------------------------------|----|
| 10.2   | Restrictions on Liens                                                     | 73 |
| 10.3   | Restrictions on Investments                                               | 75 |
| 10.4   | Restricted Payments                                                       | 76 |
| 10.5   | Mergers and Consolidations, Dispositions of Assets, Acquisitions          | 76 |
| 10.6   | Sale and Leaseback                                                        | 76 |
| 10.7   | Compliance with Environmental Laws                                        | 77 |
| 10.8   | Employee Benefit Plans                                                    | 77 |
| 10.9   | Change in Fiscal Year                                                     | 78 |
| 10.10  | Transactions with Affiliates                                              | 78 |
| 10.11  | Bank Accounts                                                             | 78 |
| 10.12  | Franchises                                                                | 78 |
| 10.13  | 2009 Senior Secured Debt Documents and Related Documents                  | 78 |
| 10.14  | Payment of Exit Costs                                                     | 79 |
| 10.15  | Unsecured Term Loan Documents                                             | 79 |
| 10.16  | Chapter 11 Claims                                                         | 79 |
| 10.17  | The DIP Orders                                                            | 79 |
| 10.18  | Critical Vendor and Other Payments                                        | 79 |
| 11.    | FINANCIAL COVENANTS and Budget Compliance                                 | 80 |
| 11.1   | Approved Budget Compliance                                                | 80 |
| 11.2   | [Intentionally Omitted]                                                   | 81 |
| 11.3   | Lease Incurrence                                                          | 81 |
| 12.    | CLOSING CONDITIONS                                                        | 81 |
| 12.1   | Loan Documents, etc                                                       | 81 |
| 12.2   | Initial Approved Budget                                                   | 81 |
| 12.3   | Interim Order                                                             | 82 |
| 12.4   | Certified Copies of Charter Documents                                     | 82 |
| 12.5   | Corporate Action                                                          | 82 |
| 12.6   | Incumbency Certificate                                                    | 82 |
| 12.7   | Opinion of Counsel                                                        | 82 |
| 12.8   | Payment of Fees and Expenses                                              | 83 |
| 12.9   | Disbursement Instructions                                                 | 83 |
| 12.10  | No Material Adverse Change                                                | 83 |
| 12.11  | No Litigation                                                             | 83 |

| | 12.12 | Consents and Approvals ...................................................................... | 83 |
|---|---|---|---|
| 13. | | ADDITIONAL CONDITIONS TO BORROWINGS .................................... | 83 |
| | 13.1 | Conditions to All Borrowings .......................................................... | 83 |
| | 13.2 | Conditions to Revolving Credit Advance and Letters of Credit Prior to the Final Order .................................................................................. | 84 |
| | 13.3 | Conditions to Revolving Credit Advance and Letters of Credit on or after November 4, 2011 ........................................................................... | 84 |
| 14. | | EVENTS OF DEFAULT; ACCELERATION; ETC ...................................... | 85 |
| | 14.1 | Events of Default and Acceleration ................................................. | 85 |
| | 14.2 | Termination Declarations................................................................. | 91 |
| | 14.3 | Remedies ........................................................................................ | 91 |
| | 14.4 | Distribution of Collateral Proceeds ................................................. | 92 |
| 15. | | SETOFF .................................................................................................. | 93 |
| | 15.1 | Setoff.............................................................................................. | 93 |
| | 15.2 | Consent to Setoff ........................................................................... | 93 |
| 16. | | THE AGENT ........................................................................................... | 94 |
| | 16.1 | Authorization .................................................................................. | 94 |
| | 16.2 | Employees and Agents..................................................................... | 94 |
| | 16.3 | No Liability .................................................................................... | 94 |
| | 16.4 | No Representations .......................................................................... | 95 |
| | 16.5 | Payments ........................................................................................ | 95 |
| | 16.6 | Holders of Notes ............................................................................ | 96 |
| | 16.7 | Indemnity ....................................................................................... | 96 |
| | 16.8 | Agent as Lender .............................................................................. | 97 |
| | 16.9 | Resignation .................................................................................... | 97 |
| | 16.10 | Notification of Defaults and Events of Default; Other Notices............ | 97 |
| | 16.11 | Duties in the Case of Enforcement .................................................. | 97 |
| | 16.12 | Agent May File Proofs of Claim ...................................................... | 97 |
| 17. | | TREATMENT OF CERTAIN CONFIDENTIAL INFORMATION................ | 98 |
| | 17.1 | Confidentiality ............................................................................... | 98 |
| | 17.2 | Prior Notification ........................................................................... | 99 |
| | 17.3 | Other .............................................................................................. | 99 |
| 18. | | EXPENSES AND INDEMNIFICATION ...................................................... | 99 |

| | 18.1 | Expenses | 99 |
| | 18.2 | Indemnification | 100 |
| | 18.3 | Survival | 101 |
| 19. | | SURVIVAL OF COVENANTS, ETC | 101 |
| 20. | | ASSIGNMENT AND PARTICIPATION | 101 |
| | 20.1 | Conditions to Assignment by Lenders | 101 |
| | 20.2 | Certain Representations and Warranties; Limitations; Covenants | 102 |
| | 20.3 | Register | 103 |
| | 20.4 | New Notes | 103 |
| | 20.5 | Participations | 104 |
| | 20.6 | Disclosure | 104 |
| | 20.7 | Assignee or Participant Affiliated with the Borrowers | 104 |
| | 20.8 | Miscellaneous Assignment Provisions | 105 |
| | 20.9 | Assignment by Borrowers | 105 |
| | 20.10 | Special Purpose Funding Vehicle | 105 |
| 21. | | NOTICES, ETC | 106 |
| 22. | | GOVERNING LAW; consent to Jurisdiction | 107 |
| 23. | | HEADINGS | 108 |
| 24. | | COUNTERPARTS | 108 |
| 25. | | ENTIRE AGREEMENT, ETC | 108 |
| 26. | | WAIVER OF JURY TRIAL | 108 |
| 27. | | CONSENTS, AMENDMENTS, WAIVERS, ETC | 108 |
| 28. | | SEVERABILITY | 109 |
| 29. | | RIGHT TO PUBLICIZE | 109 |
| 30. | | USURY | 109 |
| 31. | | BANKRUPTCY MATTERS | 111 |
| | 31.1 | Parties Including Trustees; Bankruptcy Court Proceedings | 111 |
| | 31.2 | Pre-Petition Loan Documents | 111 |
| 32. | | Patriot Act | 111 |

**Schedules and Exhibits**

| | |
|---|---|
| Schedule 1 | Lenders; Revolving Credit Commitments; Revolving Credit Commitment Percentages |
| Schedule 2 | Letter of Credit Commitments; Letter of Credit Commitment Percentages |
| Schedule 3 | Initial Approved Budget |
| Schedule 4 | Agent Affiliate Leases |
| Schedule 8.2 | Governmental Approvals |
| Schedule 8.3 | Title to Properties; Leases |
| Schedule 8.3A | Owned Real Property |
| Schedule 8.6.2 | Intellectual Property Matters |
| Schedule 8.7 | Litigation |
| Schedule 8.14.2 | Terminability of Welfare Plans |
| Schedule 8.17 | Environmental Matters |
| Schedule 8.18 | Subsidiaries |
| Schedule 8.18(A) | Parent Stockholders |
| Schedule 8.21 | Certain Transactions |
| Schedule 8.22 | Bank Accounts |
| Schedule 8.23 | Stores |
| Schedule 10.1 | Existing Indebtedness |
| Schedule 10.2 | Existing Liens |
| Schedule 10.3 | Existing Investments |
| | |
| Exhibit A | Form of Revolving Credit Note |
| Exhibit B | Form of Revolving Credit Loan Request |
| Exhibit C | Form of Compliance Certificate |
| Exhibit D | Form of Assignment and Acceptance |
| Exhibit F | Post-Closing Matters |
| Exhibit G | Interim Order |

CH\1299468.13

## SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of October 5, 2011, is by and among, (a) **REAL MEX RESTAURANTS, INC.**, formerly known as Acapulco Acquisition Corp., a Delaware corporation ("Real Mex"), **ACAPULCO RESTAURANTS, INC.**, a Delaware corporation ("ARI"), **EL TORITO FRANCHISING COMPANY**, a Delaware corporation ("ETFI"), **EL TORITO RESTAURANTS, INC.**, a Delaware corporation ("ETRI"), **TARV, INC.**, a California corporation ("TARV"), **ACAPULCO RESTAURANT OF VENTURA, INC.**, a California corporation ("ARV"), **ACAPULCO RESTAURANT OF WESTWOOD, INC.**, a California corporation ("ARW"), **ACAPULCO MARK CORP.**, a Delaware corporation ("AMC"), **MURRAY PACIFIC**, a California corporation ("MP"), **ALA DESIGN, INC.**, a California corporation ("ALAD"), **REAL MEX FOODS, INC.**, formerly known as ALA Foods, Inc., a California corporation ("RMF"), **ACAPULCO RESTAURANT OF DOWNEY, INC.**, a California corporation ("ARD"), **ACAPULCO RESTAURANT OF MORENO VALLEY, INC.**, a California corporation ("AMV"), **EL PASO CANTINA, INC.**, a California corporation ("EPC"), **CKR ACQUISITION CORP.**, a Delaware corporation ("CKR"), **CHEVYS RESTAURANTS, LLC**, a Delaware limited liability company ("Chevys", and together with Real Mex, ARI, ETFI, ETRI, TARV, ARV, ARW, AMC, MP, ALAD, RMF, ARD, AMV, EPC, and CKR, each as a borrower and debtor and debtor-in-possession, the "Borrowers"), and **RM RESTAURANT HOLDING CORP.**, a Delaware corporation ("Parent"), as debtor and debtor-in-possession and guarantor, (b) the lending institutions from time to time party hereto, and (c) **GENERAL ELECTRIC CAPITAL CORPORATION** (in its individual capacity, "GE Capital") as agent and administrative agent for such lending institutions.

On October 4, 2011 (the "Petition Date"), Borrowers and Parent (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (as hereinafter defined) with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). From and after the Petition Date, Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code.

Borrowers have requested that the Lenders provide (i) a $29,000,000 revolving credit facility, which revolving credit facility is to include a roll-up revolving credit facility in an aggregate principal amount equal to the aggregate principal balance of the Revolving Credit Loans (as hereinafter defined) outstanding as of the Petition Date under (and as defined in) the Pre-Petition Credit Agreement (as hereinafter defined); provided that until the Final Order (as hereinafter defined) shall have been entered by the Bankruptcy Court, no loans or advances under the revolving credit facility shall be made, other than revolving credit loans in the aggregate principal amount not to exceed $5,000,000 and (ii) a $20,000,000 letter of credit facility, which letter of credit facility is to include a roll-up letter of credit facility in an aggregate principal amount equal to the maximum aggregate face amount of Letters of Credit issued and outstanding under (and as defined in) the Pre-Petition Credit Agreement as of the Petition Date, the proceeds of which facilities will be used to in accordance with § 8.15 hereof.

8

The Parent has agreed to guarantee the obligations of the Borrowers hereunder and the Borrowers and the Parent have agreed to secure their respective Obligations by granting to Agent a lien on substantially all of their respective assets, in accordance with the priorities provided in the DIP Orders.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## 1. DEFINITIONS AND RULES OF INTERPRETATION.

**1.1** **Definitions**. The following terms shall have the meanings set forth in this §1 or elsewhere in the provisions of this Credit Agreement referred to below:

Acapulco Concept. The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "Acapulco".

Affected Lenders. See §6.7(c).

Affiliate. Any Person that would be considered to be an affiliate of any Borrower under Rule 144(a) of the Rules and Regulations of the Securities and Exchange Commission, as in effect on the date hereof, if such Borrower were issuing securities.

Agency Account. See §9.17.

Agency Account Agreement. See §9.17.

Agent's Office. The Agent's office located at 8377 East Hartford Drive, Suite 200, Scottsdale, Arizona 85255, or at such other location as the Agent may designate from time to time.

Agent. GE Capital acting as agent for the Lenders, or such successor Agent as may be appointed pursuant to §16.9 hereof.

Agent's Special Counsel. Latham & Watkins LLP or such other counsel as may be approved by the Agent.

ALAD. As defined in the preamble hereto.

AMC. As defined in the preamble hereto.

Applicable Margin. 6.00% per annum.

Approved Budget. The aggregate, without duplication, of all items that are set forth in the Initial Approved Budget and any Supplemental Approved Budget.

Approved Fund. With respect to any Lender that is a fund that invests in bank loans, any other fund that invests in bank loans and is advised or managed by the same investment advisor as such Lender or by an affiliate of such investment advisor.

9

ARD. As defined in the preamble hereto.

ARI. As defined in the preamble hereto.

ARV. As defined in the preamble hereto.

ARW. As defined in the preamble hereto.

Assignment and Acceptance. See §20.1.

Avoidance Actions. "Avoidance Actions" as defined in the DIP Orders.

Bankruptcy Code. The provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. or other applicable bankruptcy, insolvency or similar laws, as amended.

Bankruptcy Court. As defined in the Recitals hereto.

Balance Sheet Date. December 31, 2010.

Base Rate. At any time, a rate per annum equal to the highest of:

(a) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by Agent) or any similar release by the Federal Reserve Board (as determined by Agent),

(b) the sum of 0.5% per annum and the Federal Funds Rate and

(c) the sum of (x) the Eurodollar Rate for a period of three months as it appears on Reuters Screen LIBOR01 Page as of 11:00 A.M. (London, England time) two (2) Business Days prior to such day, plus (y) 1.50% per annum, in each instance, as of such day.

Any change in the Base Rate due to a change in any of the foregoing shall be effective on the effective date of such change in the "bank prime loan" rate, the Federal Funds Rate or the Eurodollar Rate.

Borrower(s). As defined in the preamble hereto.

Business Day. Any day (excluding Saturday and Sunday) on which banking institutions in Chicago, Illinois and New York, New York, are open for the transaction of banking business.

Canpartners. Canpartners Investments IV LLC.

Capitalized Leases. Leases under which any Borrower or any of their respective Subsidiaries is the lessee or obligor, the discounted future rental payment obligations under which are required to be capitalized on the balance sheet of the lessee or obligor in accordance with generally accepted accounting principles.

10

Capstone. Capstone Consulting LLC.

Carve-Out. "Carve-Out" as defined in the DIP Orders.

Carve-Out Cap. $1,200,000.

Casa Gallardo Concept. The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "Casa Gallardo".

Casa Gallardo Grill Concept. The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "Casa Gallardo Grill".

CERCLA. See §8.17(a).

Change of Control. At any time, the occurrence of one or more of the following events: (i) the Parent shall at any time fail to own, directly or indirectly, 100% of each class of issued and outstanding Voting Stock and economic interests of Real Mex free and clear of all liens other than Permitted Liens and, as long as such liens are subordinated to the liens of the Agent granted by Parent and the Borrowers to secure the 2009 Senior Secured Debt and the Pre-Petition Indebtedness (prior to the Roll-Up Effective Time), (ii) Permitted Holders shall at any time fail to own, directly or indirectly, 50.1% of each class of issued and outstanding Voting Stock and economic interests of the Parent or (iii) Cocina, Sun Cantinas, Sun Capital and their Control Investment Affiliates shall at any time together fail to own, directly or indirectly, a greater aggregate percentage of the issued and outstanding Voting Stock and economic interest of Parent than any other Person and its Control Investment Affiliates.

Chapter 11 Cases. Chapter 11 cases jointly administered under *In re. Real Mex Restaurants, Inc.*, Case No. 11- [_____] (__), filed on October 4, 2011 by the Debtors by filing a voluntary petition with the Bankruptcy Court.

Chevys. As defined in the preamble hereto.

CKR. As defined in the preamble hereto.

Closing Date. October 5, 2011.

Cocina. Cocina Funding Corp., L.L.C., a Delaware limited liability company.

Code. The Internal Revenue Code of 1986.

Co-Investors. H.I.G. Sun Partners, Inc., SCSF Cantinas and any of their Control Investment Affiliates, and members of the management of the Parent and the Borrowers.

Collateral. All of the property, rights and interests of the Parent, the Borrowers and their Subsidiaries (other than those that are excluded from the "DIP Collateral" under (and as defined in) the DIP Orders).

Compliance Certificate.  See §9.4(e).

Concentration Accounts.  The accounts with Bank of America with account numbers 1459239751 and 1459236007 and that account with Wells Fargo Bank with account number 4296-911928 and any other depository account that is (a) in the name of the Borrowers, (b) under the control of the Agent for the benefit of the Lenders and the Agent, and (c) with a financial institution reasonably acceptable to the Agent that has entered into an Agency Account Agreement with the Agent and the Borrowers.

Concept.  Any of the Acapulco Concept, the Casa Gallardo Concept, the Casa Gallardo Grill Concept, the Guadala Harry's Concept, the El Torito Concept, the El Torito Grill Concept, the Hola Amigos Concept, the Keystone Grill Concept, the Las Brisas Concept, or the Who Song & Larry's Concept.

Consolidated or consolidated.  With reference to any term defined herein, that term as applied to the accounts of the Borrowers and all of their Subsidiaries, consolidated in accordance with generally accepted accounting principles.

Control Investment Affiliates.  As to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person or any Person controlling such Person primarily for the purpose of making equity or debt investments in one or more companies.  For the purpose of this definition "control" of a Person means the power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

Credit Agreement.  This Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement, including the Schedules and Exhibits hereto.

Debtors.  As defined in the Recitals hereto.

Default.  Any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

Delinquent Lender.  See §16.5.3.

DIP Orders.  The Interim Order and the Final Order, as applicable, based on which such order is then in effect.

Distribution.  The declaration or payment of any dividend or other distribution on or in respect of any Equity Interests of a Person, other than dividends or distributions payable solely in Equity Interests of such Person of the same class; the purchase, redemption, or other retirement of any Equity Interests of a Person, directly or indirectly through a Subsidiary of such Person or otherwise; the return of capital by a Person to the holders of its Equity Interests as such; or any other distribution on or in respect of any Equity Interests of a Person.

Dollars or $.  Dollars in lawful currency of the United States of America.

Drawdown Date.  The date on which any Loan is made or is to be made.

12

El Torito Companies.  Collectively, ETFI and ETRI.

El Torito Concept.  The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "El Torito".

El Torito Grill Concept.  The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "El Torito Grill".

Eligible Assignee.  Any of (a) a commercial bank or finance company organized under the laws of the United States of America, or any State thereof or the District of Columbia, and having total assets in excess of $1,000,000,000; (b) a savings and loan association or savings bank organized under the laws of the United States of America, or any State thereof or the District of Columbia, and having a net worth of at least $100,000,000, calculated in accordance with generally accepted accounting principles; (c) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development (the "OECD"), or a political subdivision of any such country, and having total assets in excess of $1,000,000,000, provided that such bank is acting through a branch or agency located in the country in which it is organized or another country which is also a member of the OECD; (d) the central bank of any country which is a member of the OECD; (e) any mutual fund, insurance company, or investment fund that is an "accredited investor" (as defined in Regulation D of the Securities Act of 1933, as amended); and (f) if, but only if, any Event of Default has occurred and is continuing, any other bank, insurance company, commercial finance company or other financial institution or other Person approved by the Agent, such approval not to be unreasonably withheld.

Employee Benefit Plan.  Any employee benefit plan within the meaning of §3(3) of ERISA maintained or contributed to by any Borrower or any ERISA Affiliate other than a Multiemployer Plan.

Environmental Laws.  See §8.17(a).

EPA.  See §8.17(b).

EPC.  As defined in the preamble hereto.

Equity Interests.  All equity interests of a Person, including, without limitation, any (a) common or preferred stock, (b) limited or general partnership interests, (c) limited liability company membership interests, (d) options, warrants, or other rights to purchase or acquire any Equity Interest, or (e) securities convertible into any Equity Interest.

ERISA.  The Employee Retirement Income Security Act of 1974.

ERISA Affiliate.  Any Person which is treated as a single employer with any of the Borrowers under §414 of the Code.

ERISA Reportable Event. A reportable event with respect to a Guaranteed Pension Plan within the meaning of §4043 of ERISA and the regulations promulgated thereunder.

ETFI. As defined in the preamble hereto.

ETRI. As defined in the preamble hereto.

Eurodollar Business Day. Any day on which commercial banks are open for international business (including dealings in Dollar deposits) in London or such other eurodollar interbank market as may be selected by the Agent in its sole discretion acting in good faith.

Eurodollar Rate. For any interest period, the higher of (i) 2.00% per annum and (ii) the rate determined by the Agent to be the offered rate per annum for deposits of Dollars for the applicable interest period that appears on Reuters Screen LIBOR01 Page as of 11:00 a.m. (London, England time) two Eurodollar Business Days prior to the first day in such interest period. In the event that such rate does not appear on Reuters Screen LIBOR01 Page at such time, such rate will be the rate of interest per annum, as determined by the Agent (rounded upwards, if necessary, to the nearest 1/100 of 1%) at which deposits of Dollars in immediately available funds are offered at 11:00 a.m. (London, England time) two (2) Business Days prior to the first day in such interest period by major financial institutions reasonably satisfactory to the Agent in the London interbank market for such interest period for the applicable principal amount on such date of determination.

Event of Default. See §14.1.

Exit Costs. See §2.1(b).

Exit Financing Fee Reserve. See §2.1(b).

Facilities. Collectively, the Revolving Credit Loan Facility and the Letter of Credit Facility.

FATCA Sections 1471 through 1474 of the Code, as of the date of this Credit Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

Federal Funds Rate. For any day, the rate per annum (rounded upward to the nearest 1/100th of 1%) equal to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to the Agent on such day on such transactions as determined by the Agent in a commercially reasonable manner.

Fee Letter. The letter agreement dated September 28, 2011 among GE Capital, GE Capital Markets, Inc. and the Borrowers.

<u>Final Order</u>. Collectively, the orders of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which orders shall be satisfactory in form and substance to the Agent in its sole discretion, and which orders are in effect and not stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent in its sole discretion, which, among other matters but not by way of limitation, provides that the relief requested in the motions seeking approval of the Loan Documents and the Interim Order and Final Order and granted on an interim basis in the Interim Order is granted on a final basis (including any additional relief required by the Bankruptcy Court or agreed to by the Agent) and authorizes the Debtors to obtain credit hereunder and grant first priority priming liens and security interests under this Credit Agreement and the other Loan Documents and for the super priority of the Agent's and Lenders' claims hereunder and provides for the roll of the Pre-Petition Obligations as contemplated herein, all on a final basis.

<u>Financial Affiliate</u>. A Subsidiary of the bank holding company controlling any Lender, which Subsidiary is engaging in any of the activities permitted by §4(e) of the Bank Holding Company Act of 1956 (12 U.S.C. §1843).

<u>First Day Orders</u>. The orders entered by the Bankruptcy Court in the Chapter 11 Cases pursuant to motions and applications filed by the Debtors on the Petition Date, in each case, in form and substance reasonably satisfactory to the Agent.

<u>generally accepted accounting principles</u>. (a) When used in §11, whether directly or indirectly through reference to a capitalized term used therein, means (i) principles that are consistent with the principles promulgated or adopted by the Financial Accounting Standards Board and its predecessors, in effect for the fiscal year ended on the Balance Sheet Date, and (ii) to the extent consistent with such principles, the accounting practice of Real Mex reflected in its financial statements for the year ended on the Balance Sheet Date, and (b) when used in general, other than as provided above, means principles that are (i) consistent with the principles promulgated or adopted by the Financial Accounting Standards Board and its predecessors, as in effect from time to time, and (ii) consistently applied with past financial statements of Real Mex adopting the same principles, provided that in each case referred to in this definition of "generally accepted accounting principles" a certified public accountant would, insofar as the use of such accounting principles is pertinent, be in a position to deliver an unqualified opinion (other than a qualification regarding changes in generally accepted accounting principles) as to financial statements in which such principles have been properly applied.

<u>Guadala Harry's Concept</u>. The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "Guadala Harry's".

<u>Guaranty</u>. See §7.1.

<u>Guaranteed Pension Plan</u>. Any employee pension benefit plan within the meaning of §3(2) of ERISA maintained or contributed to by any Borrower or any ERISA Affiliate the benefits of which are guaranteed on termination in full or in part by the PBGC pursuant to Title IV of ERISA, other than a Multiemployer Plan.

15

<u>Hazardous Substances</u>.  See §8.17(b).

<u>Hola Amigos Concept</u>.  The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "Hola Amigos".

<u>Indebtedness</u>.  As to any Person and whether recourse is secured by or is otherwise available against all or only a portion of the assets of such Person and whether or not contingent, but without duplication:

        (i)      every obligation of such Person for money borrowed,

        (ii)     every obligation of such Person evidenced by bonds, debentures, notes or other similar instruments, including obligations incurred in connection with the acquisition of property, assets or businesses,

        (iii)    every reimbursement obligation of such Person with respect to letters of credit, bankers' acceptances or similar facilities issued for the account of such Person,

        (iv)    every obligation of such Person issued or assumed as the deferred purchase price of property or services (including securities repurchase agreements but excluding trade accounts payable or accrued liabilities arising in the ordinary course of business which are not overdue by more than sixty (60) days or which are being contested in good faith and for which the Borrowers maintain sufficient reserves in accordance with generally accepted accounting principles),

        (v)      every obligation of such Person under any Capitalized Lease,

        (vi)    every obligation of such Person under any lease treated as an operating lease under generally accepted accounting principles and as a loan or financing for U.S. income tax purposes (a "<u>Synthetic Lease</u>"),

        (vii)   all sales by such Person of (A) accounts or general intangibles for money due or to become due, (B) chattel paper, instruments or documents creating or evidencing a right to payment of money or (C) other receivables (collectively "receivables"), whether pursuant to a purchase facility or otherwise, other than in connection with the disposition of the business operations of such Person relating thereto or a disposition of defaulted receivables for collection and not as a financing arrangement, and together with any obligation of such Person to pay any discount, interest, fees, indemnities, penalties, recourse, expenses or other amounts in connection therewith,

        (viii)  every obligation of such Person (an "equity related purchase obligation") to purchase, redeem, retire or otherwise acquire for value any shares of capital stock of any class issued by such Person, any warrants, options or other rights to acquire any such shares, or any rights measured by the value of such shares, warrants, options or other rights,

CH\1299468.13

(ix)    every obligation of such Person under any forward contract, futures contract, swap, option or other financing agreement or arrangement (including, without limitation, caps, floors, collars and similar agreements), the value of which is dependent upon interest rates, currency exchange rates, commodities or other indices (a "derivative contract"),

(x)    every obligation in respect of Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent that such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor and such terms are enforceable under applicable law,

(xi)    every obligation, contingent or otherwise, of such Person guaranteeing, or having the economic effect of guarantying or otherwise acting as surety for, any obligation of a type described in any of clauses (i) through (x) (the "primary obligation") of another Person (the "primary obligor"), in any manner, whether directly or indirectly, and including, without limitation, any obligation of such Person (A) to purchase or pay (or advance or supply funds for the purchase of) any security for the payment of such primary obligation, (B) to purchase property, securities or services for the purpose of assuring the payment of such primary obligation, or (C) to maintain working capital, equity capital or other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such primary obligation.

The "amount" or "principal amount" of any Indebtedness at any time of determination represented by (u) any Indebtedness issued at a price that is less than the principal amount at maturity thereof, shall be the amount of the liability in respect thereof determined in accordance with generally accepted accounting principles, (v) any Capitalized Lease shall be the principal component of the aggregate of the rentals obligation under such Capitalized Lease payable over the term thereof that is not subject to termination by the lessee, (w) any sale of receivables shall be the amount of unrecovered capital or principal investment of the purchaser (other than any of the Borrowers or any of their wholly-owned Subsidiaries) thereof, excluding amounts representative of yield or interest earned on such investment, (x) any synthetic lease shall be the stipulated loss value, termination value or other equivalent amount, (y) any derivative contract shall be the maximum amount of any termination or loss payment required to be paid by such Person if such derivative contract were, at the time of determination, to be terminated by reason of any event of default or early termination event thereunder, whether or not such event of default or early termination event has in fact occurred and (z) any equity related purchase obligation shall be the maximum fixed redemption or purchase price thereof inclusive of any accrued and unpaid dividends to be comprised in such redemption or purchase price.

The obligation of such Person to pay current year insurance premiums in an amount not to exceed $3,500,000 shall be excluded from Indebtedness.

Ineligible Securities.  Securities which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1993 (12 U.S.C. §24, Seventh), as amended.

CH\1299468.13

Initial Approved Budget. As defined in §12.2.

Interest Payment Date. The last day of each calendar month with respect to interest accrued during such calendar month, including, without limitation, the calendar month which includes the Drawdown Date of a Revolving Credit Loan.

Interim Order. The order of the Bankruptcy Court with respect to the Debtors, in substantially the form of Exhibit G hereto, with such amendments, modifications or supplements reasonably acceptable to the Agent.

International Standby Practices. With respect to any standby Letter of Credit, International Standby Practices (ISP98), International Chamber of Commerce Publication No. 590, or any successor code of standby letter of credit practices among banks adopted by the Agent in the ordinary course of its business as a standby letter of credit issuer and in effect at the time of issuance of such Letter of Credit.

Investments. All expenditures made and all liabilities incurred (contingently or otherwise) for the acquisition of stock or Indebtedness of, or for loans, advances, capital contributions or transfers of property to, or in respect of any guaranties (or other commitments described under Indebtedness) or obligations of any Person. In determining the aggregate amount of Investments outstanding at any particular time: (a) the amount of any Investment represented by a guaranty shall be taken at not less than the principal amount of the obligations guaranteed and still outstanding; (b) there shall be included as an Investment all interest accrued with respect to Indebtedness constituting an Investment unless and until such interest is paid; (c) there shall be deducted in respect of each such Investment any amount received as a return of capital (but only by repurchase, redemption, retirement, repayment, liquidating dividend or liquidating distribution); (d) there shall not be deducted in respect of any Investment any amounts received as earnings on such Investment, whether as dividends, interest or otherwise, except that accrued interest included as provided in the foregoing clause (b) may be deducted when paid; and (e) there shall not be deducted from the aggregate amount of Investments any decrease in the value thereof.

Keystone Grill Concept. The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "Keystone Grill".

KKR. Collectively, KKR Financial CLO 2007-1, Ltd., KKR Strategic Capital Overseas Fund, Ltd., KKR Strategic Capital Fund, L.P., and KKR Strategic Capital Institutional Fund, Ltd.

Las Brisas Concept. The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "Las Brisas".

L/C Issuer. means GE Capital or a Subsidiary thereof or a bank or other legally authorized Person selected by or acceptable to the Agent in its sole discretion, in such Person's capacity as an issuer of Letters of Credit hereunder.

Lease Assumption Order. See §9.21(a).

CH\1299468.13

<u>Lenders</u>. The institutions listed on <u>Schedule 1</u> hereto and any other Person who becomes an assignee of any rights and obligations of a Lender pursuant to §20.

<u>Letter of Credit</u>. See §5.1.1.

<u>Letter of Credit Application</u>. See §5.1.1.

<u>Letter of Credit Commitment</u>. (a) At all times prior to the Roll-Up Effective Time, the amount set forth on <u>Part A</u> on <u>Schedule 2</u> hereto as the amount of such Lender's commitment to participate in letters of credit pursuant to the Letter of Credit Commitment to the Borrowers, as the same may be reduced from time to time in accordance with the provisions hereof; or if such commitment is terminated in accordance with the provisions hereof, zero and (b) at all times from and after the Roll-Up Effective Time, the amount set forth on <u>Part B</u> on <u>Schedule 2</u> hereto as the amount of such Lender's commitment to participate in letters of credit pursuant to the Letter of Credit Commitment to the Borrowers, as the same may be reduced from time to time in accordance with the provisions hereof; or if such commitment is terminated in accordance with to the provisions hereof, zero.

<u>Letter of Credit Commitment Percentage</u>. With respect to each Lender, the percentage set forth on <u>Schedule 2</u> hereto as such Lender's percentage of the aggregate Letter of Credit Commitments of all of the Lenders.

<u>Letter of Credit Facility</u>. The letter of credit facility established pursuant to this Credit Agreement in an aggregate amount equal to the aggregate Letter of Credit Commitments.

<u>Letter of Credit Fee</u>. See §5.6.

<u>Letter of Credit Participation</u>. See §5.1.4.

<u>Loan Documents</u>. This Credit Agreement, the Notes, the Letter of Credit Applications, the Letters of Credit, the Fee Letter and the DIP Orders.

<u>Loans</u>. The Revolving Credit Loans.

<u>Majority Lenders</u>. As of any date, any combination of Lenders the sum of whose aggregate Revolving Credit Commitments constitute at least sixty-six and two-thirds percent (66 2/3%) of the Revolving Credit Commitments of all Lenders, or, if the Revolving Credit Commitment has been terminated or if the Maturity Date has occurred, any combination of Lenders holding at least sixty-six and two-thirds percent (66 2/3%) of the total outstanding principal amount of the Loans on such date; <u>provided</u>, <u>however</u>, so long as there are two (2) Lenders or less, Majority Lenders shall be all Lenders.

<u>Materially Adverse Effect</u>. A materially adverse effect on the business, assets or financial condition of the Borrowers and their Subsidiaries taken as a whole, except for the commencement of the Chapter 11 Cases and the effects that customarily result from the commencement of chapter 11 cases.

19

Maturity Date. The earliest to occur of (a) March 31, 2012, (b) the effective date of a plan of reorganization in the Chapter 11 Cases, (c) the Termination Declaration Date, (d) the date of the consummation of the sale of all or substantially all of the assets and Equity Interests of the Debtors pursuant to Section 363 of the Bankruptcy Code, and (e) the date all Obligations are indefeasibly paid in full in cash and this Credit Agreement and the other Loan Documents are terminated.

Maximum Drawing Amount. The maximum aggregate amount that the beneficiaries may at any time draw under outstanding Letters of Credit, as such aggregate amount may be reduced from time to time pursuant to the terms of the Letter of Credit; provided, however, that the Maximum Drawing Amount shall not include the amount of any Letter of Credit to the extent any such Letter of Credit has been cash collateralized in an amount not less than 105% of the aggregate amount that the beneficiary may at any time draw under such Letter of Credit.

Mortgaged Property. Any Real Estate which is subject to a lien in favor of the Agent.

MP. As defined in the preamble hereto.

Multiemployer Plan. Any multiemployer plan within the meaning of §3(37) of ERISA maintained or contributed to by any Borrower or any ERISA Affiliate that is subject to Title IV of ERISA.

Note(s). The Revolving Credit Notes.

Obligations. All indebtedness, obligations and liabilities of any of the Borrowers, Parent and their Subsidiaries to any of the Lenders, L/C Issuers, the Agent or any other Person, individually or collectively, existing or arising on the date of this Credit Agreement or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Credit Agreement or any of the other Loan Documents or in respect of any of the Loans made or held or Reimbursement Obligations incurred or any of the Notes, Letter of Credit Applications, Letters of Credit, or other instruments at any time evidencing any thereof.

Other Taxes. Any present or future stamp, court or documentary, intangible or recording taxes any other excise or property taxes, charges or similar duties or levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Credit Agreement or any of the other Loan Documents.

Outstanding. With respect to the Loans, the aggregate unpaid principal thereof as of any date of determination.

Parent. As defined in the Recitals hereto.

Patriot Act. The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

PBGC.  The Pension Benefit Guaranty Corporation created by §4002 of ERISA and any successor entity or entities having similar responsibilities.

Permitted Holder Affiliate  With respect to a specified Person, another Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For purposes of this definition, a Person shall be deemed to "control" or be "controlled by" a Person if such Person possesses, directly or indirectly, power either (a) to vote 10% or more of the securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

Permitted Holders.  Collectively, (a) Cocina, KKR, Canpartners and Capstone, (b) the Co-Investors, and (c) any Related Parties of (i) Cocina, KKR, Canpartners or Capstone or (ii) the Co-Investors.

Permitted Expenses.  Reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other reasonable out of pocket expenses of the Agent in connection with the Chapter 11 Cases, this Credit Agreement, the Loan Documents, and all documents related thereto, and all costs and expenses of the Agent (including reasonable, documented attorney expenses in accordance herewith) in connection with the enforcement of remedies under the Loan Documents to be reimbursed on a current basis by the Debtors from the proceeds of Loans hereunder.  For avoidance of doubt, all fees and expenses in the immediately preceding sentence shall be reimbursed without regard to the amounts set forth in the Approved Budget with respect thereto; provided, that, to the extent the amounts of such fees and expenses exceed the amounts set forth therefor in the Approved Budget, the Approved Budget shall be automatically increased to incorporate such additional amounts.

Permitted Liens.  Liens, security interests and other encumbrances permitted by §10.2.

Permitted Parent Debt.  The 2009 Parent Debt as long as (i) all of such Indebtedness results from an assumption by the Parent from Real Mex of the portion of the Unsecured Term Loan in the same amount on or about July 7, 2009, (ii) such Indebtedness is unsecured and not guaranteed by any Borrower or any Subsidiary of a Borrower, (iii) such Indebtedness is not exchangeable or convertible into any Indebtedness of the Parent or any of its Subsidiaries, (iv) such Indebtedness is subordinated to the Obligations pursuant to the 2009 Intercreditor Agreement (Parent Debt), (v) interest on such Indebtedness shall be payable only in kind, and (vi) such Indebtedness does not mature, and is not subject to mandatory repurchase, redemption or amortization, in each case prior to the 180th day after the date specified in clause (a) of the definition of the term "Maturity Date".

Person.  Any individual, corporation, partnership, trust, unincorporated association, limited liability company, business, or other legal entity, and any government or any governmental agency or political subdivision thereof.

Petition Date.  As defined in the Recitals hereto.

CH\1299468.13

<u>Post-Petition</u>. The time period beginning immediately upon the filing of the Chapter 11 Cases and ending upon the closing of the Chapter 11 Cases.

<u>Postpetition Transfer Avoidance Actions</u>. "Postpetition Transfer Avoidance Actions" as defined in the DIP Orders.

<u>Prepetition First Liens</u>. "Prepetition First Liens" as defined in the DIP Orders.

<u>Pre-Petition</u>. The time period prior to the filing of the Chapter 11 Cases.

<u>Pre-Petition Credit Agreement</u>. The Second Amended and Restated Revolving Credit Agreement, dated as of January 29, 2007, as amended, supplement or otherwise modified to the date hereof, among Borrowers, the lending institutions party thereto, and GE Capital, as "Agent" (as defined therein).

<u>Pre-Petition Indebtedness</u>. Any and all Indebtedness of the Debtors incurred prior to the Petition Date and outstanding as of the Petition Date.

<u>Pre-Petition Letters of Credit</u>. "Letters of Credit" outstanding under (and as defined in) the Pre-Petition Credit Agreement.

<u>Pre-Petition Loan Documents</u>. "Loan Documents" as defined in the Pre-Petition Credit Agreement.

<u>Pre-Petition Obligations</u>. "Obligations" outstanding under (and as defined in) the Pre-Petition Credit Agreement as of the Petition Date.

<u>Pre-Petition Payments</u>. Any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition Indebtedness or other obligations or claims (including trade payables and payments in respect of reclamation and/or Section 503(b)(9) claims) of the Debtors.

<u>Prepetition Prior Liens</u>. "Prepetition Prior Liens" as defined in the DIP Orders.

<u>Prepetition Second Lien Secured Parties' Adequate Protection</u>. "Prepetition Second Lien Secured Parties' Adequate Protection" as defined in the DIP Orders.

<u>Pre-Petition Revolving Credit Loans</u>. "Revolving Credit Loans" outstanding under (and as defined in) the Pre-Petition Credit Agreement as of the Petition Date.

<u>Prior Agent</u>. The "Agent" under (and as defined in) the Pre-Petition Credit Agreement.

<u>Prior Lenders</u>. Collectively, the "Lenders" under (and as defined in) the Pre-Petition Credit Agreement.

<u>Prior L/C Issuers</u>. Collectively, the "L/C Issuers" under (and as defined in) the Pre-Petition Credit Agreement.

<u>RCRA</u>. See §8.17(a).

Real Estate.  All real property at any time owned or leased (as lessee or sublessee) by any of the Borrowers or their Subsidiaries.

Real Estate Leases.  Leases, including ground leases and space leases, pursuant to which any Borrower leases Real Estate.

Real Mex.  As defined in the preamble hereto.

Record.  The grid attached to a Note, or the continuation of such grid, or any other similar record, including computer records, maintained by any Lender with respect to any Loan referred to in such Note.

Register.  See §20.3.

Reimbursement Obligation.  The Borrowers' obligation to reimburse the Agent and the Lenders on account of any drawing under any Letter of Credit as provided in §5.2.

Related Parties.  With respect to any Permitted Holder, the Permitted Holder Affiliates of such Permitted Holder and the members, partners, directors, officers, employees, agents, trustees and advisors of such Permitted Holder and of the Permitted Holder Affiliates of such Permitted Holder.

Restricted Payments.  In relation to the Borrowers, any (a) Distribution, (b) payment in respect of or purchase of any or all of the 2009 Senior Secured Debt, (c) payment in respect of or purchase of any or all of the Unsecured Term Loan, and (d) any payment not made in accordance with the DIP Orders.

Reserves.   The reserve contemplated by §2.1(b) and reserves established by the Agent to ensure the payment of the Carve-Out up to the Carve-Out Cap and other professional expenses.

Revolving Credit Availability. As of any date of determination, the amount by which (a) the Revolving Credit Commitments of all Lenders less all Reserves established by Agent in accordance with the terms hereof exceeds (b) the Outstanding amount of Revolving Credit Loans owing to all Lenders, subject to any restrictions imposed by the DIP Orders.

Revolving Credit Commitment.  (a) At all times prior to the Roll-Up Effective Time, the amount set forth on Part A on Schedule 1 hereto as the amount of such Lender's commitment to make Revolving Credit Loans, as the same may be reduced from time to time in accordance with the provisions hereof; or if such commitment is terminated in accordance with the provisions hereof, zero, and (b) at all times from and after the Roll-Up Effective Time, the amount set forth on Part B on Schedule 1 hereto as the amount of such Lender's commitment to make Revolving Credit Loans, as the same may be reduced from time to time in accordance with the provisions hereof; or if such commitment is terminated in accordance with the provisions hereof, zero.

Revolving Credit Commitment Percentage.  With respect to each Lender, the percentage set forth on Schedule 1 hereto as such Lender's percentage of the aggregate Revolving Credit Commitments of all of the Lenders.

Revolving Credit Loan Facility. The revolving credit loan facility established pursuant to this Credit Agreement in the aggregate amount equal to aggregate Revolving Credit Commitments.

Revolving Credit Loan Request. See §2.6.

Revolving Credit Loans. Revolving credit loans made or to be made by the Lenders to the Borrowers pursuant to §2.

Revolving Credit Note Record. A Record with respect to a Revolving Credit Note.

Revolving Credit Note(s). See §2.4.

RMF. As defined in the preamble hereto.

RM Integrated. RM Integrated, Inc., a Delaware corporation and wholly-owned subsidiary of Parent.

Roll-Up Effective Time. The moment in time immediately following of the entry of the Final Order by the Bankruptcy Court approving the roll-up of the Pre-Petition Obligations as contemplated therein and herein.

Sale-Leaseback. See §10.6.

Satisfactory Exit Commitment. A written financing commitment from the parties to which Exit Costs are to be paid, which commitment provides (or which commitment together with other amounts to be paid pursuant to documentation in form and substance acceptable to Agent provide) for funds sufficient for the indefeasible repayment in full in cash of the Obligations and Pre-Petition Obligations and is otherwise in form and substance acceptable to the Agent.

Satisfactory Exit Consent. A written consent, in form and substance acceptable to the Agent, duly executed and delivered by the holders of the 2009 Senior Secured Debt holding at least a majority of the outstanding principal amount of the 2009 Senior Secured Debt, that memorializes such parties' irrevocable consent to (i) to the Debtors obtaining the Facilities from the Agent and Lenders in accordance with the Loan Documents, on an interim basis pursuant to the Interim Order and on a final basis pursuant to the Final Order and (ii) the entry of the Lease Assumption Order in accordance with this Credit Agreement and the DIP Orders. In addition, such written consent shall include an affirmative agreement by such holders of the 2009 Senior Secured Debt to direct the trustee under the 2009 Indenture (in the manner required under the 2009 Indenture to effectuate such direction) not to object to or otherwise oppose the relief described in clauses (i) and (ii) above, and, if applicable, to amend or waive any provisions of the 2009 Intercreditor Agreement (2009 Senior Secured Debt) that conflict with the terms of the Facilities set forth in this Credit Agreement.

SCSF Cantinas. SCSF Cantinas, LLC, a Delaware limited liability company.

Second A&R Unsecured Credit Agreement. The Second Amended and Restated Credit Agreement, dated as of July 7, 2009, by and among Real Mex, Parent, the lenders party thereto, and the administrative agent thereunder.

Store. A particular restaurant at a particular location that is owned or operated by a Borrower or a Borrower's Subsidiary.

Subsidiary. Any corporation, partnership, association, trust, limited liability company or other business entity of which the designated parent shall at any time own directly or indirectly through a Subsidiary or Subsidiaries at least a majority (by number of votes) of the outstanding Voting Stock.

Sun Cantinas. Sun Cantinas, LLC, a Delaware limited liability company.

Sun Cantinas Finance Fee Letter. The letter agreement dated as of the Closing Date among Sun Cantinas Finance, LLC, a Delaware limited liability company, and the Borrowers.

Sun Capital. Sun Capital Partners Group IV, Inc.

Supplemental Approved Budget. In respect of the Initial Approved Budget, supplemental or replacement budgets delivered in accordance with §9.4(j) and approved by the Agent and Majority Lenders (covering any time period covered by a prior budget or covering additional time periods).

Synthetic Leases. As defined in clause (vi) of the definition of the term "Indebtedness".

TARV. As defined in the preamble hereto.

Taxes. Any and all present or future taxes, levies, imposts, deductions, duties, charges, fees, compulsory loans, withholdings and restrictions or conditions of any nature imposed or levied by any jurisdiction or any political subdivision thereof or taxing or other authority therein, and all liabilities with respect thereto, excluding, in the case of each Lender and the Agent, such taxes (including income taxes or franchise taxes) as are imposed on or measured by each Lender's or (in case of payments made to the Agent for its own account) the Agent's net income by any jurisdiction (whether federal, state or local and including any political subdivision thereof) under the laws of which such Lender or the Agent, as the case may be, is organized or maintains a lending office and any U.S. federal withholding taxes imposed by FATCA.

Test Day. See §9.4(k).

Test Period. See §9.4(k).

Total Commitment. The sum of (a) the Revolving Credit Commitments of all Lenders and (b) the Letter of Credit Commitments of all Lenders.

Termination Declaration. See §14.2.

Termination Declaration Date. See §14.2.

Uniform Customs. With respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500 or any successor version thereto adopted by the Agent in the ordinary course of its business as a letter of credit issuer and in effect at the time of issuance of such Letter of Credit or, in the case of a standby Letter of Credit, either the Uniform Customs or the International Standby Practices (ISP98), International Chamber of Commerce Publication No. 590, or any successor code of standby letter of credit practices among banks adopted by the Agent in the ordinary course of its business as a standby letter of credit issuer and in effect at the time of issuance of such Letter of Credit.

Unpaid Reimbursement Obligation. Any Reimbursement Obligation for which the Borrowers have not reimbursed the Agent and the Lenders on the date specified in, and in accordance with, §5.2.

Unsecured Term Loan Documents. (i) the Second A&R Unsecured Credit Agreement, (ii) the Guarantee Agreement (as defined in the Second A&R Unsecured Credit Agreement) and (iii) the Term Notes (as defined in the Second A&R Unsecured Unsecured Credit Agreement), in each case as amended (to the extent permitted by §10.15) and in effect from time to time.

Voting Stock. Stock or similar interests, of any class or classes (however designated), the holders of which are at the time entitled, as such holders, to vote for the election of the directors (or persons performing similar functions) of the corporation, partnership, association, limited liability company, trust or other business entity involved, whether or not the right so to vote exists by reason of the happening of a contingency.

Who Song & Larry's Concept. The method of operation used by and the intellectual property associated with those Stores that as of the Closing Date operate under any trade name that contains the words "Who Song & Larry's".

2009 Indenture. The Indenture referenced in the definition of the term "2009 Senior Secured Debt Documents".

2009 Intercreditor Agreement (2009 Senior Secured Debt). The Intercreditor Agreement among the collateral agent and trustee under the 2009 Senior Secured Debt Documents, and the Prior Agent, dated as of July 7, 2009, as amended, restated or otherwise modified from time to time in accordance with its terms.

2009 Intercreditor Agreement (Parent Debt). The Subordination and Intercreditor Agreement among the Parent, the administrative agent under the 2009 Parent Debt Documents, and the Prior Agent, dated as of July 7, 2009, as amended, restated or otherwise modified from time to time in accordance with its terms.

2009 Unsecured Term Loan Subordination Agreement (Senior Secured Debt). Subordination and Intercreditor Agreement dated as of July 7, 2009 by and among Subordinated Agent (as defined therein), Cocina and KKR Financial CLO 2005-2, Ltd., as subordinated creditors, Holding (as defined therein), Opco (as defined therein), the Listed Obligors (as defined therein) party thereto and the trustee for the holders of the Senior Secured Debt, as amended, restated or otherwise modified from time to time in accordance with its terms.

CH\1299468.13

**2009 Parent Debt.** Unsecured Indebtedness of the Parent in an aggregate principal amount not to exceed $25,000,000 (plus any increase in such $25,000,000 amount solely due to the capitalization of interest on such Indebtedness by adding such interest to the principal amount thereof) and evidenced by the 2009 Parent Debt Documents and any Permitted Subordinated Refinancings (as defined in the 2009 Intercreditor Agreement (Parent Debt)) thereof.

**2009 Parent Debt Documents.** The credit agreement, dated as of July 7, 2009, among Parent, the administrative agent and the lenders referred to therein pursuant to which up to $25,000,000 aggregate principal amount of 2009 Parent Debt has been issued to the Parent and each of the notes and other documents delivered pursuant thereto, in each case, as amended in accordance with this Credit Agreement and in effect from time to time.

**2009 Senior Secured Debt.** Indebtedness of the Borrowers issued on July 7, 2009 in an aggregate original principal amount not to exceed $130,000,000 evidenced by senior secured notes due 2013 issued pursuant to the 2009 Senior Secured Debt Documents and that is expressly subject to the provisions of the 2009 Intercreditor Agreement (2009 Senior Secured Debt).

**2009 Senior Secured Debt Documents.** (i) The Indenture, dated as of July 7, 2009, among Real Mex, the guarantors thereunder, and the trustee and collateral agent thereunder (the "2009 Indenture"), pursuant to which up to $130,000,000 original principal amount of 2009 Senior Secured Debt has been issued by Real Mex, in effect on the date hereof and as amended in the future (to the extent permitted by §10.13), and each of the notes, security documents, guaranties and other documents delivered pursuant thereto, and (ii) the 2009 Intercreditor Agreement (2009 Senior Secured Debt).

## 1.2     Rules of Interpretation.

(a)     A reference to any document or agreement shall include such document or agreement as amended, modified or supplemented from time to time in accordance with its terms and the terms of this Credit Agreement unless explicitly specified to the contrary, either in the defined term referring to such document and agreement or otherwise.

(b)     The singular includes the plural and the plural includes the singular.

(c)     A reference to any law includes any amendment or modification to such law.

(d)     A reference to any Person includes its permitted successors and permitted assigns.

(e)     Accounting terms not otherwise defined herein have the meanings assigned to them by generally accepted accounting principles applied on a consistent basis by the accounting entity to which they refer.

(f)     The words "include", "includes" and "including" are not limiting.

(g)     All terms not specifically defined herein or by generally accepted accounting principles, which terms are defined in the Uniform Commercial Code as in effect in the State of Illinois, have the meanings assigned to them therein, with the term "instrument" being that defined under Article 9 of the Uniform Commercial Code.

(h)     Reference to a particular "§" refers to that section of this Credit Agreement unless otherwise indicated.

(i)     The words "herein", "hereof", "hereunder" and words of like import shall refer to this Credit Agreement as a whole and not to any particular section or subdivision of this Credit Agreement.

(j)     Unless otherwise expressly indicated, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

(k)     This Credit Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are, however, cumulative and are to be performed in accordance with the terms thereof.

(l)     This Credit Agreement and the other Loan Documents are the result of negotiation among, and have been reviewed by counsel to, among others, the Agent and the Borrowers and are the product of discussions and negotiations among all parties. Accordingly, this Credit Agreement and the other Loan Documents are not intended to be construed against the Agent or any of the Lenders merely on account of the Agent's or any Lender's involvement in the preparation of such documents.

## 2.     THE REVOLVING CREDIT FACILITY.

**2.1     Commitment to Lend, Exit Financing Fee Reserve and Roll-Up of the Pre-Petition Revolving Credit Loans.**

(a)     Subject to the terms and conditions set forth in this Credit Agreement, each of the Lenders severally agrees to lend to the Borrowers and the Borrowers may borrow, repay, and reborrow on a joint and several basis from time to time from the Closing Date up to and including the Maturity Date upon notice by the Borrowers to the Agent given in accordance with §2.6, such sums as are requested by the Borrowers up to a maximum aggregate amount Outstanding (after giving effect to all amounts requested) owing to such Lender at any one time equal to such Lender's Revolving Credit Commitment, <u>minus</u> such Lender's Revolving Credit Commitment Percentage of all Reserves established by Agent pursuant to the terms hereof; <u>provided</u> that (a) the Outstanding amount of the Revolving Credit Loans (after giving effect to all amounts requested) owing to all Lenders, <u>plus</u> the Maximum Drawing Amount, plus all Unpaid Reimbursement Obligations <u>plus</u> all Reserves established by Agent pursuant to the terms hereof at such time shall not at any time exceed the Total Commitment, and (b) the Outstanding amount of Revolving Credit Loans (after giving effect to all amounts

28

requested) owing to all Lenders, <u>plus</u> all Reserves established by Agent pursuant to the terms hereof shall not at any time exceed the Revolving Credit Commitments of all Lenders. The Revolving Credit Loans shall be made pro rata in accordance with each Lender's Revolving Credit Commitment Percentage. Each request for a Revolving Credit Loan hereunder shall constitute a representation and warranty by the Borrowers that the conditions set forth in §12 and §13, in the case of the initial Revolving Credit Loans to be made on the Closing Date, and §13, in the case of all other Revolving Credit Loans, have been satisfied on the date of such request.

(b)     Notwithstanding anything to the contrary herein, $1,000,000 of the Revolving Credit Commitments shall be reserved (the "<u>Exit Financing Fee Reserve</u>") exclusively for payment by the Debtors of market fees and costs associated with the arrangement, syndication, negotiation and documentation of exit financing or acquisition financing, as applicable (collectively, the "<u>Exit Costs</u>") and the Exit Financing Fee Reserve shall not become available unless and until the Agent receives the Satisfactory Exit Consent. Notwithstanding anything to the contrary contained herein or otherwise, the Exit Financing Fee Reserve shall not become available if any holder (or any representative or agent thereof) of 2009 Senior Secured Debt opposes, contests or supports any other Person opposing or contesting the entry of any DIP Order or the terms or provisions of any Loan Document or any DIP Order.

(c)     Effective upon the occurrence of the Roll-Up Effective Time, without any further action by any party to this Credit Agreement, the Bankruptcy Court or any other Person, the Pre-Petition Revolving Credit Loans owing to each Lender at the Roll-Up Effective Time shall be rolled-up into and constitute Revolving Credit Loans hereunder and the outstanding principal balance of the Pre-Petition Revolving Credit Loans owing to such Lender shall constitute a portion of the Outstanding amount of the Revolving Credit Loans owing to such Lender hereunder. All interest and fees with respect to the Pre-Petition Revolving Credit Loans that have accrued but remain unpaid at the Roll-Up Effective Time shall constitute Obligations hereunder and shall be due and payable on the first date after the Roll-Up Effective Time on which interest and fees, as applicable, with respect to the Revolving Credit Loans are due and payable in accordance with the terms set forth herein.

CH\1299468.13

**2.2   Commitment Fee.**  The Borrowers jointly and severally agree to pay to the Agent for the accounts of the Lenders in accordance with their respective Revolving Credit Commitment Percentages a commitment fee in an amount equal to one-half of one percent (0.50%) per annum on the average daily amount during each calendar quarter or portion thereof from the Closing Date to the Maturity Date by which the Total Commitment exceeds the sum of (a) the Outstanding amount of Revolving Credit Loans plus (b) the Maximum Drawing Amount plus (c) all Unpaid Reimbursement Obligations during such calendar quarter.  The commitment fee shall be payable quarterly in arrears on the last day of each calendar quarter for the calendar quarter then ending, commencing on the first such date after the Closing Date, with a final payment on the Maturity Date or any earlier date on which the Revolving Credit Commitments shall terminate.

**2.3   Reduction of Total Revolving Credit Commitment.**  The Borrowers shall have the right at any time and from time to time upon one (1) Business Days prior written notice (confirmed telephonically on the date of delivery of such written notice) or telephonic notice (confirmed in writing on the date of such telephonic notice) to the Agent to reduce the Total Revolving Credit Commitment in connection with a payment in full of the Obligations.  Promptly after receiving any notice of the Borrowers delivered pursuant to this §2.3, the Agent will notify the Lenders of the substance thereof.

**2.4   The Revolving Credit Notes.**  If so requested by any Lender, the Revolving Credit Loans shall be evidenced by joint and several promissory notes of the Borrowers in substantially the form of Exhibit A hereto (each a "Revolving Credit Note"), dated as of the Closing Date and completed with appropriate insertions.  One Revolving Credit Note shall be payable to each Lender in a principal amount equal to such Lender's Revolving Credit Commitment or, if less, the Outstanding amount of all Revolving Credit Loans made by such Lender, plus interest accrued thereon, as set forth below.  Each of the Borrowers irrevocably authorizes each Lender to make or cause to be made, at or about the time of the Drawdown Date of any Revolving Credit Loan or at the time of receipt of any payment of principal on such Lender's Revolving Credit Note, an appropriate notation on such Lender's Revolving Credit Note Record reflecting the making of such Revolving Credit Loan or (as the case may be) the receipt of such payment.  The Outstanding amount of the Revolving Credit Loans set forth on such Lender's Revolving Credit Note Record shall be prima facie evidence of the principal amount thereof owing and unpaid to such Lender, but the failure to record, or any error in so recording, any such amount on such Lender's Revolving Credit Note Record shall not limit or otherwise affect the obligations of the Borrowers hereunder or under any Revolving Credit Note to make payments of principal of or interest on any Revolving Credit Note when due.

**2.5   Interest on Revolving Credit Loans.**  Except as otherwise provided in §6.10,

(a)   Each Revolving Credit Loan shall bear interest for the period commencing with the Drawdown Date thereof (or with respect to the borrowings which are deemed to occur at the Roll-Up Effective Time, commencing with the Roll-Up Effective Time) and ending on the day such Revolving Credit Loan is paid in full at an annual rate equal to the sum of (i) the Base Rate as in effect from time to time while such Loan is Outstanding plus (ii) the Applicable Margin.

CH\1299468.13

(b)     The Borrowers jointly and severally promise to pay interest on each Revolving Credit Loan in arrears on each Interest Payment Date with respect thereto.

**2.6     Requests for Revolving Credit Loans.**  The Borrowers shall give to the Agent telephonic and written notice (such written notice to be in the form of Exhibit B hereto) of each Revolving Credit Loan requested hereunder (a "Revolving Credit Loan Request") (a) prior to noon (Chicago time) on the proposed Drawdown Date of any such Loan equal to or less than $5,000,000 and (b) prior to noon (Chicago time) on the date which is one (1) Business Day prior to the proposed Drawdown Date of any such Loan in excess of $5,000,000; provided that no such notice shall be required for the borrowings which are deemed to occur at the Roll-Up Effective Time.  Each such written notice shall specify the principal amount of the Revolving Credit Loan requested and the proposed Drawdown Date of such Revolving Credit Loan.  Upon receipt of any such notices, the Agent shall promptly notify each of the Lenders thereof.  Each Revolving Credit Loan Request shall be irrevocable and binding on the Borrowers and shall obligate the Borrowers to accept the Revolving Credit Loan requested from the Lenders on the proposed Drawdown Date.  Each Revolving Credit Loan Request shall be in a minimum aggregate amount of $100,000 or an integral multiple of $50,000 in excess thereof.  Unless the Agent is otherwise directed in writing by the Borrowers, the proceeds of each requested borrowing after the Closing Date will be made available to the Borrowers by the Agent by wire transfer of such amount to the Borrowers pursuant to the wire transfer instructions specified on the signature page hereto in relation to the Borrowers.

**2.7     [Intentionally Omitted].**

**2.8     Funds for Revolving Credit Loans.**

**2.8.1     Funding Procedures.**  Not later than 1:00 p.m. (Chicago time) on the proposed Drawdown Date of any Revolving Credit Loans, each of the Lenders will make available to the Agent, at the Agent's Office, in immediately available funds, the amount of such Lender's Revolving Credit Commitment Percentage of the amount of the requested Revolving Credit Loans.  Upon receipt from each Lender of such amount, and upon receipt of the documents required by §§12 and 13 and the satisfaction of the other conditions set forth therein, to the extent applicable, the Agent will make available to the Borrowers the aggregate amount of such Revolving Credit Loans made available to the Agent by the Lenders.  The failure or refusal of any Lender to make available to the Agent at the aforesaid time and place on any Drawdown Date the amount of its Revolving Credit Commitment Percentage of the requested Revolving Credit Loans shall not relieve any other Lender from its several obligation hereunder to make available to the Agent the amount of such other Lender's Revolving Credit Commitment Percentage of any requested Revolving Credit Loans.

**2.8.2     Advances by Agent.**  The Agent may, unless notified to the contrary by any Lender prior to a Drawdown Date, assume that such Lender has made available to the Agent on such Drawdown Date the amount of such Lender's Revolving Credit Commitment Percentage of the Revolving Credit Loans to be made on such Drawdown Date, and the Agent may (but it shall not be required to), in reliance upon such assumption, make available to the Borrowers a corresponding amount.  If any Lender

31

makes available to the Agent such amount on a date after such Drawdown Date, such Lender shall pay to the Agent on demand an amount equal to the product of (a) the average computed for the period referred to in clause (c) below, of the weighted average interest rate paid by the Agent for federal funds acquired by the Agent during each day included in such period, times (b) the amount of such Lender's Revolving Credit Commitment Percentage of such Revolving Credit Loans, times (c) a fraction, the numerator of which is the number of days that elapse from and including such Drawdown Date to the date on which the amount of such Lender's Revolving Credit Commitment Percentage of such Revolving Credit Loans shall become immediately available to the Agent, and the denominator of which is 360. A statement of the Agent submitted to such Lender with respect to any amounts owing under this paragraph shall be prima facie evidence of the amount due and owing to the Agent by such Lender. If the amount of such Lender's Revolving Credit Commitment Percentage of such Revolving Credit Loans is not made available to the Agent by such Lender within three (3) Business Days following such Drawdown Date, the Agent shall be entitled to recover such amount from the Borrowers on demand, with interest thereon at the rate per annum applicable to the Revolving Credit Loans made on such Drawdown Date.

## 3. **REPAYMENT OF THE REVOLVING CREDIT LOANS.**

**3.1    Maturity.** The Borrowers jointly and severally promise to pay on the Maturity Date, or at such earlier time as the Revolving Credit Loans become due and payable as set forth herein, and there shall become absolutely due and payable on the Maturity Date, or at such earlier time as the Revolving Credit Loans become due and payable as set forth herein, all of the Revolving Credit Loans Outstanding on such date, together with any and all accrued and unpaid interest thereon.

**3.2    Mandatory Repayments of Revolving Credit Loans.** If at any time (i) the sum of the Outstanding amount of the Revolving Credit Loans, plus the Maximum Drawing Amount, plus all Unpaid Reimbursement Obligations, plus all Reserves established by Agent in accordance with the terms hereof exceeds the Total Commitment or (ii) the sum of the Outstanding amount of the Revolving Credit Loans, plus all Reserves established by Agent in accordance with the terms hereof exceeds the Revolving Credit Commitments of all Lenders, then the Borrowers shall immediately pay the amount of such excess to the Agent for the respective accounts of the Lenders for application to the Revolving Credit Loans. Each prepayment of Revolving Credit Loans shall be allocated among the Lenders, in proportion, as nearly as practicable, to the respective unpaid principal amount of each Lender's Revolving Credit Note, with adjustments to the extent practicable to equalize any prior payments or repayments not exactly in proportion.

**3.3    Optional Repayments of Revolving Credit Loans.** The Borrowers shall have the right, at their election, to repay the Outstanding amount of the Revolving Credit Loans, as a whole or in part, at any time without penalty or premium. The Borrowers shall give the Agent, no later than noon (Chicago time), on the date of any proposed prepayment prior written notice (confirmed telephonically on the date of delivery of such written notice, but in any case such confirmation to occur no later than noon (Chicago time) time, on the date of any such proposed prepayment) or telephonic notice (confirmed in writing on the date of such telephonic notice) of

any proposed prepayment pursuant to this §3.3, in each case specifying the proposed date of prepayment of Revolving Credit Loans and the principal amount to be prepaid. Each such partial prepayment of the Loans shall be in a minimum amount of $100,000 or an integral multiple of $50,000 in excess thereof and shall be accompanied by the payment of accrued interest on the principal prepaid to the date of prepayment. Each partial prepayment shall be allocated among the Lenders, in proportion, as nearly as practicable, to the respective unpaid principal amount of each Lender's Note, with adjustments to the extent practicable to equalize any prior repayments not exactly in proportion.

4.      [INTENTIONALLY OMITTED]

5.      LETTERS OF CREDIT.

5.1     **Letter of Credit Commitment and Roll-Up of the Pre-Petition Letters of Credit**.

5.1.1   **Commitment to Issue Letters of Credit and the Roll-Up of Pre-Petition Letters of Credit**.

(a)     Subject to the terms and conditions hereof and the execution and delivery by the Borrowers of a letter of credit application on the applicable L/C Issuer's customary form (a "Letter of Credit Application"), each L/C Issuer on behalf of the Lenders and in reliance upon the agreement of the Lenders set forth in §5.1.4 and upon the representations and warranties of the Borrowers contained herein, agrees, in its individual capacity, to issue, extend and renew for the account of the Borrowers, in accordance with such L/C Issuer's usual and customary business practices, one or more standby or documentary letters of credit (denominated in Dollars) (individually, a "Letter of Credit"), in such form as may be requested from time to time by the Borrowers and agreed to by such L/C Issuer; provided, however, that, after giving effect to such request, (i) the sum of the aggregate Maximum Drawing Amount and all Unpaid Reimbursement Obligations shall not exceed the Letter of Credit Commitments of all Lenders and (ii) the sum of the aggregate Maximum Drawing Amount and all Unpaid Reimbursement Obligations plus the Outstanding amount of the Revolving Credit Loans owing to all Lenders plus all Reserves established by the Agent in accordance with the terms hereof shall not, at any time, exceed the Total Commitment. Notwithstanding the foregoing, no L/C Issuer shall have any obligation to issue any Letter of Credit:

(A)     to support or secure any Indebtedness of any of the Borrowers or their Subsidiaries to the extent that such Indebtedness was incurred prior to the proposed issuance date of such Letter of Credit, unless in any such case the Borrowers demonstrate to the satisfaction of such L/C Issuer and the Agent that (x) such prior incurred Indebtedness was then fully secured by a prior perfected and unavoidable security interest in collateral provided by the Borrowers or such Subsidiary to the proposed beneficiary of such Letter of Credit or (y) such prior incurred Indebtedness were then secured or supported by a letter of credit issued for the account of such Borrower or such Subsidiary and the reimbursement obligation with respect to such letter of credit was fully secured by a prior

33

perfected and unavoidable security interest in collateral provided to the issuer of such letter of credit by such Borrower or such Subsidiary; and

(B)     upon the occurrence of any of the following: (i) any fee due in connection with, and on or prior to, such issuance has not been paid, (ii) such Letter of Credit is requested to be issued in a form that is not acceptable to such L/C Issuer or (iii) such L/C Issuer shall not have received, each in form and substance reasonably acceptable to it and duly executed by the Borrowers the documents that such L/C Issuer generally uses in the ordinary course of its business for the issuance of letters of credit of the type of such Letter of Credit (collectively, the "L/C Reimbursement Agreement").

For each issuance, extension of the expiration date of, or renewal of a Letter of Credit, the applicable L/C Issuer may, but shall not be required to, determine that, or take notice whether, the conditions precedent set forth in §13 have been satisfied or waived in connection with the issuance, extension or renewal of any Letter of Credit; provided, however, that no Letter of Credit shall be issued, extended or renewed during the period starting on the first Business Day after the receipt by such L/C Issuer of notice from the Agent or the Majority Lenders that any applicable condition precedent contained in §13 is not satisfied and ending on the date all such conditions are satisfied or duly waived.

(b)     Effective upon the occurrence of the Roll-Up Effective Time, without any further action by any party to this Credit Agreement, the Bankruptcy Court or any other Person, the Pre-Petition Letters of Credit issued by Prior L/C Issuer that remain outstanding at the Roll-Up Effective Time shall be rolled-up into and constitute Letters of Credit issued hereunder and the maximum aggregate amount that the beneficiaries may at any time draw under outstanding Pre-Petition Letters of Credit shall constitute a portion of the Maximum Drawing Amount hereunder. All fees with respect to the Pre-Petition Letters of Credit that have accrued but remain unpaid at the Roll-Up Effective Time shall constitute Obligations hereunder and shall be due and payable on the first date after the Roll-Up Effective Time on which fees with respect to Letters of Credit are due and payable in accordance with the terms set forth herein.

(c)     As provided in the DIP Orders, effective upon a draw on a Pre-Petition Letter of Credit on or after the Petition Date but prior to the Roll-Up Effective Time, any Reimbursement Obligation (as defined in the Pre-Petition Credit Agreement) with respect thereto shall be rolled up and constitute a Reimbursement Obligation hereunder without the need of any further action.

**5.1.2   Letter of Credit Applications.** Each Letter of Credit Application shall be completed to the satisfaction of the applicable L/C Issuer. In the event that any provision of any Letter of Credit Application shall be inconsistent with any provision of this Credit Agreement, then the provisions of this Credit Agreement shall, to the extent of any such inconsistency, govern.

**5.1.3   Terms of Letters of Credit.** Each Letter of Credit issued, extended or renewed hereunder shall, among other things, (a) provide for the payment of sight drafts

for honor thereunder when presented in accordance with the terms thereof and when accompanied by the documents described therein, and (b) have an expiry date no later than (i) the first anniversary of the issue date thereof (although Letters of Credit may provide for automatic renewals upon the expiration thereof for additional periods not exceeding one year as long as (x) the Borrowers and such L/C Issuer each have the option to prevent such renewal before the expiration of such term or any such period and (y) neither the L/C Issuer nor the Borrowers shall permit any such renewal to extend such expiration date beyond the date set forth in the immediately succeeding clause (ii)) hereof and (ii) the date which is fourteen (14) days (or, if the Letter of Credit is confirmed by a confirmer or otherwise provides for one or more nominated persons, thirty (30) days) prior to the Maturity Date (it being understood and agreed that, notwithstanding the foregoing clause (ii) to the contrary, the outstanding Pre-Petition Letters of Credit may be rolled-up as provided herein). Each Letter of Credit so issued, extended or renewed shall be subject to the Uniform Customs.

**5.1.4** **Reimbursement Obligations of Lenders.** Each Lender severally agrees that it shall be absolutely liable, without regard to the occurrence of any Default or Event of Default or any other condition precedent whatsoever, to the extent of such Lender's Letter of Credit Commitment Percentage, to reimburse each L/C Issuer on demand for the amount of each draft paid by such L/C Issuer under each Letter of Credit to the extent that such amount is not reimbursed by the Borrowers pursuant to §5.2 (such agreement for a Lender being called herein the "Letter of Credit Participation" of such Lender).

**5.1.5** **Participations of Lenders.** Each such payment made by a Lender shall be treated as the purchase by such Lender of a participating interest in the Borrowers' Reimbursement Obligation under §5.2 in an amount equal to such payment. Each Lender shall share in accordance with its participating interest in any interest which accrues pursuant to §5.2.

**5.1.6** **Cash Collateral Demand.** At any time following the occurrence and during the continuance a Default or an Event of Default, the Agent or any L/C Issuer may require that the Borrowers deliver to the Agent on demand, and the Borrowers hereby agree to deliver to the Agent at any such time, cash collateral to secure the Maximum Drawing Amount or Unpaid Reimbursement Obligation with respect to any Letter of Credit in an amount not less than 105% of the amount of the Maximum Drawing Amount and Unpaid Reimbursement Obligations under any Letter of Credit outstanding at such time.

**5.1.7** **Reporting Obligations of L/C Issuers.** Each L/C Issuer agrees to provide the Agent (which, after receipt, the Agent shall provide to each Lender), in form and substance satisfactory to the Agent, each of the following on the following dates: (A) (i) on or prior to any issuance, extension and renewal, as the case may be, of any Letter of Credit by such L/C Issuer, (ii) immediately after any drawing under any such Letter of Credit or (iii) immediately after any payment (or failure to pay when due) by the Borrowers of any related reimbursement obligation as provided in §5.2), notice thereof, which shall contain a reasonably detailed description of such issuance, extension and renewal, as the case may be, drawing or payment; (B) upon the request of the Agent (or

any Lender through the Agent), copies of any Letter of Credit issued, extended or renewed by such L/C Issuer and any related L/C Reimbursement Agreement and such other documents and information as may reasonably be requested by the Agent; and (C) on the first Business Day of each calendar week, a schedule of the Letters of Credit issued, extended and renewed, as the case may be, by such L/C Issuer, in form and substance reasonably satisfactory to the Agent, setting forth the Maximum Drawing Amount for such Letters of Credit outstanding on the last Business Day of the previous calendar week.

**5.2** **Reimbursement Obligation of the Borrowers.** In order to induce each L/C Issuer to issue, extend and renew each Letter of Credit and the Lenders to participate therein, the Borrowers hereby jointly and severally agree to reimburse or pay to the Agent, for the account of such L/C Issuer or (as the case may be) the Lenders, with respect to each Letter of Credit issued, extended or renewed by such L/C Issuer hereunder,

(a) on the day following each date that any draft presented under such Letter of Credit is honored by such L/C Issuer, or such L/C Issuer otherwise makes a payment with respect thereto, the amount of any taxes, fees, charges or other costs and expenses whatsoever incurred by such L/C Issuer or any Lender in connection with any payment made by such L/C Issuer or any Lender under, or with respect to, such Letter of Credit, and

(b) upon the termination of the Letter of Credit Commitments, or the acceleration of the Reimbursement Obligations with respect to all Letters of Credit in accordance with §14, an amount equal to the then Maximum Drawing Amount on all Letters of Credit, which amount shall be held by the Agent for the benefit of the Lenders and the L/C Issuers as cash collateral for all Reimbursement Obligations; and

(c) on the Maturity Date, the amount of outstanding Unpaid Reimbursement Obligations.

Each such payment shall be made to the Agent at the Agent's Office in immediately available funds. Interest on any and all amounts remaining unpaid by the Borrowers under this §5.2 at any time from the date such amounts become due and payable (whether as stated in this §5.2, by acceleration or otherwise) until payment in full (whether before or after judgment) shall be payable to the Agent on demand at the rate specified in §6.10 for principal on the Revolving Credit Loans.

**5.3** **Letter of Credit Payments.** If any draft shall be presented or other demand for payment shall be made under any Letter of Credit, the applicable L/C Issuer shall notify the Borrowers of the date and amount of the draft presented or demand for payment and of the date and time when it expects to pay such draft or honor such demand for payment. If the Borrowers have not reimbursed the Agent, for the account of such L/C Issuer or (as the case may be) the Lenders, the Agent may at any time thereafter notify the Lenders of the amount of any such Unpaid Reimbursement Obligation. No later than 2:00 p.m. (Chicago time) on the Business Day

36

next following the receipt of such notice, each Lender shall make available to the Agent, at the Agent's Office, in immediately available funds, such Lender's Letter of Credit Commitment Percentage of such Unpaid Reimbursement Obligation, together with an amount equal to the product of (i) the average, computed for the period referred to in clause (iii) below, of the weighted average interest rate paid by the Agent for federal funds acquired by the Agent during each day included in such period, times (ii) the amount equal to such Lender's Letter of Credit Commitment Percentage of such Unpaid Reimbursement Obligation, times (iii) a fraction, the numerator of which is the number of days that elapse from and including the date such L/C Issuer paid the draft presented for honor or otherwise made payment to the date on which such Lender's Letter of Credit Commitment Percentage of such Unpaid Reimbursement obligation shall become immediately available to the Agent, and the denominator of which is 360. The responsibility of any L/C Issuer to the Borrowers and the Lenders shall be only to determine that the documents (including each draft) delivered under each Letter of Credit in connection with such presentment shall be in conformity in all material respects with such Letter of Credit. Interest on Unpaid Reimbursement Obligations shall be payable on the last day of each calendar month with respect to interest accrued during such calendar month at the rate specified in §6.10 for principal on the Revolving Credit Loans.

      **5.4**    **Obligations Absolute.** (a)  The Borrowers' obligations under this §5 shall be absolute and unconditional under any and all circumstances and irrespective of the occurrence of any Default or Event of Default or any condition precedent whatsoever or any setoff, counterclaim or defense to payment which any of the Borrowers may have or have had against the Agent, any L/C Issuer any Lender or any beneficiary of a Letter of Credit, other than claims arising due to the gross negligence or willful misconduct of the Agent, any L/C Issuer or any Lender. Each of the Borrowers further agrees with the Agent, the L/C Issuers and the Lenders that neither the Agent, any L/C Issuer nor any Lender shall be responsible for, and the Borrowers' Reimbursement Obligations under §5.2 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even if such documents should in fact prove to be in any or all respects invalid, fraudulent or forged, or any dispute between or among the Borrowers, the beneficiary of any Letter of Credit or any financing institution or other party to which any Letter of Credit may be transferred or any claims or defenses whatsoever of any of the Borrowers against the beneficiary of any Letter of Credit or any such transferee. The Agent, the L/C Issuers and the Lenders shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit. Each of the Borrowers agrees that any action taken or omitted by the Agent, any L/C Issuer or any Lender under or in connection with each Letter of Credit and the related drafts and documents, if done in good faith, shall be binding upon the Borrowers and shall not result in any liability on the part of the Agent, any L/C Issuer or any Lender to the Borrowers.

      (b)    The obligations of the Lenders under §5.1.4 and §5.1.5 above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Credit Agreement irrespective of (A) (i) the invalidity or unenforceability of any term or provision in any Letter of Credit, any document transferring or purporting to transfer a Letter of Credit, any Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (ii) any document presented under a Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or failing to comply with the

37

terms of such Letter of Credit or (iii) any loss or delay, including in the transmission of any document, (B) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Borrower) may have against the beneficiary of any Letter of Credit or any other Person, whether in connection with any Loan Document or any other contractual obligation or transaction, or the existence of any other withholding, abatement or reduction, (C) (i) the failure of any condition precedent set forth in §13 to be satisfied (each of which conditions precedent the Lenders hereby irrevocably waive) or (ii) any adverse change in the condition (financial or otherwise) of any Borrower and (D) any other act or omission to act or delay of any kind of Agent or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this clause (b), constitute a legal or equitable discharge of any obligation of any Lender hereunder.

     **5.5**   **Reliance by Issuer.**  To the extent not inconsistent with §5.4, each L/C Issuer shall be entitled to rely, and shall be fully protected in relying upon, any Letter of Credit, draft, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel, independent accountants and other experts selected by such L/C Issuer. The Agent shall be fully justified in failing or refusing to take any action under this Credit Agreement unless it shall first have received such advice or concurrence of the Majority Lenders as it reasonably deems appropriate or it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Credit Agreement in accordance with a request of the Majority Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon the Lenders and all future holders of the Revolving Credit Notes or of a Letter of Credit Participation.

     **5.6**   **Letter of Credit Fee.**  The Borrower agrees to pay to Agent for the ratable benefit of the Lenders, as compensation to such Lenders for obligations incurred by Lenders at the request of the Borrowers, whether direct or indirect, contingent or otherwise, due or not due, in connection with the issuance of Letters of Credit by L/C Issuers hereunder or in connection with the reimbursement obligations and the purchase of a participation as set forth in §5.1.4 and §5.1.5 above with respect to Letters of Credit issued hereunder (collectively, "Letter of Credit Obligations"), (i) without duplication of costs and expenses otherwise payable to Agent or Lenders hereunder or fees otherwise paid by the Borrowers, all reasonable costs and expenses incurred by Agent or any Lender on account of such obligations with respect to any Letter of Credit issued hereunder, and (ii) for each month during which any Letter of Credit Obligation shall remain outstanding, a fee (the "Letter of Credit Fee") in an amount equal to the product of the average daily undrawn face amount of all Letters of Credit issued, guaranteed or supported by risk participation agreements multiplied by a per annum rate equal to 4.50%; provided, however, at Agent's or Majority Lenders' option, while an Event of Default exists, such rate shall be increased by two percent (2.00%) per annum. Such fee shall be paid to Agent for the benefit of the Lenders in arrears, on the first day of each calendar month and on the Maturity Date. In addition, the Borrower shall pay to each L/C Issuer, on demand, such reasonable fees, without duplication of fees otherwise payable hereunder (including all per annum fees), charges and expenses of such L/C Issuer in respect of the issuance, negotiation, acceptance, amendment,

transfer and payment of such Letter of Credit or otherwise payable pursuant to the application and related documentation under which such Letter of Credit is issued.

**6.      CERTAIN GENERAL PROVISIONS.**

**6.1      Fees.**  The Borrowers jointly and severally agree to pay the Agent all fees described in the Fee Letter in accordance with the term thereof.

**6.2      Funds for Payments.**

**6.2.1      Payments to Agent.**  All payments of principal, interest, Reimbursement Obligations, commitment fees, Letter of Credit Fees and any other amounts due hereunder or under any of the other Loan Documents shall be made to the Agent (for the ratable account of the Persons entitled thereto), at the Agent's Office at the address for payment specified in the signature page hereof in relation to the Agent or at such other location that the Agent may from time to time designate, in each case at or about 12:00 p.m. (Chicago time) in immediately available funds.

**6.2.2      No Offset, etc.**

(a)      Any and all payments by the Borrowers hereunder and under any of the other Loan Documents shall be made without setoff or counterclaim and free and clear of and without deduction or withholding for any Taxes, except as required by applicable law.  In addition, each Borrower shall pay all Other Taxes to the relevant governmental authority as required by applicable law.

(b)      Subject to §6.2.2(f), the Borrowers agree, jointly and severally, to indemnify and hold harmless each Lender and the Agent for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this §6.2.2) paid by such Lender or the Agent and any liability (including penalties, interest, additions to tax and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.  Payment under this indemnification shall be made within thirty (30) days after the date any Lender (through the Agent) or the Agent makes written demand therefor.

(c)      If any Borrower or the applicable withholding agent shall be required by law to deduct or withhold any Taxes or Other Taxes from or in respect of any sum payable hereunder to any Lender or the Agent, then, subject to §6.2.2(f):

(i)      the sum payable shall be increased as necessary so that after making all required deductions and withholdings of Taxes or Other Taxes (including deductions and withholdings of Taxes or Other Taxes applicable to additional sums payable under this §6.2.2) such Lender or the Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made;

(ii)     such Borrower or the applicable withholding agent shall make such deductions and withholdings; and

(iii)     such Borrower or the applicable withholding agent shall pay the full amount deducted or withheld to the relevant taxing authority or other authority in accordance with applicable law.

(d)     Within thirty (30) days after the date of any payment by any Borrower of Taxes or Other Taxes, such Borrower shall furnish the Agent the original or a certified copy of a receipt evidencing payment thereof, or other evidence of payment reasonably satisfactory to the Agent.

(e)     If any Borrower is required to pay additional amounts to any Lender or the Agent pursuant to subsection (b) or (c) of this §6.2.2, then such Lender shall use commercially reasonable efforts (consistent with legal and regulatory restrictions) to change the jurisdiction of its lending office so as to eliminate any such additional payment by such Borrower which may thereafter accrue, if such change in the judgment of such Lender is not otherwise disadvantageous to such Lender.

(f)     No Borrower shall be obligated to indemnify any Lender or the Agent pursuant to §6.2.2(b) or gross up any payments to any Lender or the Agent pursuant to §6.2.2(c) in respect of United States federal withholding taxes to the extent such Lender or the Agent is organized under the laws of a jurisdiction outside the United States and to the extent imposed as a result of (i) the failure of such Lender or the Agent to deliver the relevant form or forms prescribed by the Internal Revenue Service of the United States referred to in §6.2.2(h) if the Agent or such Lender is entitled under the Code to deliver such forms, (ii) the information or certifications made in such forms being untrue or inaccurate on the date delivered or such form or forms not establishing a complete exemption for United States withholding taxes (except by reason of a change in United States tax laws or regulations occurring after the Closing Date) or (iii) such Lender or the Agent designating a successor lending office which has the effect of causing such Lender or Agent to become obligated for tax payments (or being subject to added United States federal withholding taxes) in excess of those in effect immediately prior to such designation, unless such designation is made at the request of a Borrower.

(g)     If a Lender or the Agent receives the benefit of a refund or credit which it determines in its sole discretion is attributable to any Taxes or Other Taxes as to which it has been indemnified by a Borrower, or with respect to which a Borrower has paid increased amounts hereunder, it shall within thirty (30) days after the date of such receipt pay over the amount of such refund or credit (to the extent so attributable) to such Borrower, net of all reasonable out-of-pocket expenses of such Lender or the Agent related to claiming such refund or credit; provided, however, that (i) any Lender or the Agent may determine, in its sole discretion consistent with the policies of such Lender or the Agent, whether to

seek such a refund or credit; (ii) any Taxes or Other Taxes that are imposed on a Lender or the Agent as a result of a disallowance or reduction (including through the expiration of any tax credit carryover or carryback of such lender or the Agent that otherwise would not have expired) of any such refund or credit with respect to which such Lender or the Agent has made a payment to a Borrower pursuant to this §6.2.2(g) shall be treated as a Tax for which a Borrower is obligated to indemnify such Lender or the Agent pursuant to this §6.2.2 without any setoff, counterclaims, exclusions or defenses; and (iii) nothing in this §6.2.2(g) shall require the Lenders or the Agent to disclose any confidential information to a Borrower (including, without limitation, its tax returns).

(h) Each Lender and the Agent shall deliver to the Borrowers and the Agent:

(i)     in the case of a Lender or Agent that is a "United States person" within the meaning of the Code, executed originals of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(ii)     in the case of a Lender or Agent that is not a "United States person" within the meaning of the Code;

(A)     with respect to payments of interest under any Loan Document, executed originals of Internal Revenue Service Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of an applicable income tax treaty to which the United States is a party and with respect to any other applicable payments under any Loan Document, Internal Revenue Service Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)     executed originals or Internal Revenue Service Form W-8ECI; or

(C)     executed originals or Internal Revenue Service Form W-8BEN along with a certificate that such Lender or Agent is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the relevant Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code; and

(D)     executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to

CH\1299468.13

permit the Borrower or the applicable withholding agent to determine the withholding or deduction required to be made;

(iii)    if a payment made to a Lender or the Agent under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender or the Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or the Agent shall deliver to the Borrower or the applicable withholding agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the applicable withholding agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the applicable withholding agent as may be necessary for the Borrower and the applicable withholding agent to comply with their obligations under FATCA and to determine that such Lender or the Agent has complied with such Lender's or Agent's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Credit Agreement.

(i) For purposes of this Section 6.2.2, the term "Lender" includes any L/C Issuer.

**6.3**    **Computations.**  All computations of interest on the Loans and of commitment fees, Letter of Credit Fees or other fees shall be based on a 360-day year and paid for the actual number of days elapsed.  Whenever a payment hereunder or under any of the other Loan Documents becomes due on a day that is not a Business Day, the due date for such payment shall be extended to the next succeeding Business Day, and interest shall accrue during such extension.  The outstanding amount of the Loans as reflected on the Revolving Credit Note Records from time to time shall be considered correct and binding on the Borrowers absent manifest error.

**6.4**    **[Intentionally Omitted].**

**6.5**    **[Intentionally Omitted].**

**6.6**    **Additional Costs, etc**.

(a)    If any future applicable law or any change in interpretation of any present law, which expression, as used herein, includes statutes, rules and regulations thereunder and interpretations thereof by any competent court or by any governmental or other regulatory body or official charged with the administration or the interpretation thereof and requests, directives, instructions and notices at any time or from time to time hereafter made upon or otherwise issued to any Lender or the Agent by any central bank

CH\1299468.13

or other fiscal, monetary or other authority (whether or not having the force of law), shall:

(i)     subject any Lender or the Agent to any tax, levy, impost, duty, charge, fee, deduction or withholding of any nature with respect to this Credit Agreement, the other Loan Documents, any Letters of Credit, such Lender's Revolving Credit Commitment or the Loans (other than taxes based upon or measured by the income or profits of such Lender or the Agent, taxes imposed by FATCA and taxes covered by §6.2.2), or

(ii)    impose or increase or render applicable (other than to the extent specifically provided for elsewhere in this Credit Agreement) any special deposit, reserve, assessment, liquidity, capital adequacy or other similar requirements (whether or not having the force of law) against assets held by, or deposits in or for the account of, or loans by, or letters of credit issued by, or commitments of an office of any Lender, or

(iii)   impose on any Lender or the Agent any other conditions or requirements with respect to this Credit Agreement, the other Loan Documents, any Letters of Credit, the Loans, such Lender's Revolving Credit Commitment, or any class of loans, letters of credit or commitments of which any of the Loans or such Lender's Revolving Credit Commitment forms a part;

and the result of any of the foregoing is:

(A)     to increase the cost to any Lender of making, funding, issuing, renewing, extending or maintaining any of the Loans or such Lender's Revolving Credit Commitment or any Letter of Credit, or

(B)     to reduce the amount of principal, interest, Reimbursement Obligation or other amount payable to such Lender or the Agent hereunder on account of such Lender's Revolving Credit Commitment, any Letter of Credit or any of the Loans, or

(C)     to require such Lender or the Agent to make any payment or to forego any interest or Reimbursement Obligation or other sum payable hereunder, the amount of which payment or foregone interest or Reimbursement Obligation or other sum is calculated by reference to the gross amount of any sum receivable or deemed received by such Lender or the Agent from the Borrowers hereunder,

then, and in each such case, the Borrowers will, upon demand made by such Lender or (as the case may be) the Agent at any time and from time to time and as often as the occasion therefor may arise, pay to such Lender or the Agent such additional amounts as will be sufficient to compensate such Lender or the Agent for such additional cost, reduction, payment or foregone interest or Reimbursement Obligation or other sum.

43

(b)     Failure or delay on the part of any Lender to demand compensation for any increased costs or reductions in amounts received or receivable or reductions in return on capital shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be under any obligation to compensate any Lender under subclause (a) above with respect to increased costs or reductions with respect to any period prior to the date that is one year prior to such request if such Lender knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would in fact result in a claim for increased compensation by reason of such increased costs or reductions; provided, further, that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any law, regulation, rule, guideline or directive as aforesaid within such one year period.

### 6.7    Capital Adequacy.

(a)     If after the date hereof any Lender or the Agent determines that (i) the adoption of or change in any law, governmental rule, regulation, policy, guideline or directive (whether or not having the force of law) regarding capital requirements for banks or bank holding companies or any change in the interpretation or application thereof by a court or governmental authority with appropriate jurisdiction, or (ii) compliance by such Lender or the Agent or any corporation controlling such Lender or the Agent with any such law, governmental rule, regulation, policy, guideline or directive issued after the date hereof (whether or not having the force of law) of any such entity regarding capital adequacy, has the effect of reducing the return on such Lender's or the Agent's commitment with respect to any Loans to a level below that which such Lender or the Agent could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or the Agent's then existing policies with respect to capital adequacy and assuming full utilization of such entity's capital) by any amount deemed by such Lender or (as the case may be) the Agent to be material, then such Lender or the Agent may notify the Borrowers of such fact.  To the extent that the amount of such reduction in the return on capital is not reflected in the Base Rate, the Borrowers agree to pay such Lender or (as the case may be) the Agent for the amount of such reduction in the return on capital as and when such reduction is determined upon presentation by such Lender or (as the case may be) the Agent of a certificate in accordance with §6.8 hereof.  Each Lender shall allocate such cost increases among its customers in good faith and on an equitable basis.

(b)     Each Lender agrees that, upon the occurrence of any event giving rise to the operation of §§ 6.2.2, 6.6 or 6.7 with respect to such Lender, it will, if requested in writing by the Borrowers, use commercially reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage; provided, further, that nothing in this §6.7 shall affect or postpone any of the obligations of the Borrowers or the rights of any Lender or the Agent pursuant to §§ 6.2.2, 6.6 or 6.7.

CH\1299468.13

(c)   Upon receipt by the Borrowers from any Lender (an "<u>Affected Lender</u>") of a claim under §§ 6.2.2, 6.6 or 6.7, the Borrowers may:

(i)   request one or more of the other Lenders to acquire and assume all or part of such Affected Lender's Loans and Revolving Credit Commitment, provided that no Lender shall be required to accede to any such request; or

(ii)   replace such Affected Lender with another Lender or an Eligible Assignee; provided that (A) such other Lender or Eligible Assignee agrees to be the replacement Lender, (B) such replacement does not conflict with any requirement of law, (C) no Default or Event of Default shall have occurred and be continuing at the time of such replacement, (D) the Borrowers shall repay (or the replacement Lender shall purchase, at par) all Loans, accrued interest and other amounts owing to such replaced Lender prior to the date of replacement, (E) the replacement Lender, if not already a Lender, shall be an Eligible Assignee and reasonably satisfactory to the Agent, (F) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of §20 (provided that the Borrowers or the replacement Lender shall be obligated to pay the registration and processing fee) and (G) the Borrowers shall pay all additional amounts (if any) required pursuant to §§ 6.2.2, 6.6 or 6.7, as the case may be, to the extent such additional amounts were incurred on or prior to the consummation of such replacement.

**6.8     <u>Certificate</u>.** A certificate setting forth any additional amounts payable pursuant to §§6.6 or 6.7 and a brief explanation of such amounts which are due including the calculation thereof in reasonable detail, submitted by any Lender or the Agent to the Borrowers, shall be conclusive, absent manifest error, that such amounts are due and owing.

**6.9     [Intentionally Omitted].**

**6.10     <u>Interest After Default</u>.** At the election of the Agent or the Majority Lenders while any Event of Default exists (or automatically while any Event of Default under §14.1(a) or §14.1(b) exists), the principal of all Loans, the Unpaid Reimbursement Obligations and (to the extent permitted by law) unpaid interest thereon shall, until such Event of Default has been cured or remedied or such Event of Default has been waived by the Lenders pursuant to §27, bear interest compounded monthly and payable on demand at a rate per annum equal to the Base Rate then in effect <u>plus</u> the Applicable Margin <u>plus</u> two percent (2%) per annum.

**6.11     <u>Concerning Joint and Several Liability of the Borrowers.</u>**

(a)   Each of the Borrowers is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lenders and the Agent under this Credit Agreement, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the

undertakings of each other Borrower to accept joint and several liability for the Obligations.

(b)     Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this §6.11), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them.

(c)     If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)     The Obligations of each of the Borrowers under the provisions of this §6.11 constitute the full recourse Obligations of each of the Borrowers enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Credit Agreement or the other Loan Documents or any other circumstance whatsoever as to any other Borrower.

(e)     Except as otherwise expressly provided herein, each Borrower hereby waives promptness, diligence, presentment, demand, protest, notice of acceptance of its joint and several liability, notice of any and all advances of the Loans made under this Credit Agreement and the Notes, notice of occurrence of any Default or Event of Default (except to the extent notice is expressly required to be given pursuant to the terms of this Credit Agreement or any of the other Loan Documents), or of any demand for any payment under this Credit Agreement, notice of any action at any time taken or omitted by the Agent or the Lenders under or in respect of any of the Obligations hereunder, any requirement of diligence and, generally, all demands, notices and other formalities of every kind in connection with this Credit Agreement and the other Loan Documents. Each Borrower hereby waives all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, any right to require the marshaling of assets of the Borrowers and any other entity or Person primarily or secondarily liable with respect to any of the Obligations, and all suretyship defenses generally.  Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment, or place or manner for payment, compromise, refinancing, consolidation or renewals of any of the Obligations hereunder, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by the Agent and the Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Credit Agreement and the other Loan Documents, any and all other indulgences whatsoever by the Agent and the Lenders in respect of any of the Obligations hereunder, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of such Obligations or the addition, substitution or release, in whole or in part, of any Borrower or any other entity or Person primarily or

46

secondarily liable for any Obligation. Such Borrower further agrees that its Obligations shall not be released or discharged, in whole or in part, or otherwise affected by the adequacy of any rights which the Agent or any Lender may have against any collateral security or other means of obtaining repayment of any of the Obligations, the impairment of any collateral security securing the Obligations, including, without limitation, the failure to protect or preserve any rights which the Agent or any Lender may have in such collateral security or the substitution, exchange, surrender, release, loss or destruction of any such collateral security, any other act or omission which might in any manner or to any extent vary the risk of such Borrower, or otherwise operate as a release or discharge of such Borrower, all of which may be done without notice to such Borrower; provided, however, that the foregoing shall in no way be deemed to create commercially unreasonable standards as to the Agent's duties as secured party under the Loan Documents (as such rights and duties are set forth therein). If for any reason any of the other Borrowers has no legal existence or is under no legal obligation to discharge any of the Obligations, or if any of the Obligations have become irrecoverable from any of the other Borrowers by reason of such other Borrower's insolvency, bankruptcy or reorganization or by other operation of law or for any reason, this Credit Agreement and the other Loan Documents to which it is a party shall nevertheless be binding on such Borrower to the same extent as if such Borrower at all times had been the sole obligor on such Obligations. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of the Agent and the Lenders, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder which might, but for the provisions of this §6.11, afford grounds for terminating, discharging or relieving such Borrower, in whole or in part, from any of its obligations under this §6.11, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the obligations of such Borrower under this §6.11 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this §6.11 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any reconstruction or similar proceeding with respect to any other Borrower, or any of the Lenders. The joint and several liability of the Borrowers hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, ownership, membership, constitution or place of formation of any Borrower or the Lenders. Each of the Borrowers acknowledges and confirms that it has itself established its own adequate means of obtaining from each of the other Borrowers on a continuing basis all information desired by such Borrower concerning the financial condition of each of the other Borrowers and that each such Borrower will look to each of the other Borrowers and not to the Agent or any Lender in order for such Borrower to keep adequately informed of changes in each of the other Borrowers' respective financial conditions.

(f)     The provisions of this §6.11 are made for the benefit of the Lenders and the Agent and their respective permitted successors and assigns, and may be enforced by it or them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Lenders or the Agent or

47

such successor or assign first to marshall any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this §6.11 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by any Lender or the Agent upon the insolvency, bankruptcy or reorganization of any of the Borrowers, or otherwise, the provisions of this §6.11 will forthwith be reinstated in effect, as though such payment had not been made.

(g)     Each of the Borrowers hereby agrees that it will not enforce any of its rights of reimbursement, contribution, subrogation or the like against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to any of the Lenders or the Agent with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been irrevocably paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to the Lenders or the Agent hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(h)     Each of the Borrowers hereby agrees that the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations. Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for the Agent and be paid over to the Agent for the pro rata accounts of the Lenders to be applied to repay the Obligations.

## 7.     PARENT GUARANTY; SUPER PRIORITY NATURE OF OBLIGATIONS AND LENDERS' LIENS.

### 7.1     Parent Guaranty.

(a)     Parent hereby absolutely and unconditionally guarantees, as a guaranty of payment and performance and not merely as a guaranty of collection, prompt payment

when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of the Obligations, including all renewals, extensions, amendments, refinancings and other modifications thereof and all costs, attorneys' fees and expenses incurred by the Agent and any Lender in connection with the collection or enforcement thereof, and whether recovery upon such Obligations may be or hereafter become unenforceable or shall be an allowed or disallowed claim under any proceeding or case commenced by or against Parent or any Borrower under the Bankruptcy Code, any successor statute or any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally (collectively, "Debtor Relief Laws"), and including interest that accrues after the commencement by or against any Borrower of any proceeding under any Debtor Relief Laws (collectively, the "Guaranteed Obligations"). The Agent's and the Lenders' books and records showing the amount of the Guaranteed Obligations shall be admissible in evidence in any action or proceeding, and shall be binding upon Parent and conclusive for the purpose of establishing the amount of the Guaranteed Obligations. The guaranty under this §7.1 (this "Guaranty") shall not be affected by the genuineness, validity, regularity or enforceability of the Guaranteed Obligations or any instrument or agreement evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the obligations of Parent under this Guaranty, and Parent hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

(b)     Parent shall make all payments hereunder without setoff or counterclaim and free and clear of and without deduction for any taxes, levies, imposts, duties, charges, fees, deductions, withholdings, compulsory loans, restrictions or conditions of any nature now or hereafter imposed or levied by any jurisdiction or any political subdivision thereof or taxing or other authority therein unless Parent is compelled by law to make such deduction or withholding. If any such obligation (other than one arising with respect to taxes based on or measured by the income or profits of the Agent or any Lender) is imposed upon Parent with respect to any amount payable by it hereunder, Parent will pay to such Person, on the date on which such amount is due and payable hereunder, such additional amount in U.S. dollars as shall be necessary to enable such Person to receive the same net amount which such Person would have received on such due date had no such obligation been imposed upon Parent. Parent will deliver promptly, upon written demand, to the Agent and the Lenders certificates or other valid vouchers for all taxes or other charges deducted from or paid with respect to payments made by Parent hereunder. The obligations of Parent under this paragraph shall survive the payment in full of the Guaranteed Obligations and termination of this Credit Agreement.

(c)     Parent consents and agrees that the Agent and the Lenders may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof:     (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms

49

of the Guaranteed Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of this Guaranty or any Guaranteed Obligations; (c) apply such security and direct the order or manner of sale thereof as the Lender in its sole discretion may determine; and (d) release or substitute one or more of any endorsers or other guarantors of any of the Guaranteed Obligations. Without limiting the generality of the foregoing, Parent consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of Parent under this Guaranty or which, but for this provision, might operate as a discharge of Parent.

(d) Parent waives (a) any defense arising by reason of any disability or other defense of any Borrower or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of the Agent or any Lender) of the liability of any Borrower; (b) any defense based on any claim that Parent's obligations exceed or are more burdensome than those of any Borrower; (c) the benefit of any statute of limitations affecting Parent's liability hereunder; (d) any right to require the Agent or any Lender to proceed against any Borrower, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in the Agent's or any Lender's power whatsoever; (e) any benefit of and any right to participate in any security now or hereafter held by the Agent or any Lender; and (f) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties, in each case, of any kind or nature whatsoever with respect to Parent's payment and performance of the Guaranteed Obligations. Parent expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Guaranteed Obligations, and all notices of acceptance of this Guaranty or of the existence, creation or incurrence of new or additional Guaranteed Obligations.

(e) The obligations of Parent hereunder are those of primary obligor, and not merely as surety, and are independent of the Guaranteed Obligations and the obligations of any other guarantor, and a separate action may be brought against Parent to enforce this Guaranty whether or not any Borrower or any other person or entity is joined as a party.

(f) Parent shall not exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Guaranty until all of the Guaranteed Obligations and any amounts payable under this Guaranty have been indefeasibly paid and performed in full and any commitments of the Agent and the Lenders or facilities provided by the Agent and the Lenders with respect to the Guaranteed Obligations are terminated. If any amounts are paid to Parent in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Agent and the Lenders and shall forthwith be paid to the Agent, for the benefit of itself and the Lenders, to reduce the amount of the Guaranteed Obligations, whether matured or unmatured.

(g)     This Guaranty is a continuing and irrevocable guaranty of all Guaranteed Obligations now or hereafter existing and shall remain in full force and effect until all Guaranteed Obligations and any other amounts payable under this Guaranty are indefeasibly paid in full in cash and all commitments of the Agent and the Lenders or facilities provided by the Agent and the Lenders with respect to the Guaranteed Obligations are terminated. Notwithstanding the foregoing, this Guaranty shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of any Borrower or Parent is made, or the Agent or any Lender exercises its right of setoff , in respect of the Guaranteed Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Agent or any Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, all as if such payment had not been made or such setoff had not occurred and whether or not the Agent is in possession of or has released this Guaranty and regardless of any prior revocation, rescission, termination or reduction. The obligations of Parent under this paragraph shall survive termination of this Guaranty.

(h)     Parent hereby subordinates the payment of all obligations and indebtedness of the Borrowers owing to Parent, whether now existing or hereafter arising, including but not limited to any obligation of the Borrowers to Parent as subrogee of the Agent or any Lender or resulting from Parent's performance under this Guaranty, to the indefeasible payment in full in cash of all Guaranteed Obligations. If the Agent so requests, any such obligation or indebtedness of the Borrowers to Parent shall be enforced and performance received by Parent as trustee for the Agent and the Lenders and the proceeds thereof shall be paid over to the Agent, for the benefit of itself and the Lenders, on account of the Guaranteed Obligations, but without reducing or affecting in any manner the liability of Parent under this Guaranty.

(i)     In the event that acceleration of the time for payment of any of the Guaranteed Obligations is stayed, in connection with any case commenced by or against Parent or any Borrower under any Debtor Relief Laws, or otherwise, all such amounts shall nonetheless be payable by Parent immediately upon demand by the Agent.

**7.2     Super Priority of Obligations and Agent's Liens.** The priority of Agent's liens on the Debtors' Collateral shall be set forth in the Interim Order and the Final Order.

**7.3     Grant of Liens.** Each Debtor hereby grants to the Agent, for the benefit of the Lenders and the Agent, to secure the payment and performance in full of all of the Obligations, a security interest in and pledges and assigns to the Agent, for the benefit of the Lenders and the Agent, the following properties, assets and rights of such Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: all personal and fixture property of every kind and nature including all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents (including, if applicable, electronic documents), accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting

51

obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, all general intangibles (including all payment intangibles) and all products and proceeds of any or all of the foregoing (including all Post-Petition property, including Postpetition Transfer Avoidance Actions but excluding all other Avoidance Actions). As used in this §7.3, all terms defined in the Uniform Commercial Code of the State of Illinois and used herein shall have the same definitions herein as specified therein. Without limiting the foregoing, Obligations shall also be secured by the Prepetition First Liens, which shall remain in full force and effect and continue from and after the Petition Date to secure both Obligations and the Pre-Petition Obligations (with Obligations having priority in accordance with the terms of the DIP Orders). Security interests, liens and pledges granted to the Agent, for the benefit of the Lenders and the Agent, to secure the payment and performance in full of all of the Obligations, shall include the Prepetition First Liens solely to the extent that they secure Obligations as provided herein and in the DIP Orders.

## 8. REPRESENTATIONS AND WARRANTIES.

The Borrowers represent and warrant to the Lenders and the Agent as follows:

### 8.1 Corporate Authority.

**8.1.1 Incorporation; Good Standing.** Each of the Borrowers and each of their Subsidiaries (i) is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, (ii) has all requisite corporate power to own or lease its property as the case may be and conduct its business as now conducted and as presently contemplated, and (iii) is in good standing as a foreign corporation and is duly authorized to do business in each jurisdiction where such qualification is necessary except where a failure to be so qualified would not have a Materially Adverse Effect.

**8.1.2 Authorization.** Except where a failure thereof would not have a Materially Adverse Effect and subject to the entry and terms of the DIP Orders, the execution, delivery and performance of this Credit Agreement and the other Loan Documents to which each of the Borrowers or any of their Subsidiaries is or is to become a party and the transactions contemplated hereby and thereby (i) are within the corporate authority of such Person, (ii) have been duly authorized by all necessary corporate proceedings, (iii) do not conflict with or result in any breach or contravention of any provision of law, statute, rule or regulation to which any of the Borrowers or any of their Subsidiaries is subject or any judgment, order, writ, injunction, license or permit applicable to any of the Borrowers or any of their Subsidiaries and (iv) do not conflict with any provision of the corporate charter or bylaws of, or any agreement or other instrument binding upon, any of the Borrowers or any of their Subsidiaries.

**8.1.3 Enforceability.** The execution and delivery of this Credit Agreement and the other Loan Documents to which any of the Borrowers or any of their Subsidiaries is or is to become a party, subject to the entry of the DIP Orders, will result in valid and legally binding obligations of such Person enforceable against it in accordance with the respective terms and provisions hereof and thereof, except as enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting

CH\1299468.13

generally the enforcement of creditors' rights and except to the extent that availability of the remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.

**8.2** **Governmental Approvals.** Subject to the entry and terms of the DIP Orders, the execution, delivery and performance by each of the Borrowers and their Subsidiaries of this Credit Agreement and the other Loan Documents to which each is or is to become a party and the transactions contemplated hereby and thereby do not require the approval or consent of, or filing with, any governmental agency or authority, except transactions contemplated by §9.20 hereof and except as set forth on Schedule 8.2 and where a failure thereof would not have a Materially Adverse Effect.

**8.3** **Title to Properties; Leases.** Attached hereto as Schedule 8.3, as such Schedule 8.3 may be updated from time to time in accordance with the provisions of §9.5.7, is a complete list of Real Estate owned or leased by the Borrowers. The Borrowers own or lease all of the assets reflected in the consolidated balance sheet of the Borrowers and their Subsidiaries as at the Balance Sheet Date or acquired since that date (except property and assets sold or otherwise disposed of in the ordinary course of business since the Closing Date or as permitted hereunder since the Closing Date), subject to no rights of others, including any mortgages, leases, conditional sales agreements, title retention agreements, liens or other encumbrances except Permitted Liens.

**8.4** **Financial Statements.**

**8.4.1** **Fiscal Year.** Each of the Borrowers and their Subsidiaries will have a fiscal year which ends on the last Sunday in December of each calendar year.

**8.4.2** **Financial Statements.** There has been furnished to each of the Lenders (a) a consolidated balance sheet of the Borrowers and their Subsidiaries as at the Balance Sheet Date, and a consolidated statement of income of the Borrowers and their Subsidiaries for the fiscal year then ended, certified by Grant Thornton LLP, and (b) unaudited balance sheets and statements of income and cash flow for that portion of the fiscal year ending on June 26, 2011. Such financial statements described in the preceding sentence have been prepared in accordance with generally accepted accounting principles and fairly present the financial condition of the Borrowers and their Subsidiaries as at the close of business on the date thereof and the results of operations for the fiscal period then ended subject to year end adjustments in the case of interim statements.

**8.4.3** **[Intentionally Omitted]**

**8.5** **No Material Changes, etc.**

(a)     From June 26, 2011 through the Closing Date, there has occurred no materially adverse change in the financial condition or business of the Borrowers as shown on or reflected in the balance sheet of the Borrowers as of June 26, 2011, or the consolidated statement of income for the fiscal year then ended, other than (i) changes in the ordinary course of business that have not had any materially adverse effect either individually or in the aggregate on the business or financial condition of the Borrowers

53

and (ii) the commencement of the Chapter 11 Cases and the effects that customarily result from the commencement of chapter 11 cases. From the Balance Sheet Date through the Closing Date, no Borrower has made any Restricted Payment.

(b)     Since June 26, 2011, there has occurred no materially adverse change in the financial condition or business of the Borrowers other than changes in the ordinary course of business that have not had any materially adverse effect either individually or in the aggregate on the business or financial condition of the Borrowers except for the commencement of the Chapter 11 Cases and the effects that customarily result from the commencement of chapter 11 cases.

### 8.6     **Laws, Licenses; Franchises, Patents, Copyrights, etc**.

**8.6.1  Laws, Licenses**.   None of the Borrowers or their Subsidiaries is in violation of or delinquent with respect to, any decree, order, or arbitration award of any court or governmental authority, or any agreement with, or any license or permit from, any governmental authority, or any statute, law, license, rule or regulation including, without limitation, laws and regulations relating to food or liquor, occupational health and safety, equal employment opportunities, fair employment practices, and sex, race, religious or age discrimination, in any of the foregoing cases in a manner that could reasonably be expected to result in the imposition of substantial penalties or materially and adversely affect the financial condition, properties or business of the Borrowers and their Subsidiaries taken as a whole. Any and all approvals by any federal, state or local liquor authority necessary for the continued operation of any restaurant operated by any of the Borrowers or their Subsidiaries with full liquor service have been received and remain in full force and effect except where the failure thereof would not have a Materially Adverse Effect.

**8.6.2  Franchises, Patents, Copyrights, etc**.   Except as set forth on Schedule 8.6.2 and where a failure thereof would not have a Materially Adverse Effect, each of the Borrowers and their Subsidiaries possesses all franchises, patents, copyrights, trademarks, trade names, licenses and permits, and rights in respect of the foregoing, adequate for the conduct of the business of the Borrowers and their Subsidiaries, substantially as such business is now conducted without known conflict with any rights of others.

**8.7   Litigation.**  Except as set forth in Schedule 8.7 hereto, there are no actions, suits, proceedings or investigations of any kind pending or, to the knowledge of the Borrowers or their Subsidiaries, threatened against any of the Borrowers or their Subsidiaries before any court, tribunal or administrative agency or board that could be reasonably expected to, either in any case or in the aggregate, materially adversely affect the properties, assets, financial condition or business of the Borrowers and their Subsidiaries or materially impair the right of the Borrowers and their Subsidiaries, taken as a whole, to carry on business substantially as now conducted by them, or result in any substantial liability not adequately covered by insurance, or for which adequate reserves are not maintained on the consolidated balance sheet of the Borrowers and their Subsidiaries, or which question the validity of this Credit Agreement or any of the other Loan Documents or any action taken or to be taken pursuant hereto or thereto.

**8.8   No Materially Adverse Contracts, etc.**  None of the Borrowers or their Subsidiaries is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation that has or could reasonably be expected in the future to have a materially adverse effect on the business, assets or financial condition of the Borrowers and their Subsidiaries.

**8.9   Compliance with Other Instruments, etc.**  None of the Borrowers or their Subsidiaries is in violation of any provision of its charter documents, bylaws, or any agreement or instrument to which it may be subject or by which it or any of its properties may be bound or any decree, order, judgment, statute, license, rule or regulation, in any of the foregoing cases in a manner that could result in the imposition of substantial penalties or have a Materially Adverse Effect and other than with respect to the Pre-Petition Loan Documents and the 2009 Senior Secured Debt Documents.

**8.10   Tax Status.**  Each of the Borrowers and their Subsidiaries (a) has made or filed, or have filed valid extensions of time to file, all federal and state income tax returns and all other material tax returns, reports and declarations required by any jurisdiction to which it is subject, (b) has paid all material taxes and other governmental assessments and charges shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and by appropriate proceedings and (c) has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Borrowers know of no basis for any such claim.

**8.11   No Event of Default.**  No Default or Event of Default has occurred and is continuing.

**8.12   Investment Company Act.**  None of the Borrowers and their Subsidiaries is an "investment company", or an "affiliated company" or a "principal underwriter" of an "investment company", as such terms are defined in the Investment Company Act of 1940.

**8.13   Absence of Financing Statements; Perfection of Security Interests.**  Except with respect to Permitted Liens, there is no financing statement, security agreement, chattel mortgage, real estate mortgage or other document filed or recorded with any filing records,

CH\1299468.13

registry or other public office, that purports to cover, affect or give notice of any present or possible future lien on, or security interest in, any assets or property of any of the Borrowers or their Subsidiaries or any rights relating thereto. All filings, assignments, pledges and deposits of documents or instruments have been made and all other actions have been taken that are necessary or advisable, under applicable law, to establish and perfect the Agent's security interest in the Collateral. The Collateral and the Agent's rights with respect to the Collateral are not subject to any setoff, claims, withholdings or other defenses, except for Permitted Liens. The Borrowers are the owners of the Collateral free from any lien, security interest, encumbrance and any other claim or demand, except for Permitted Liens.

### 8.14 **Employee Benefit Plans**.

**8.14.1 In General.** Each Employee Benefit Plan and each Guaranteed Pension Plan has been maintained and operated in compliance in all material respects with the provisions of ERISA and, to the extent applicable, the Code, including but not limited to the provisions thereunder respecting prohibited transactions and the bonding of fiduciaries and other persons handling plan funds as required by §412 of ERISA. The Borrowers have heretofore delivered to the Agent the most recently filed annual report, Form 5500, with all required attachments, and actuarial statement required to be submitted under §103(d) of ERISA, with respect to each Guaranteed Pension Plan.

**8.14.2 Terminability of Welfare Plans.** Except as set forth in Schedule 8.14.2, (a) no Employee Benefit Plan maintained or contributed to by the Borrowers or their Subsidiaries which is an employee welfare benefit plan within the meaning of §3(1) or §3(2)(B) of ERISA, provides benefit coverage subsequent to termination of employment, except as required by Title I, Part 6 of ERISA or the applicable state insurance laws and (b) the Borrowers, or their Subsidiaries, as the case may be, may terminate each such Plan at any time (or at any time subsequent to the expiration of any applicable bargaining agreement) in the discretion of the Borrowers or their Subsidiaries without liability to any Person other than for claims arising prior to termination.

**8.14.3 Guaranteed Pension Plans.** Each contribution required to be made to a Guaranteed Pension Plan, whether required to be made to avoid the incurrence of an accumulated funding deficiency, the notice or lien provisions of §302(f) of ERISA, or otherwise, has been timely made. No waiver of an accumulated funding deficiency or extension of amortization periods under §412 of the Code or §302 of ERISA has been received with respect to any Guaranteed Pension Plan, and neither any of the Borrowers nor any ERISA Affiliate is obligated to post or has posted security in connection with an amendment to a Guaranteed Pension Plan pursuant to §307 of ERISA or §401(a)(29) of the Code. No liability to the PBGC (other than required insurance premiums, all of which have been paid) has been incurred by any Borrower or any ERISA Affiliate with respect to any Guaranteed Pension Plan and no ERISA Reportable Event (other than an ERISA Reportable Event as to which the requirement of 30 days notice has been waived), nor any other event or condition which presents a material risk of termination of any Guaranteed Pension Plan by the PBGC, has occurred. Based on the latest valuation of each Guaranteed Pension Plan (which in each case occurred within twelve months of the date of this representation), and on the actuarial methods and assumptions employed

for that valuation, the aggregate benefit liabilities of all such Guaranteed Pension Plans within the meaning of §4001 of ERISA did not exceed the aggregate value of the assets of all such Guaranteed Pension Plans, disregarding for this purpose the benefit liabilities and assets of any Guaranteed Pension Plan with assets in excess of benefit liabilities.

**8.14.4 Multiemployer Plans.** Neither any of the Borrowers nor any ERISA Affiliate has incurred any material liability (including secondary liability) to any Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan under §4201 of ERISA or as a result of a sale of assets described in §4204 of ERISA. Neither any of the Borrowers nor any ERISA Affiliate has been notified that (a) any Multiemployer Plan is in reorganization or insolvent under and within the meaning of §4241 or §4245 of ERISA or is at risk of entering reorganization or becoming insolvent, or (b) that any Multiemployer Plan intends to terminate or has been terminated under §4041A of ERISA.

**8.15 Use of Proceeds.**

**8.15.1 General.**

(a) The Revolving Credit Loans shall be used solely for (i) working capital (excluding capital expenditures) to the extent set forth in, and in accordance with, the Approved Budget, (ii) capital expenditures to the extent set forth in, and in accordance with, the Approved Budget, (iii) payment of costs of administration of the Chapter 11 Cases to the extent set forth in, and in accordance with, the Approved Budget, (iv) Permitted Expenses, (v) the unpaid fees, costs, and disbursements of professionals in the Chapter 11 Cases as set forth in the definition of the term "Carve-Out" in the DIP Order, (vi) such Pre-Petition Obligations as the Agent consents to and the Bankruptcy Court approves, in each case in a manner consistent with the terms and conditions contained herein and in the DIP Orders, and to the extent set forth, and in accordance with, the Approved Budget and (vii) the roll-up of the Pre-Petition Obligations as contemplated herein and in the DIP Orders. The Borrowers will obtain Letters of Credit for self-insurance and voluntary disability insurance programs and purchases of supplies in the ordinary course of business to the extent set forth in, and in accordance with, the Approved Budget.

(b) No Exist Costs may be funded with the proceeds of the Revolving Credit Loans prior to the release of the Exit Financing Fee Reserve pursuant to and in accordance with §2.1(b), and following the release of the Exit Financing Fee Reserve pursuant to and in accordance with §2.1(b), not more than $350,000 of Exit Costs (or such greater amount as may be approved by the Agent in its sole discretion in writing) may be funded with the proceeds of the Revolving Credit Loans or otherwise expended by the Debtors prior to receipt by the Agent of the Satisfactory Exit Commitment and in no event prior to the entry of the Final Order.

**8.15.2 Regulations U and X.** No portion of any Loan is to be used, and no portion of any Letter of Credit is to be obtained, for the purpose of purchasing or carrying

any "margin security" or "margin stock" as such terms are used in Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.

**8.15.3 Ineligible Securities.** No portion of the proceeds of any Loans is to be used, and no portion of any Letter of Credit is to be obtained, for the purpose of knowingly purchasing, or providing credit support for the purchase of, during the underwriting or placement period or within thirty (30) days thereafter, any Ineligible Securities underwritten or privately placed by a Financial Affiliate.

**8.16 Disclosure.** Neither this Credit Agreement, nor any of the other Loan Documents, nor any other written information provided to the Lenders by any Borrower or any of the Borrowers' Subsidiaries contains any untrue statement of a material fact or omits to state a material fact (known to any of the Borrowers or their Subsidiaries in the case of any document or information not furnished by it or any of its Subsidiaries) necessary in order to make the statements herein or therein not misleading at the time made. There is no fact known to any of the Borrowers or their Subsidiaries which materially adversely affects, or which could reasonably be expected to materially adversely affect, the business, assets, financial condition or prospects of the Borrowers and their Subsidiaries taken as a whole, exclusive of effects resulting from changes in general economic conditions, legal standards or regulatory conditions and other than the commencement of the Chapter 11 Cases and the filing of the DIP Orders, First Day Order, and other filings made by Debtors in the Bankruptcy Court and the effects that customarily result from the commencement of chapter 11 cases.

**8.17 Environmental Compliance.** The Borrowers have taken all steps reasonably deemed necessary by the Borrowers to investigate the past and present condition and usage of the Real Estate and the operations conducted thereon and, based upon such diligent investigation, have determined that, except as disclosed on Schedule 8.17:

(a) none of the Borrowers or their Subsidiaries is in violation, or, to the knowledge of the Borrowers or their Subsidiaries, alleged violation, of any judgment, decree, order, law, license, rule or regulation pertaining to environmental matters, including without limitation, those arising under the Resource Conservation and Recovery Act ("RCRA"), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, or any state or local statute, regulation, ordinance, order or decree relating to health, safety or the environment (hereinafter "Environmental Laws"), which violation could be reasonably expected to have a Materially Adverse Effect;

(b) none of the Borrowers or their Subsidiaries has received written notice from any third party including, without limitation, any federal, state or local governmental authority, (i) that any one of them has been identified by the United States Environmental Protection Agency ("EPA") as a potentially responsible party under CERCLA with respect to a site listed on the National Priorities List, 40 C.F.R. Part 300 Appendix B; (ii) that any hazardous waste, as defined by 42 U.S.C. §6903(5), any hazardous substances as defined by 42 U.S.C. §9601(14), any pollutant or contaminant as defined by 42 U.S.C. §9601(33) and any toxic substances, petroleum products or

58