hazardous materials or other chemicals or substances regulated by any Environmental Laws ("Hazardous Substances") which any one of them has generated, transported or disposed of has been found at any site at which a federal, state or local agency or other third party has conducted an investigation, removal or other response action pursuant to any remedial investigation, removal or other response action pursuant to any Environmental Law; or (iii) that it is or shall be a named party to any claim, action, cause of action, complaint, or legal or administrative proceeding (in each case, contingent or otherwise) arising out of any third party's incurrence of costs, expenses, losses or damages of any kind whatsoever in connection with the release of Hazardous Substances;

(c)    (i) no portion of the Real Estate has been used for the handling, processing, storage or disposal of Hazardous Substances except in accordance with applicable Environmental Laws, and no underground tank or other underground storage receptacle for Hazardous Substances owned or used by, or which the Borrowers or their Subsidiaries are or could be reasonably expected to be liable is located on any portion of the Real Estate, except for such handling, storage, disposal or use which could not be reasonably expected to have a Materially Adverse Effect; (ii) in the course of any activities conducted by the Borrowers, their Subsidiaries or operators of their properties, no Hazardous Substances have been generated or are being used on the Real Estate except in substantial compliance with applicable Environmental Laws; (iii) there have been no releases (i.e. any past or present releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, disposing or dumping) or threatened releases of Hazardous Substances on, upon, into or from the properties of any of the Borrowers or their Subsidiaries, which releases would have a Materially Adverse Effect; (iv) to the best of the Borrowers' knowledge, there have been no releases on, upon, from or into any real property in the vicinity of any of the Real Estate which, through soil or groundwater contamination, may have come to be located on, and which would have a Materially Adverse Effect; and (v) in addition, any Hazardous Substances that have been generated on any of the Real Estate while owned or leased by the Borrowers or their Subsidiaries have been transported offsite in compliance with applicable Environmental Law, treated or disposed of only by treatment or disposal facilities maintaining valid permits at the time of such treatment or disposal as required under applicable Environmental Laws, which transporters and facilities have been and are, to the best of the Borrowers' knowledge, operating in compliance with such permits and applicable Environmental Laws; and

(d)    none of the Borrowers, their Subsidiaries, any Mortgaged Property or any of the other Real Estate is subject to any applicable Environmental Law requiring the performance of Hazardous Substances site assessments, or the removal or remediation of Hazardous Substances, or the giving of notice to any governmental agency or the recording or delivery to other Persons of an environmental disclosure document or statement by virtue of the transactions set forth and contemplated in the Loan Documents, or as a condition to the recording of any Mortgage or to the effectiveness of any other transactions contemplated hereby except where the existence thereof would not have a Materially Adverse Effect.

59

**8.18    Subsidiaries, etc.**  Schedule 8.18 lists all Subsidiaries of each Borrower, together with information on their jurisdictions of incorporation, the number and class of authorized and issued capital stock and the owners of all issued capital stock. Such capital stock constitutes, of record, 100% of the outstanding capital stock of each such Borrower and, on a fully-diluted basis, 100% of such outstanding capital stock. Except as set forth on Schedule 8.18 hereto, none of the Borrowers or their Subsidiaries is engaged in any joint venture or partnership with any other Person.  Schedule 8.18(A) lists the owners of all issued capital stock of Parent as of the Closing Date and the percentage of issued capital stock of Parent owned by each such Person. As of the Closing Date, except as set forth on Schedule 8.18(A), there are no securities convertible into or exchangeable for capital stock of Parent and there are no warrants, options or other rights to purchase, subscribe for or otherwise acquire any capital stock of Parent.

**8.19    [Intentionally Omitted]** .

**8.20    [Intentionally Omitted].**

**8.21    Certain Transactions.**  Except for transactions listed on Schedule 8.21 and arm's length transactions pursuant to which any of the Borrowers or their Subsidiaries makes payments in the ordinary course of business upon terms no less favorable than such Borrower or such Subsidiary could obtain from third parties, none of the officers, directors, or employees of any of the Borrowers or their Subsidiaries is presently a party to any transaction with any of the Borrowers or their Subsidiaries (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Borrowers, any corporation, partnership, trust or other entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

**8.22    Bank Accounts.**  Schedule 8.22, as such Schedule 8.22 may be updated from time to time in accordance with the provisions of §9.5.6, sets forth the account numbers and location of all bank accounts of the Borrowers and their Subsidiaries.

**8.23    Stores.**  Schedule 8.23 sets forth, as of the Closing Date, the names, addresses and Concepts of each Store and identifies, as of the Closing Date, which of those Stores are operated under a franchise agreement between a Borrower as franchisor and a franchisee.

**8.24    Franchise Agreements.**  The Borrowers have delivered to the Agent as at the Closing Date and pursuant to §9.5.5 true and complete copies of any franchise agreements to which the Borrowers or any of the Borrowers' Subsidiaries is party.

**8.25    Leases.**   Neither the execution, delivery and performance of this Credit Agreement or the other Loan Documents to which the Borrowers or any of their Subsidiaries is a party, including a pledge by the Borrowers to the Agent of all the Equity Interests of the Borrowers nor the realization by the Agent on such pledge, will create a default under any Real Estate Lease under which the Borrowers or any of their Subsidiaries is presently a lessee or sublessee, which is likely to have a materially adverse effect on the business or financial condition of the Borrowers and their Subsidiaries, taken as a whole.

CH\1299468.13

**8.26** **Foreign Assets Control Regulations.** None of the requesting or borrowing of the Loans, the requesting or issuance, extension or renewal of any Letters of Credit or the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, neither the Borrower nor any of its Subsidiaries or other Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person".

**8.27** **Bankruptcy Matters.**

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice, to the extent given or required to be given prior to the date hereof, was given for (x) the motions seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearings for the approval of the Interim Order, and (z) the hearings for the approval of the Final Order.

(b)     From and after the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors as set forth in the DIP Orders.

(c)     From and after the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority lien on all of the Collateral, subject, as to priority only, to the Carve-Out and the priorities set forth in the DIP Orders.

**9.** **AFFIRMATIVE COVENANTS.**

Each of the Borrowers covenants and agrees that, so long as any Loan, Unpaid Reimbursement Obligation, Letter of Credit or Note is Outstanding or any Lender has any obligation to make any Loans or the Agent has any obligation to issue, extend or renew any Letters of Credit:

**9.1** **Punctual Payment.** The Borrowers will duly and punctually pay or cause to be paid the principal and interest on the Loans, all Reimbursement Obligations, the Letter of Credit Fees, the commitment fees and all other fees or other amounts provided for in this Credit Agreement and the other Loan Documents to which any of the Borrowers or their Subsidiaries is

a party, all in accordance with the terms of this Credit Agreement and such other Loan Documents.

**9.2  Maintenance of Office.**  Each of the Borrowers will maintain its chief executive office at the location identified in the Perfection Certificate delivered by it pursuant to the Security Agreement under (and as defined in) the Pre-Petition Credit Agreement), or at such other place in the United States of America as such Borrower shall designate upon written notice to the Agent, where notices, presentations and demands to or upon such Borrower in respect of the Loan Documents to which such Borrower is a party may be given or made.

**9.3  Records and Accounts.**  Each of the Borrowers will (i) keep, and cause each of its Subsidiaries to keep, true and accurate records and books of account in which full, true and correct entries will be made in accordance with generally accepted accounting principles, (ii) maintain adequate accounts and reserves for all taxes (including income taxes), depreciation, depletion, obsolescence and amortization of its properties and the properties of its Subsidiaries, contingencies, and other reserves, and (iii) at all times engage Grant Thornton LLP or other independent nationally recognized certified public accountants reasonably satisfactory to the Agent as the independent certified public accountants of the Borrowers and their Subsidiaries and will not permit more than thirty (30) days to elapse between the cessation of such firm's (or any successor firm's) engagement as the independent certified public accountants of the Borrowers and their Subsidiaries and the appointment in such capacity of a successor firm as shall be reasonably satisfactory to the Agent.

**9.4  Financial Statements, Supplemental Approved Budgets, Certificates and Information.**  The Borrowers will deliver to each of the Lenders:

(a)  as soon as practicable, but in any event not later than ninety (90) days after the end of each fiscal year of the Borrowers and their Subsidiaries, the consolidated balance sheet of the Borrowers and their Subsidiaries, as at the end of such year, and the related consolidated statement of income and consolidated statement of cash flow for such year, each setting forth in comparative form the figures for the previous fiscal year and the projections from the current fiscal year and all such consolidated statements to be in reasonable detail, prepared in accordance with generally accepted accounting principles;

(b)  as soon as practicable, but in any event not later than forty-five (45) days after the end of each of the fiscal quarters of the Borrowers and their Subsidiaries, copies of the unaudited consolidated balance sheet of the Borrowers and their Subsidiaries as at the end of such quarter, and the related consolidated statement of income and consolidated statement of cash flow for such fiscal quarter and the portion of the such Persons' fiscal year then elapsed, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet as of the end of) the previous fiscal year and the comparisons to the projections for such period, all in reasonable detail and prepared in accordance with generally accepted accounting principles, together with a certification by the principal financial or accounting officer of the Borrowers that the information contained in such financial

statements fairly presents the financial position of the Borrowers and their Subsidiaries on the date thereof (subject to year-end adjustments);

(c)     as soon as practicable, but in any event within thirty (30) days after the end of each month in each fiscal year of the Borrowers and their Subsidiaries, unaudited monthly consolidated financial statements of the Borrowers and their Subsidiaries for such month and the portion of the Borrowers' fiscal year then ending setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year and the projections for such period, each prepared in accordance with generally accepted accounting principles, together with a certification by the principal financial or accounting officer of the Borrowers that the information contained in such financial statements fairly presents the financial condition of the Borrowers and their Subsidiaries on the date thereof (subject to year-end adjustments). The financial statements, projections and other information delivered by the Borrowers pursuant to this §9.4(c) shall be delivered by the Borrowers to the Agent by electronic means approved by the Agent in an electronic format reasonably satisfactory to the Agent, followed by a hard copy if requested by the Agent;

(d)     as soon as practicable, but in any event not (i) later than thirty (30) days after the end of each month in each fiscal year of the Borrowers and their Subsidiaries sales and Consolidated EBITDA (as such term is defined in the Pre-Petition Credit Agreement) statements on an individual Store-by-Store basis for each Store operated by a Borrower or a Borrower's Subsidiary and comparing such amounts to the previous fiscal year period, and (ii) forty-five (45) days after the end of each of the fiscal quarters of the Borrowers and their Subsidiaries sales and Consolidated EBITDA statements on an individual Store-by-Store basis for each Store operated by a Borrower or a Borrower's Subsidiary and comparing such amounts to the previous fiscal year period, all such statements to be in a form satisfactory to the Majority Lenders;

(e)     simultaneously with the delivery of the financial statements referred to in subsections (a), (b) and (c) above, a statement certified by the principal financial or accounting officer of the Borrowers (and in the case of delivery of the financial statements referred to in subsection (a) above, the accountants of the Borrowers), in substantially the form of Exhibit C hereto (a "Compliance Certificate");

(f)     promptly after the filing or mailing thereof, copies of all material of a financial nature filed with the Securities and Exchange Commission or sent to the stockholders of the Borrowers;

(g)     within forty-five (45) days after the beginning of each fiscal year of the Borrowers and from time to time upon request of the Agent (but not more frequently than annually so long as no Default or Event of Default is continuing), projections of the Borrowers and their Subsidiaries broken down for the next fiscal year on a month by month and quarter by quarter basis updating those projections and budgets delivered to the Lenders and referred to in §8.4.3 or, if applicable, updating any later such projections delivered in response to a request pursuant to this §9.4(g);

63

(h)    all information sent to the directors of any Borrower regarding the opening of new Stores;

(i)    (A) all notices and other information sent to any holder of any obligations under Unsecured Term Loan Documents in its capacity as such, (B) all notices and other information sent to any holder of any obligations under the 2009 Senior Secured Debt Documents in its capacity as such, (C) all notices and other information sent to any holder of any obligations under the 2009 Senior Secured Debt Documents in its capacity as such, (D) all notices and other information sent to any party to the 2009 Unsecured Term Loan Subordination Agreement (Senior Secured Debt) and (E) all notices and other information sent to any party to the 2009 Unsecured Term Loan Subordination Agreement (2009 Senior Secured Debt);

(j)    Commencing with October 21, 2011 and on every other Friday thereafter, a supplement to the Approved Budget most recently delivered extending the period of such Approved Budget for an additional two weeks;

(k)    commencing with October 21, 2011 and on every other Friday thereafter (each such day, a "Test Day"), a budget variance report/reconciliation (the "Variance Report"), certified by the Chief Financial Officer or Vice President of Finance of the Borrowers, in form acceptable to the Agent, setting forth (i) the actual cash receipts, expenditures, disbursements and the Outstanding amount of the Revolving Credit Loans of the Debtors for the four-week period ending on a Friday immediately preceding such Test Day (or with respect to the Variance Report due on October 21, 2011, for the period from and including the Petition Date through and including October 14, 2011) (each such four-week or shorter period, the "Test Period") on a line-item basis and the Aggregate Liquidity as of the end of the Test Period and (ii) the variance in dollar amounts of the actual expenditures, disbursements and the Outstanding amount of the Revolving Credit Loans for each Test Period from those budgeted amounts for the corresponding Test Period reflected in the Approved Budget and the variance of the actual cash receipts for the Test Period from those budgeted amounts for the corresponding Test Period reflected in the Approved Budget; and

(l)    from time to time such other financial data and information (including accountants' management letters) as the Agent or any Lender may reasonably request.

**9.5    Notices.**

**9.5.1    Defaults.**    Each of the Borrowers will promptly notify the Agent in writing of the occurrence of any Default or Event of Default. If any Person shall give any notice or take any other action in respect of a claimed default (whether or not constituting an Event of Default) under this Credit Agreement or any other note, evidence of Indebtedness, indenture or other such obligation to which or with respect to which any of the Borrowers or their Subsidiaries is a party or obligor in excess of $1,000,000, whether as principal, guarantor, surety or otherwise, the Borrowers shall forthwith give written notice thereof to the Agent, describing the notice or action and the nature of the claimed default.

**9.5.2 Environmental Events.** Each of the Borrowers will promptly give notice to the Agent (a) of any violation of any Environmental Law that any of the Borrowers or their Subsidiaries reports in writing to, or is required by Environmental Law to report (or for which any written report supplemental to any oral report is made) to, any federal, state or local environmental agency, and (b) upon becoming aware thereof, of any inquiry, proceeding, investigation, or other action, including a notice from any agency of potential environmental liability, of any federal, state or local environmental agency or board, that has the potential to have a Materially Adverse Effect, or have a materially adverse effect on the Agent's mortgages, deeds of trust or security interests pursuant to the Loan Documents.

**9.5.3 Notification of Claim against Collateral.** Each of the Borrowers will, immediately upon becoming aware thereof, notify the Agent in writing of any setoff, claim (including, with respect to the Real Estate, environmental claims), withholding or other defense to which any of the Collateral having a value in excess of $500,000, or the Agent's rights with respect to the Collateral, are subject.

**9.5.4 Notice of Litigation and Judgments.** Each of the Borrowers will, and will cause each of its Subsidiaries to, give notice to the Agent in writing within fifteen (15) days of becoming aware of any litigation or proceedings threatened in writing or any significant development in any pending litigation and proceedings affecting the Borrowers or any of their Subsidiaries or to which any of the Borrowers or their Subsidiaries is or becomes a party involving an uninsured claim against any of the Borrowers or their Subsidiaries that could reasonably be expected to have a materially adverse effect on the Borrowers and their Subsidiaries and stating the nature and status of such litigation or proceedings. Each of the Borrowers will, and will cause each of its Subsidiaries to, give notice to the Agent, in writing, in form and detail satisfactory to the Agent, within ten (10) days of any judgment not covered by insurance, final or otherwise, against any of the Borrowers or their Subsidiaries in an amount in excess of $500,000.

**9.5.5 Notice of Franchise Agreements.** Each of the Borrowers will, and will cause each of its Subsidiaries to, give notice to the Agent in writing of any such Person entering into, or modifying any material provisions relating to compensation, term or advertising requirements under any franchise agreement with any franchisee simultaneously with the delivery of the financial statements referred to in §9.4(c) but in any event no later than one month after such event.

**9.5.6 Notice of Bank Accounts.** Each of the Borrowers will, and will cause each of its Subsidiaries to, give notice to the Agent in writing of any such Person creating or opening any additional bank accounts simultaneously with the delivery of the financial statements referred to in §9.4(c) but in any event no later than one month after the opening of such account. In such event, the Agent is hereby authorized by the parties hereto to amend Schedule 8.22 to include each such new bank account.

**9.5.7 Notice of Real Estate.** Without prejudice to §9.13, each of the Borrowers will, and will cause each of its Subsidiaries to, give notice to the Agent in writing of any such Person acquiring any additional owned or leased Real Estate simultaneously with

65

the delivery of the financial statements referred to in § 9.4(c) but in any event no later than one month after such acquisition. In such event, the Agent is hereby authorized by the parties hereto to amend Schedule 8.3 to include each such additional Real Estate.

**9.6** **Corporate Existence; Maintenance of Properties.** Each of the Borrowers will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and rights and those of its Subsidiaries and will not, and will not cause or permit any of its Subsidiaries to, convert to a limited liability company. It (i) will cause all of its properties and those of its Subsidiaries used or useful in the conduct of its business or the business of its Subsidiaries to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment, (ii) will cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the judgment of such Borrower may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times, and (iii) will, and will cause each of its Subsidiaries to, continue to engage primarily in the businesses now conducted by them and in related businesses; provided that nothing in this §9.6 shall prevent any of the Borrowers from discontinuing the operation and maintenance of any of its properties or any of those of its Subsidiaries if such discontinuance is, in the judgment of such Borrower, desirable in the conduct of its or their business and that do not in the aggregate materially adversely affect the business of the Borrowers and their Subsidiaries on a consolidated basis.

**9.7** **Insurance.**

**9.7.1** **Required Insurance.** Each of the Borrowers will, and will cause each of its Subsidiaries to, maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with the general practices of businesses engaged in similar activities in similar geographic areas and in amounts, containing such terms, in such forms and for such periods as may be reasonable and prudent. Without limiting the foregoing, (a) such insurance shall be in such minimum amounts that such Person will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Agent, (b) all such insurance shall be payable to the Agent as loss payee under a "standard" or "New York" loss payee clause for the benefit of the Lenders and the Agent (c) each such Person will (i) keep all of its physical property insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverages and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of such property, with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, subject to aggregate sublimits for flood and earthquake equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, (ii) maintain all such workers' compensation or similar insurance as may be required by law and (iii) maintain, in amounts and with deductibles and "stop loss" provisions equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death or property damage occurring, on, in or about the properties of such Person; business

interruption insurance; and product liability insurance. Each of the Borrowers will, and will cause each of its Subsidiaries to, maintain insurance on the Mortgaged Properties in accordance with the terms of the Mortgages.

9.7.2 **Insurance Proceeds.** The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with a prior interest in the property covered thereby, (i) so long as no Event of Default has occurred and is continuing and to the extent that the amount of such proceeds is less than $1,000,000, be disbursed to the applicable Borrower for reinvestment in such Borrower's business and (ii) in all other circumstances, be held by the Agent as cash collateral for the Obligations. The Agent may, so long as no Event of Default has occurred and is continuing, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as the Agent may reasonably prescribe, for direct application by such Borrower solely to the repair or replacement of such Borrower's property so damaged or destroyed or other reinvestment in the Borrowers' business. In the event that such proceeds have not been reinvested in the Borrowers' business with two hundred and seventy (270) days after the earlier to occur of receipt thereof by the Borrowers or receipt thereof by the Agent, the Agent shall apply all or any part of such proceeds to the Obligations.

9.7.3 **Notice of Cancellation.** All policies of insurance shall provide for at least 30 days prior written cancellation notice to the Agent. In the event of failure by any Borrower to provide and maintain insurance as herein provided, the Agent may, at its option, provide such insurance and charge the amount thereof to such Borrower. Each Borrower shall furnish the Agent with certificates of insurance and policies evidencing compliance with the foregoing insurance provision.

**9.8** **Taxes.** Each of the Borrowers will, and will cause each of its Subsidiaries to, duly pay and discharge, or cause to be paid and discharged, before the same shall become overdue, all material taxes, assessments and other governmental charges imposed upon it and its real properties, sales and activities, or any part thereof, or upon the income or profits therefrom, as well as all claims for labor, materials, or supplies that if unpaid might by law become a lien or charge upon any of its property; provided that any such tax, assessment, charge, levy or claim need not be paid if the validity or amount thereof shall currently be contested in good faith by appropriate proceedings and if such Borrower or such Subsidiary shall have set aside on its books adequate reserves with respect thereto; and provided further that each of the Borrowers and their Subsidiaries will pay all such taxes, assessments, charges, levies or claims forthwith upon the commencement of proceedings to foreclose any lien that may have attached as security therefor.

**9.9** **Inspection of Properties and Books, etc.**

9.9.1 **General.** Each of the Borrowers shall permit the Lenders, if accompanied by the Agent, to visit and inspect any of the properties of any of the Borrowers or their Subsidiaries, to examine the books of account of the Borrowers and their Subsidiaries (and to make copies thereof and extracts therefrom), and shall permit the Lenders to discuss the affairs, finances and accounts of the Borrowers and their Subsidiaries with,

CH\1299468.13

and to be advised as to the same by, its and their officers, all at such reasonable times and intervals as the Agent or any Lender may reasonably request, provided that any such visits shall occur no more frequently than twice per year if no Event of Default has occurred and is continuing. The Agent shall notify the Lenders of any such visit or inspection by the Agent, and the Lenders shall have the right to participate therein.

9.9.2 **Environmental Assessments.** If the Agent reasonably suspects that an Event of Default has occurred and is continuing, the Agent may, from time to time, in its discretion for the purpose of assessing and ensuring the value of any Mortgaged Property, obtain one or more environmental assessments or audits of such Mortgaged Property prepared by a hydrogeologist, an independent engineer or other qualified consultant or expert approved by the Agent to evaluate or confirm (a) whether any Hazardous Substances are present in the soil or water at such Mortgaged Property in violation of Environmental Laws and (b) whether the use and operation of such Mortgaged Property complies with all Environmental Laws. Such environmental assessments or audits shall be conducted, to the extent reasonably practicable, in a manner that does not unreasonably interfere with the Borrowers' or their Subsidiaries' use of the Mortgaged Property. The Agent's right to conduct such environmental assessment or audit shall be subject to all related restrictions in any applicable lease. Environmental assessments may include without limitation detailed visual inspections of such Mortgaged Property including any and all storage areas, storage tanks, drains, dry wells and leaching areas, and the taking of soil samples, surface water samples and ground water samples, as well as such other investigations or analyses as the Agent deems reasonably appropriate. All such environmental assessments shall be conducted and made at the expense of the Borrowers.

9.9.3 **Communications with Accountants.** Each of the Borrowers authorizes the Lenders, if accompanied by the Agent, to communicate directly with the Borrowers' independent certified public accountants and authorizes such accountants to disclose to the Agent any and all financial statements and other supporting financial documents and schedules including copies of any management letter with respect to the business, financial condition and other affairs of any of the Borrowers or their Subsidiaries. At the request of the Agent, the Borrowers shall deliver a letter addressed to such accountants instructing them to comply with the provisions of this §9.9.3.

9.10 **Compliance with Laws, Contracts, Licenses, and Permits.** Each of the Borrowers will, and will cause each of its Subsidiaries to, comply in all material respects with (a) the applicable laws and regulations wherever its business is conducted, including all Environmental Laws, (b) the provisions of its charter documents and by-laws, (c) all agreements and instruments by which it or any of its properties may be bound and (d) all applicable decrees, orders, and judgments except as would not have a Materially Adverse Effect. If any authorization, consent, approval, permit or license from any officer, agency or instrumentality of any government shall become necessary or required in order that any of the Borrowers or their Subsidiaries may fulfill any of its obligations hereunder or any of the other Loan Documents to which such Borrower or such Subsidiary is a party, such Borrower will, or (as the case may be) will cause such Subsidiary to, immediately take or cause to be taken all reasonable steps within the power of such Borrower or such Subsidiary to obtain such authorization, consent, approval,

68

permit or license and furnish the Agent and the Lenders with evidence thereof. Without limiting the foregoing, each of the Borrowers will, and will cause each of its Subsidiaries to, obtain any and all approvals by any federal, state or local liquor authority necessary for the continued operation at all times of any Store operated by any of the Borrowers or their Subsidiaries with full liquor service unless the failure to obtain such approvals would not have a Materially Adverse Effect.

9.11    **Employee Benefit Plans.** The Borrowers will (i) promptly upon filing the same with the Department of Labor or Internal Revenue Service and upon request of the Agent, furnish to the Agent a copy of the most recent actuarial statement required to be submitted under §103(d) of ERISA and Annual Report, Form 5500, with all required attachments, in respect of each Guaranteed Pension Plan and (ii) promptly upon receipt or dispatch by the Borrowers or any ERISA affiliate, furnish to the Agent any notice, report or demand sent or received in respect of a Guaranteed Pension Plan under §§302, 4041, 4042, 4043, 4063, 4065, 4066 and 4068 of ERISA, or in respect of a Multiemployer Plan, under §§4041A, 4202, 4219, 4242, or 4245 of ERISA.

9.12    **Use of Proceeds.** The Borrowers will use the proceeds of the Loans and the Letters of Credit for the purposes described in §8.15.1, and none other.

9.13    **Mortgaged Property.** Upon request by the Agent, each Borrower shall, or shall cause each applicable Subsidiary to deliver forthwith to the Agent for the benefit of the Lenders and the Agent a fully executed valid and enforceable first priority mortgage or deed of trust over real estate, free and clear of all defects and encumbrances except for Permitted Liens.

9.14    **Further Assurances.** Each of the Borrowers will, and will cause each of its Subsidiaries to, cooperate with the Lenders and the Agent and execute such further instruments and documents as the Lenders or the Agent shall reasonably request to carry out to their satisfaction the transactions contemplated by this Credit Agreement and the other Loan Documents. Upon receipt of an affidavit of any officer of any Lender as to the loss, theft, destruction or mutilation of the any Note or other Loan Document, the Borrowers will issue, in lieu thereof, a replacement Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

9.15    **Conduct of Business; Stores.** Each of the Borrowers will, and will cause its Subsidiaries to, continue to engage only in the business of owning and operating casual dining restaurants and in businesses and activities closely related thereto. The Borrowers shall inform the Agent of any new Store locations simultaneously with the delivery of the financial statements referred to in §9.4(c) but in any event no later than one month after the opening of a new Store location and the entering into a lease for, or the acquisition of, the premises for a new Store.

9.16    **[Intentionally Omitted].**

9.17    **Bank Accounts.** On or prior to the Closing Date, each of the Borrowers will, and will cause each of its Subsidiaries to cause all cash receipts, checks and cash proceeds of accounts receivable and other Collateral of the Borrowers and their Subsidiaries to be deposited only into (x) depository accounts with financial institutions that have entered into agency

69

account agreements in a form satisfactory to the Agent (such agency account agreements referred to herein as "Agency Account Agreements" and such depository accounts with financial institutions that have entered into such Agency Account Agreements referred to herein as "Agency Accounts"), (y) the Concentration Accounts or (z) deposit account number 3084386826 maintained at JPMorgan Chase Bank, National Association that is not an Agency Account (an "Excluded Account") as long as all funds in the Excluded Account maintained at JPMorgan Chase Bank, National Association in excess of $20,000 is transferred to the Concentration Accounts on a weekly basis. The Agency Account Agreements shall provide that at any time following the occurrence of a Default or an Event of Default, the Agent shall be entitled to direct the financial institutions party thereto to cause all funds of the Borrowers and their Subsidiaries held in the Agency Accounts at such financial institutions to be transferred immediately and at any time thereafter to the Agent to be applied to the Obligations or held as Collateral, as the Agent deems appropriate. The Borrowers shall cause (a) all cash receipts and checks in excess of $50,000 at each Store to be deposited into an Agency Account, a Concentration Account or, subject to the satisfaction of conditions set forth in clause (z) above, an Excluded Account, on at least two separate Business Days during each week (a "week," for the purposes of this §9.17, being deemed to begin at the beginning of each Monday and end at the end of the following Friday) and (b) all funds in (A) each Agency Account or any other account of the Borrowers or their Subsidiaries (other than Excluded Accounts) in excess of $2,000 and (B) the Excluded Account maintained at JPMorgan Chase Bank, National Association in excess of $20,000 to be transferred to the Concentration Accounts on a weekly basis. The Borrowers shall at all times maintain a Concentration Account with a financial institution that has entered into an Agency Account Agreement with the Agent and the Borrowers that is in all respects satisfactory to the Agent. Notwithstanding the foregoing to the contrary, (i) Chevys may maintain deposit account number 3039022607 at Union Bank of California that is not an Agency Account as long as (A) the balance of funds on deposit in such account shall not exceed $50,000 at any time and (B) such deposit account and such funds on deposit therein are pledged as security to the California State Board of Equalization and (ii) Chevys may maintain deposit account number 8759883641 at Wells Fargo Bank that is not an Agency Account so long as (A) the balance of funds on deposit in such account shall not exceed $169,000 plus any interest accrued thereon at any time and (B) such deposit account and such funds on deposit therein are pledged as security to the Nevada Department of Taxation.

**9.18** **Bankruptcy Covenants**. Notwithstanding anything in the Loan Documents to the contrary, Debtors shall comply with all covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders.

**9.19** **Chapter 11 Cases**. In connection with the Chapter 11 Cases, Debtors shall give the proper notice for (x) the motions seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearings for the approval of the Interim Order, and (z) the hearings for the approval of the Final Order. The Borrowers shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

**9.20** **Sales Process Timeline**. The Debtors shall timely comply with the following sale process milestones and shall incorporate such milestones into a bidding procedures motion

70

and order, each of which shall be in form and substance reasonably acceptable to the DIP Agent (the "Bid Procedures Motion" and "Bid Procedures Order", respectively):

(a)     on or prior to 15 days following the Petition Date, the Debtors shall file the Bid Procedures Motion and proposed form of Bid Procedures Order;

(b)     on or prior to 45 days following the Petition Date, the Bankruptcy Court shall hold a hearing on the Bid Procedures Motion and the Debtors shall file with the Bankruptcy Court a form of asset purchase agreement not less than five days prior to such hearing;

(c)     on or prior to 50 days following the Petition Date, the Bankruptcy Court shall enter the Bid Procedures Order;

(d)     on or prior to 105 days following the Petition Date, all qualified bids (pursuant to which potential bidders shall have unconditionally waived or satisfied all financing and diligence outs) shall be due (which bid deadline shall not be extended without the consent of the Agent unless otherwise set forth herein);

(e)     on or prior to 110 days following the Petition Date, the auction shall be conducted;

(f)     on or prior to 115 days following the Petition Date, the Bankruptcy Court shall hold a hearing to approve the sale to the winning bidder (the proceeds of such sale shall be used to repay in cash all Pre-Petition Obligations and Obligations upon the closing thereof or such sale shall otherwise be on terms, and pursuant to definitive documentation, acceptable to the Agent);

(g)     on or prior to 145 days following the Petition Date, such sale shall have been consummated.

Notwithstanding the foregoing, the Debtors shall have the right to extend, for not more than two weeks, the date by which all qualified bids are due if the Debtors determine in their reasonable business judgment that doing so could reasonably be expected to result in a higher purchase price. If such qualified bid deadline is so extended, each subsequent deadline set forth above shall also be increased by the same number of days as the qualified bid deadline extension. Promptly upon receipt by any Debtor, Debtors shall deliver to the Agent copies of all written indications of interest in the sale (by proposal, letter of intent or otherwise), term sheets, asset purchase agreements and other documents from prospective bidders, other interested parties or their representatives, and such other information and documents as the Agent may from time to time reasonably request it being understood that (i) the Agent shall, consistent with its internal procedures, take steps to provide that employees of GE Capital and its Affiliates which are working as a bidder (or providing financing to a bidder) do not receive such information from the Agent and (ii) the Agent shall, consistent with its internal procedures, take steps to provide that no Lender receives such information from the Agent (and Agent shall not be required to provide such information to any Lender) unless the Agent receives assurance reasonably satisfactory to the Agent that such Lender has procedures in place that provide that employees of such Lender

and its Affiliates which are working as a bidder (or providing financing to a bidder) do not receive such information from the Agent).

**9.21  Agent Affiliate Lease Assumptions.**

(a)  On or prior to the earlier of (a) 50 days following the Petition Date and (b) the first date on which the Debtors move the Bankruptcy Court to assume or reject any other unexpired lease and/or executory contract, the Debtors shall file a motion in form and substance acceptable to the Agent seeking Bankruptcy Court approval, pursuant to an order in form and substance acceptable to the Agent (the "Lease Assumption Order"), to assume each of the unexpired leases described on Schedule 4 hereto (each such lease, any "Agent Affiliate Lease") and each assumed Agent Affiliate Lease shall have the basic terms set forth opposite such Agent Affiliate Lease on Schedule 4.

(b)  On or prior to December 9, 2011, the Debtors shall have obtained the Lease Assumption Order.

**9.22  Post-Closing Matters.**

Borrowers shall satisfy the requirements set forth on Exhibit F, on or before the date specified for such requirement on Exhibit F (or such later date that may be approved by the Agent in its discretion).

**10.  CERTAIN NEGATIVE COVENANTS.**

Each of the Borrowers covenants and agrees that, so long as any Loan, Unpaid Reimbursement Obligation, Letter of Credit or Note is Outstanding or any Lender has any obligation to make any Loans or the Agent has any obligations to issue, extend or renew any Letters of Credit:

**10.1  Restrictions on Indebtedness.** None of the Borrowers will, and none will permit any of its Subsidiaries to, create, incur, assume, guarantee or be or remain liable, contingently or otherwise, with respect to any Indebtedness other than:

(a)  Indebtedness to the Lenders and the Agent arising under any of the Loan Documents;

(b)  endorsements for collection, deposit or negotiation and warranties of products or services, in each case incurred in the ordinary course of business;

(c)  [Intentionally Omitted];

(d)  [Intentionally Omitted];

(e)  Indebtedness of one Borrower to another then existing Borrower; provided that all such intercompany Indebtedness permitted by this §10.1(e), and all instruments evidencing any thereof, shall be pledged and delivered to the Agent, for the benefit of the Lenders and the Agent, as security for the Obligations pursuant to the provisions of the

72

applicable Loan Documents, and the Agent shall have a first priority perfected lien and security interest therein; and provided, further, that all such intercompany Indebtedness shall be subordinated to the Obligations on terms satisfactory to the Agent;

(f)     Indebtedness existing on the date hereof and listed and described on Schedule 10.1 hereto;

(g)     Indebtedness in an original principal amount not in excess of $130,000,000 evidenced by the 2009 Senior Secured Debt Documents;

(h)     [Intentionally Omitted];

(i)     Indebtedness consisting of any Borrower or any of its Subsidiaries guarantying the Indebtedness of another Borrower so long as such Indebtedness is otherwise permitted hereunder;

(j)     **[Intentionally Omitted];**

(k)     Indebtedness in an original principal amount not in excess of $25,000,000 (plus any increase in such $25,000,000 amount solely due to the capitalization of interest on such Indebtedness by adding such interest to the principal amount thereof), and evidenced by the Unsecured Term Loan Documents; and

(l)     Indebtedness representing installment insurance premiums of any Borrower or any of its Subsidiaries owing to insurance companies in the ordinary course of business.

**10.2    Restrictions on Liens.**  None of the Borrowers will, and none will permit any of its Subsidiaries to, (i) create or incur or suffer to be created or incurred or to exist any lien, encumbrance, mortgage, pledge, charge, restriction or other security interest of any kind upon any of its property or assets of any character whether now owned or hereafter acquired, or upon the income or profits therefrom; (ii) transfer any of such property or assets or the income or profits therefrom for the purpose of subjecting the same to the payment of Indebtedness or performance of any other obligation in priority to payment of its general creditors; (iii) acquire, or agree or have an option to acquire, any property or assets upon conditional sale or other title retention or purchase money security agreement, device or arrangement; (iv) suffer to exist for a period of more than thirty (30) days after the same shall have been incurred any Indebtedness or claim or demand against it that if unpaid might by law or upon bankruptcy or insolvency, or otherwise, be given any priority whatsoever over its general creditors; (v) sell, assign, pledge or otherwise transfer any "receivables" as defined in clause (vii) of the definition of the term "Indebtedness," with or without recourse other than in the ordinary course of business; or (vi) enter into or permit to exist any arrangement or agreement, enforceable under applicable law, which directly or indirectly prohibits any Borrower or any of its Subsidiaries from creating or incurring any lien, encumbrance, mortgage, pledge, charge, restriction or other security interest other than (1) the restrictions under the Loan Documents in favor of the Agent for the benefit of the Lenders and the Agent, (2) the restrictions under the 2009 Senior Secured Debt Documents as in effect on July 7, 2009 as amended to the extent permitted by §10.13, (3) restrictions under the Unsecured Term Loan Documents and as amended to the extent permitted by §10.15, (4)

73

restrictions under the Pre-Petition Loan Documents, and (5) customary anti-assignment provisions in leases and licensing agreements entered into by such Borrower or such Subsidiary in the ordinary course of its business, <u>provided</u> that any of the Borrowers or their Subsidiaries may create or incur or suffer to be created or incurred or to exist:

     (a)    liens to secure taxes, assessments and other government charges in respect of obligations not overdue or liens on properties to secure claims for labor, material or supplies in respect of obligations not overdue or which are being contested in good faith and for which an adequate reserve or other appropriate provisions shall have been made to the extent required by generally accepted accounting principles;

     (b)    deposits or pledges made in connection with, or to secure payment of, workmen's compensation, unemployment insurance, old age pensions or other social security obligations;

     (c)    liens in respect of judgments or awards that have been in force for less than the applicable period for taking an appeal so long as execution is not levied thereunder or in respect of which such Borrower or such Subsidiary shall at the time in good faith be prosecuting an appeal or proceedings for review and in respect of which a stay of execution shall have been obtained pending such appeal or review;

     (d)    liens of carriers, warehousemen, mechanics and materialmen, and other like liens in existence less than 120 days from the date of creation thereof in respect of obligations not overdue or which are being contested in good faith and for which an adequate reserve or other appropriate provisions shall have been made to the extent required by generally accepted accounting principles;

     (e)    encumbrances on Real Estate other than the Mortgaged Property consisting of easements, rights of way, zoning restrictions, restrictions on the use of real property and defects and irregularities in the title thereto, landlord's or lessor's liens under leases or subleases to which any Borrower or a Subsidiary of any Borrower is a party, and other minor liens or encumbrances none of which in the opinion of the Borrowers interferes materially with the use of the property affected in the ordinary conduct of the business of the Borrowers and their Subsidiaries, which defects do not individually or in the aggregate have a materially adverse effect on the business of the Borrowers and their Subsidiaries on a consolidated basis;

     (f)    liens existing on the date hereof and listed and described on Schedule 10.2 hereto;

     (g)    purchase money security interests in or purchase money mortgages on real or personal property other than Mortgaged Properties acquired after the date hereof to secure purchase money Indebtedness of the type and amount permitted by §10.1(d), incurred in connection with the acquisition of such property, which security interests or mortgages cover only the real or personal property so acquired;

     (h)    other liens and encumbrances on each Mortgaged Property as and to the extent permitted by the Mortgage applicable thereto;

(i)     liens in favor of the Agent for the benefit of the Lenders and the Agent under the Loan Documents;

(j)     liens on tenant improvements securing Indebtedness incurred with respect thereto and which is permitted under §10.1(d) or §10.1(j); and

(k)     liens created under, or evidenced or governed by, the 2009 Senior Secured Debt Documents as in effect on the Petition Date securing Indebtedness permitted by §10.1(g) so long as such liens are subject to, and subordinated to the liens of the Agent pursuant to, all of the terms of the 2009 Intercreditor Agreement (2009 Senior Secured Debt); and

(l)     liens on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto.

**10.3    Restrictions on Investments**. None of the Borrowers will, and none will permit any of its Subsidiaries to, make or permit to exist or to remain outstanding any Investment except Investments in:

(a)     marketable direct or guaranteed obligations of the United States of America that mature within one (1) year from the date of purchase by such Borrower;

(b)     receivables owing to a Borrower or any of its Subsidiaries if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(c)     demand deposits, certificates of deposit, bankers acceptances and time deposits of United States banks having total assets in excess of $1,000,000,000;

(d)     securities commonly known as "commercial paper" issued by a corporation organized and existing under the laws of the United States of America or any state thereof that at the time of purchase have been rated and the ratings for which are not less than "P 1" if rated by Moody's Investors Service, Inc., and not less than "A 1" if rated by Standard and Poor's Rating Group;

(e)     Investments existing on the date hereof and listed on Schedule 10.3 hereto;

(f)     loans, investments and advances by any Borrower in or to another Borrower to the extent permitted by §§ 10.1(e) or 10.1(f) and equity investments made by a Borrower in another Borrower;

(g)     [Intentionally Omitted];

(h)     securities (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

75

(i)    Investments consisting of promissory notes received as proceeds of asset dispositions permitted by §10.5.2, provided that the aggregate value of such promissory notes received in connection with any such asset disposition shall not exceed 50% of the aggregate value of the proceeds of such asset disposition; and

(j)    Investments consisting of loans and advances to employees for moving, entertainment, travel and other similar expenses in the ordinary course of business not to exceed $250,000 in the aggregate at any time outstanding;

provided, however, that, with the exception of demand deposits referred to in §10.3(b) and loans and advances referred to in §10.3(h), such Investments will be considered Investments permitted by this §10.3 only if all actions have been taken to the satisfaction of the Agent to provide to the Agent, for the benefit of the Lenders and the Agent, a first priority perfected security interest in all of such Investments free of all encumbrances other than Permitted Liens.

**10.4    Restricted Payments**.    None of the Borrowers will make any Restricted Payments except for (i) Distributions payable by any Borrower to any other Borrower, (ii) Prepetition Second Lien Secured Parties' Adequate Protection granted pursuant to and in accordance with the DIP Orders and (iii) payments to Parent permitted pursuant to §10.10.

**10.5    Mergers and Consolidations, Dispositions of Assets, Acquisitions**.

**10.5.1    Mergers and Consolidations**.    Subject to §10.5.3, none of the Borrowers will, and none will permit any of its Subsidiaries to, become a party to any merger or consolidation except the merger or consolidation of one or more of the Subsidiaries of any Borrower with and into any Borrower, or the merger or consolidation of two or more Subsidiaries of any Borrower.

**10.5.2    Dispositions of Assets**.    None of the Borrowers will, and none will permit any of its Subsidiaries to, become a party to or agree to or effect any disposition of any assets, other than (a) the sale of inventory and the disposition of obsolete assets, in each case, in the ordinary course of business consistent with past practices and (b) the sale of assets permitted pursuant to §9.20. Nothing in this §10.5.2 is intended to prohibit any Borrower or any of the Borrowers' Subsidiaries from conditionally agreeing to dispose of any assets (i) with a fair market value of less than $250,000 in the aggregate for all dispositions or (ii) in connection with the requirements of §9.20 hereof. The Agent may release any Collateral disposed of by any Borrower or any Subsidiary of any Borrower if such disposition is in compliance with this §10.5.2 and otherwise with the terms hereof.

**10.5.3    Acquisitions**.    None of the Borrowers will, and none will permit any of its Subsidiaries to, agree to or effect any asset acquisition or stock acquisition except (a) capital expenditures to the extent set forth in, and in accordance with, the Approved Budget, and (b) the acquisition of inventory, equipment, furnishings and other similar assets (not including Stores or real property) in the ordinary course of business consistent with past practice.

**10.6    Sale and Leaseback**.    From and after the Closing Date, none of the Borrowers will, and none will permit any of its Subsidiaries to, enter into any arrangement, directly or

76

indirectly, whereby any Borrower or any Subsidiary of any Borrower shall sell or transfer any property owned by it in order then or thereafter to lease such property or lease other property that any Borrower or any Subsidiary of any Borrower intends to use for substantially the same purpose as the property being sold or transferred (a "Sale-Leaseback") other than the Sale-Leasebacks in existence on the Closing Date and the modifications thereof contemplated by §9.21 or other modifications thereof approved by the Bankruptcy Court.

**10.7    Compliance with Environmental Laws.** Except as set forth in Schedule 8.17, none of the Borrowers will, and none will permit any of its Subsidiaries to, (i) use any of the Real Estate or any portion thereof for the handling, processing, storage or disposal of Hazardous Substances except in material compliance with applicable Environmental Law, (ii) cause or permit to be located on any of the Real Estate any underground tank or other underground storage receptacle for Hazardous Substances except in material compliance with applicable Environmental Law, (iii) generate any Hazardous Substances on any of the Real Estate except in material compliance with applicable Environmental Law, (iv) conduct any activity at any Real Estate or use any Real Estate in any manner so as to cause a release (i.e. releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping) or threatened release of Hazardous Substances on, upon or into the Real Estate except in material compliance with applicable Environmental Law or (v) otherwise conduct any activity at any Real Estate or use any Real Estate in any manner that would materially violate any Environmental Law or bring such Real Estate in material violation of any Environmental Law.

**10.8    Employee Benefit Plans.** Neither any Borrower nor any ERISA Affiliate will:

(a)    engage in any "prohibited transaction" within the meaning of §406 of ERISA or §4975 of the Code which could result in a material liability for any of the Borrowers or their Subsidiaries; or

(b)    permit any Guaranteed Pension Plan to incur an "accumulated funding deficiency", as such term is defined in §302 of ERISA, whether or not such deficiency is or may be waived; or

(c)    fail to contribute to any Guaranteed Pension Plan to an extent which, or terminate any Guaranteed Pension Plan in a manner which, could result in the imposition of a lien or encumbrance on the assets of any of the Borrowers or their Subsidiaries pursuant to §302(f) or §4068 of ERISA; or

(d)    permit any Guaranteed Pension Plan to be amended in circumstances requiring the posting of security pursuant to §307 of ERISA or §401(a)(29) of the Code; or

(e)    permit or take any action which would result in the aggregate benefit liabilities (with the meaning of §4001 of ERISA) of all Guaranteed Pension Plans exceeding the value of the aggregate assets of such Plans, disregarding for this purpose the benefit liabilities and assets of any such Plan with assets in excess of benefit liabilities.

**10.9   Change in Fiscal Year.**  None of the Borrowers will, and none will permit any of its Subsidiaries to, effect any change in the end of its fiscal year from that set forth in §8.4.1.

**10.10   Transactions with Affiliates.**  None of the Borrowers will, and none will permit any of its Subsidiaries to, engage in any transaction with any Affiliate (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such Affiliate or, to the knowledge of any Borrower, any corporation, partnership, trust or other entity in which any such Affiliate has a substantial interest or is an officer, director, trustee or partner, on terms less favorable to the Borrowers or their Subsidiaries than would have been obtainable on an arm's-length basis in the ordinary course of business, provided that (x) the foregoing restriction shall not apply to the fees paid pursuant to the Sun Cantinas Finance Fee Letter and (y) for so long as no Default or Event of Default is continuing the foregoing restriction shall not apply to (a) payments by one or more Borrowers to Parent to permit Parent to pay franchise taxes, directors fees and reasonable accounting, legal and administrative expenses of Parent (other than legal fees and expenses and fees and expenses of auditors and accountants incurred in connection with any litigation relating to or defaults under this Credit Agreement) when due, in an aggregate amount not to exceed $500,000 in any fiscal year, **and** (b) for so long as Real Mex is a member of a group filing a consolidated or combined tax return with Parent or any direct or indirect parent of Parent, payments by Real Mex to Parent in respect of an allocable portion of the tax liabilities of such group that is attributable to Real Mex and its Subsidiaries ("Tax Payments"); provided, however, that (A) the Tax Payments shall not exceed the lesser of (i) the amount of the relevant tax (including any penalties and interest) that Real Mex would owe if Real Mex were filing a separate tax return (or a separate consolidated or combined return with its Subsidiaries that are members of the consolidated or combined group), taking into account any carryovers and carrybacks of tax attributes (such as net operating losses) of Real Mex and such Subsidiaries from other taxable years and (ii) the net amount of the relevant tax that Parent actually owes to the appropriate taxing authority and (B) any Tax Payments received from Real Mex shall be paid over to the appropriate taxing authority within 30 days of Parent's receipt of such Tax Payments or refunded to Real Mex.

**10.11   Bank Accounts.**  None of the Borrowers will, and none will permit any of its Subsidiaries to, (a) [Intentionally Omitted]; (b) violate directly or indirectly the Agency Account Agreement, any Agency Account Agreement or other bank agency or lock box agreement in favor of the Agent for the benefit of the Lenders and the Agent with respect to such account; or (iii) deposit into any of the payroll accounts listed on Schedule 8.22 any amounts in excess of amounts necessary to pay current payroll obligations from such accounts.

**10.12   Franchises.**  The Borrowers will not, and will not permit any of their Subsidiaries to, enter into any franchise agreement pursuant to which such Borrower or such Subsidiary is prohibited from pledging or otherwise assigning its rights under such franchise agreement including its right to receive any franchise fees or other fees or amounts paid to such Borrower or such Subsidiary thereunder.

**10.13   2009 Senior Secured Debt Documents and Related Documents.**  None of the Borrowers will, and none will permit any of its Subsidiaries to, materially amend, supplement or

otherwise modify (pursuant to a waiver or otherwise) the terms and conditions of any of the 2009 Senior Secured Debt Documents, the 2009 Unsecured Term Loan Subordination Agreement (Senior Secured Debt), or the 2009 Unsecured Term Loan Subordination Agreement (2009 Senior Secured Debt) without the prior written consent of the Agent.

**10.14  Payment of Exit Costs.** No Debtor shall pay any Exit Costs prior to the release of the Exit Financing Fee Reserve pursuant to and in accordance with §2.1(b), and following the release of the Exit Financing Fee Reserve pursuant to and in accordance with §2.1(b), the Debtors shall not pay more than $350,000 of Exit Costs (or such greater amount as may be approved by the Agent in its sole discretion in writing) prior to receipt by the Agent of the Satisfactory Exit Commitment and in no event prior to the entry of the Final Order. In no event shall payments of the Exit Costs by the Debtors exceed $1,000,000 in the aggregate. Notwithstanding anything to the contrary contained herein or otherwise, the Debtor shall not pay any Exit Costs if any holder (or any representative or agent thereof) of 2009 Senior Secured Debt opposes, contests or supports any other Person opposing or contesting the entry of any DIP Order or the terms or provisions of any Loan Document or any DIP Order.

**10.15  Unsecured Term Loan Documents.** None of the Borrowers will, and none will permit any of its Subsidiaries to, materially amend, supplement or otherwise modify (pursuant to a waiver or otherwise) the terms and conditions of any of the Unsecured Term Loan Documents without the prior written consent of the Agent, if the effect of such amendment, supplement or other modification or waiver is to increase the interest rate payable on the relevant Indebtedness thereunder or increase the cash portion of any interest required to be paid thereon, change (to earlier dates) any dates upon which payments of principal or interest are due thereon, increase the obligations of the obligor or obligors thereunder or confer any additional rights on the holders of the relevant Indebtedness thereunder which would be adverse to the Borrowers or any of their Subsidiaries, the Agent or the Lenders.

**10.16  Chapter 11 Claims.** None of the Borrowers will, and none will permit any of its Subsidiaries to, incur, create, assume, suffer to exist or permit (other than those existing, and disclosed to the Agent, on the date hereof) any administrative expense, unsecured claim, or other super-priority claim or lien (except for the Carve-Out and Prepetition Prior Liens to the extent such liens had priority over the liens granted under the Pre-Petition Credit Agreement) that are pari passu with or senior to the claims of the Lenders against the Debtors hereunder, or apply to the Bankruptcy Court for authority to do so.

**10.17  The DIP Orders.** None of the Borrowers shall, and none will permit any of its Subsidiaries to, make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Interim Order or the Final Order, other than as approved by the Agent.

**10.18  Critical Vendor and Other Payments.** None of the Debtors shall, and none will permit any of its Subsidiaries to, make (i) any Pre-Petition "critical vendor" payments or other payments on account of any creditor's Pre-Petition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in

CH\1299468.13

each case as permitted by the First Day Orders or in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court and (b) are permitted by the Approved Budget.

## 11. FINANCIAL COVENANTS AND BUDGET COMPLIANCE.

Each of the Borrowers covenants and agrees that, so long as any Loan, Unpaid Reimbursement Obligation, Letter of Credit, or Note is Outstanding, or any Lender has any obligation to make any Loans, or the Agent has any obligation to issue, extend or renew any Letters of Credit, the Borrowers will comply with the following financial covenants:

**11.1 Approved Budget Compliance.** Subject to the terms and conditions set forth below and in the DIP Orders, the proceeds of Revolving Credit Loans made under this Credit Agreement and other proceeds of Collateral shall be used in accordance with the Credit Agreement and the DIP Order and:

(a) the sum of all actual operating disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) (i) for the first Test Period shall not exceed one hundred fifteen percent (115%) of the sum of the "Total Operating Disbursements" budgeted for the first Test Period pursuant to the Approved Budget and (ii) for each subsequent Test Period shall not exceed one hundred ten percent (110%) of the sum of the "Total Operating Disbursements" budgeted for such subsequent Test Period pursuant to the applicable Approved Budget;

(b) the sum of the actual receipts of the Debtors (i) for the first Test Period shall be at least eighty-five percent (85%) of the sum of the "Total Receipts" budgeted for the first Test Period pursuant to the Approved Budget and (ii) for each subsequent Test Period shall be at least ninety (90%) of the sum of the "Total Receipts" budgeted for such subsequent Test Period pursuant to the applicable Approved Budget; and

(c) the actual "Revolver Borrowed Balance" (calculated in the same manner as the budgeted "Revolver Borrowed Balance" set forth in the Approved Budget) as of the close of business on the last day of each Test Period shall not exceed 115% of the budgeted "Revolver Borrowed Balance" set forth under the last week of such Test Period in the Approved Budget. Notwithstanding the foregoing, for purposes of testing the "Revolver Borrowed Balance" for any week during the period prior to the earliest to occur of 11:59 p.m. prevailing Eastern time on November 4, 2011 and the entry of the Final Order (including the permitted variances thereto as set forth above), the "Revolver Borrowed Balance" set forth in the Approved Budget for such week shall be the sum of the budgeted "Revolver Borrowed Balance" for such week plus the "Prepetition Revolver Balance" for such week, in each case as set forth in the Approved Budget.

The Agent and Lenders (i) may assume that the Debtors will comply with the Approved Budget to the extent required by this §11.1 and shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the

Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to Agent and Lenders are estimates only, and the Debtors remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents, the Interim Order and the Final Order. Nothing in the Approved Budget shall constitute an amendment or other modification of this Credit Agreement or any of such restrictions or other lending limits set forth therein.

**11.2** **[Intentionally Omitted]** .

**11.3** **Lease Incurrence.**

(A) [Intentionally Omitted];

(B) From and after the Closing Date, the Borrowers will not enter into any new lease obligations (other than renewals of existing leases in the ordinary course of business and modifications thereof contemplated by §9.21 or other modifications thereof approved by the Bankruptcy Court).

## 12. CLOSING CONDITIONS.

The effectiveness of this Credit Agreement and the obligations of the Lenders to make the initial Loans and of the Agent and the L/C Issuers to issue any initial Letters of Credit hereunder shall be subject to the satisfaction or waiver of the following conditions precedent:

**12.1** **Loan Documents, etc.**

**12.1.1** **Loan Documents.** Each of the Loan Documents and the Master Standby Letter of Credit Agreement among GE Capital and Borrowers shall have been duly executed and delivered by the respective parties thereto, shall be in full force and effect and shall be in form and substance satisfactory to each of the Lenders. The Agent shall have received a fully executed copy of each such document.

**12.1.2** **Last-Out Participation.** The Agent and Lenders shall have received evidence, in form and substance satisfactory to the Agent and Lenders, that Sun Cantinas Finance, LLC will maintain a $7,500,000 last-out participation in the Facilities.

**12.1.3** **Payment of Pre-Petition Interest and Fees**. The Agent shall have received evidence satisfactory to the Agent that Borrowers will pay in full all Pre-Petition interest and Pre-Petition fees that have accrued pursuant to the Pre-Petition Credit Agreement but remain unpaid.

**12.1.4** **Financial Statements**. The Agent and Lenders shall have received all financial statements and reports required to be delivered by the Debtors pursuant to the Pre-Petition Credit Agreement.

**12.2** **Initial Approved Budget.** The Agent and Lenders shall have received the initial 13-week cash flow budget, attached as Schedule 3 hereto, setting forth, on a weekly and a line-item basis, (i) projected cash receipts, (ii) projected disbursements and the amount of outstanding

Letters of Credit (including ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Cases, capital expenditures, asset sales, issuances of any letter of credit, including the fees relating thereto, and estimated fees and expenses of the Agent and Lenders (including fees and expenses of their legal counsel and financial advisor), estimated fees and expenses of the Prior Agent and Prior Lenders (including fees and expenses of their legal counsel and financial advisor), estimated fees and expenses of the trustee under the 2009 Indenture (including fees and expenses of its legal counsel), estimated fees and expenses of the holders of the 2009 Senior Secured Debt representing a majority in aggregate principal amount of the 2009 Senior Secured Debt (including fees and expenses of their legal counsel and financial advisor) and any other fees and expenses relating to the Facilities), and (iii) the sum of Revolving Credit Availability <u>plus</u> unrestricted and available cash on hand (such sum, the "<u>Aggregate Availability</u>") and (iv) the Outstanding amount of the Revolving Credit Loans (including, from and after the Roll-Up Effective Time, the outstanding principal balance of the Pre-Petition Revolving Credit Loans that are rolled-up as provided herein) (labeled as "Revolver Borrowed Balance" in the Approved Budget), in each case for each week from the first day of the week in which the Closing Date occurs through the last day of the week that is 13 weeks thereafter, to be attached to the Interim Order which shall be in form and substance satisfactory to the Agent and Majority Lenders (the "<u>Initial Approved Budget</u>").

**12.3** **Interim Order.** The Bankruptcy Court shall have entered the Interim Order and the First Day Orders, in each case in form and substance reasonably satisfactory to the Agent and Lenders.

**12.4** **Certified Copies of Charter Documents.** The Agent shall have received from the Parent, Borrowers and each of their Subsidiaries a copy, certified by a duly authorized officer of such Person to be true and complete on the Closing Date, of each of (i) its charter or other incorporation documents as in effect on such date of certification, and (ii) its by-laws as in effect on such date.

**12.5** **Corporate Action.** All corporate action necessary for the filing of the Chapter 11 Cases and the valid execution, delivery and performance by the Parent, Borrowers and each of their Subsidiaries of this Credit Agreement and the other Loan Documents to which it is or is to become a party shall have been duly and effectively taken, and evidence thereof satisfactory to the Agent shall have been provided to the Agent.

**12.6** **Incumbency Certificate.** The Agent shall have received from the Parent, Borrowers and each of their Subsidiaries an incumbency certificate, dated as of the Closing Date, signed by a duly authorized officer of such Person, and giving the name and bearing a specimen signature of each individual who shall be authorized: (i) to sign, in the name and on behalf of such Person, each of the Loan Documents to which such Person is or is to become a party; (ii) in the case of each Borrower, to make Revolving Credit Loan Requests and to apply for Letters of Credit; and (iii) to give notices and to take other action on its behalf under the Loan Documents.

**12.7** **Opinion of Counsel.** Each of the Lenders and the Agent shall have received a favorable legal opinion addressed to the Lenders and the Agent, dated as of the Closing Date (or, if acceptable to the Agent, dated prior to the Closing Date), in form and substance satisfactory to the Lenders and the Agent.

CH\1299468.13

**12.8** **Payment of Fees and Expenses.** The Agent shall have received evidence satisfactory to the Agent that the Borrowers will pay to the Lenders or the Agent, as appropriate, all fees then due hereunder, under the Fee Letter and under the Sun Cantinas Finance Fee Letter. The Borrowers shall have reimbursed the Agent for, or paid directly, all fees, costs and expenses incurred by the Agent's Special Counsel and local counsel to the Agent in all relevant jurisdictions in connection with the closing of the transactions contemplated hereby.

**12.9** **Disbursement Instructions.** The Agent shall have received a Revolving Credit Loan Request, disbursement instructions and funds flow from the Borrowers with respect to the proceeds of the Revolving Credit Loans to be made on the Closing Date.

**12.10** **No Material Adverse Change.** The Agent shall be satisfied that there shall have occurred no material adverse change in the business, operations, assets, management, properties, financial condition, income or prospects of the Borrowers and their Subsidiaries taken as a whole since June 26, 2011 except for the commencement of the Chapter 11 Cases and the effects that customarily result from the commencement of chapter 11 cases.

**12.11** **No Litigation.** No litigation, inquiry, injunction or restraining order shall be pending, entered or threatened that, in the reasonable opinion of the Agent, could reasonably be expected to have a material adverse effect on (i) the transactions contemplated hereby, (ii) the ability of the Borrowers or any of their Subsidiaries to perform their obligations under the Loan Documents or Pre-Petition Loan Documents, (iii) the rights and remedies of the Agent and the Lenders under the Loan Documents or Pre-Petition Loan Documents, or (iv) the perfection or priority of any security interests granted to the Agent under the Loan Documents.

**12.12** **Consents and Approvals.** The Agent shall have received evidence that all material governmental and third-party approvals necessary or advisable in connection with the credit facilities contemplated hereby and the continuing operations of the Debtors shall have been obtained and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Debtors taken as a whole, or the credit facilities contemplated hereby.

## 13. ADDITIONAL CONDITIONS TO BORROWINGS.

**13.1** **Conditions to All Borrowings.** The obligations of the Lenders to make any Loan, and of the Agent and the L/C Issuers to issue, extend or renew any Letter of Credit, in each case whether on or after the Closing Date, shall also be subject to the satisfaction of the following conditions precedent (provided that such conditions precedent shall be deemed to be satisfied on the Roll-up Effective Time with respect of the roll-up of the Pre-Petition Obligations):

    (a)    Each of the representations and warranties of any of the Borrowers and their Subsidiaries contained in this Credit Agreement, the other Loan Documents or in any document or instrument delivered pursuant to or in connection with this Credit Agreement shall be true and correct in all material respects as of the date as of which they were made and shall also be true and correct in all material respects at and as of the time

83

of the making of such Loan or the issuance, extension or renewal of such Letter of Credit, with the same effect as if made at and as of that time (except to the extent that such representations and warranties relate expressly to an earlier date) and no Default or Event of Default shall have occurred and be continuing.

(b)     No change shall have occurred in any law or regulations thereunder or interpretations thereof that in the reasonable opinion of any Lender would make it illegal for such Lender to make such Loan or to participate in the issuance, extension or renewal of such Letter of Credit or in the reasonable opinion of the Agent would make it illegal for the Agent to issue, extend or renew such Letter of Credit.

(c)     Each Lender shall have received such statements in substance and form reasonably satisfactory to such Lender as such Lender shall require for the purpose of compliance with any applicable regulations of the Comptroller of the Currency or the Board of Governors of the Federal Reserve System.

(d)     All proceedings in connection with the transactions contemplated by this Credit Agreement, the other Loan Documents and all other documents incident thereto shall be satisfactory in substance and in form to the Lenders and to the Agent and the Agent's Special Counsel, and the Lenders, the Agent and such counsel shall have received all information and such counterpart originals or certified or other copies of such documents as the Agent may reasonably request, including the Revolving Credit Loan Request required by §2.6.

(e)     All other conditions to borrowing in the DIP Order shall have been satisfied.

**13.2     Conditions to Revolving Credit Advance and Letters of Credit Prior to the Final Order**. The obligations of the Lenders to make any Loan, and of the Agent and the L/C Issuers to issue, extend or renew any Letter of Credit, in each case prior to the entry of the Final Order, shall also be subject to the satisfaction of the following conditions precedent:

(a)     For any Revolving Credit Loan to be made prior to the entry of the Final Order, the sum of the Outstanding amount of the Revolving Credit Loans (after giving effect to the amount of the requested Revolving Credit Loan) shall not exceed $5,000,000; and

(b)     For any Letter of Credit to be issued prior to the entry of the Final Order, after giving effect to the requested Letter of Credit, the sum of the aggregate Maximum Drawing Amount and all Unpaid Reimbursement Obligations shall not exceed the lesser of (i) the Letter of Credit Commitments of all Lenders and (i) $20,000,000.

**13.3     Conditions to Revolving Credit Advance and Letters of Credit on or after November 4, 2011**. No Lenders shall have any obligation to make any Loan, and neither the Agent nor any L/C Issuer shall have any obligation to issue, extend or renew any Letter of Credit, in each case on or after November 4, 2011 if:

(a)     the Bankruptcy Court shall not have entered the Final Order;

84

(b)     the Final Order shall have been vacated, stayed, reversed, modified or amended unless the Agent's and Majority Lenders' have consented thereto or shall otherwise not be in full force and effect;

(c)     the Final Order in any respect shall be the subject of a stay pending either appeal or a motion for reconsideration thereof.

## 14.     EVENTS OF DEFAULT; ACCELERATION; ETC.

**14.1     Events of Default and Acceleration.** If any of the following events ("Events of Default" shall occur:

(a)     the Borrowers shall fail to pay any principal of the Loans or any Reimbursement Obligation when the same shall become due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment;

(b)     the Borrowers shall fail to pay any interest on the Loans, the commitment fee, any Letter of Credit Fee, any fees under the Fee Letter, or any other sums due hereunder or under any of the other Loan Documents, within three (3) days of the date when the same became due and payable, whether at the stated date of maturity or any accelerated date of maturity or at any other date fixed for payment;

(c)     any of the Borrowers shall fail to comply with any of its respective covenants contained in §§9.5, 9.7.1, 9.9, 9.12, 9.18, 9.19, 9.20, 9.21, 9.22, 10 or 11 (except as to the covenants contained in §10.7, for which the Borrowers' failure to comply shall only be deemed an Event of Default should the Borrowers fail to cure the failure within the earlier of thirty (30) days or the time period required by Environmental Laws), with any of its covenants contained in §9.4 for a period in excess of five days, or with any of the covenants contained in any of the Mortgages for three days;

(d)     the Borrowers or any of their Subsidiaries shall fail to perform any term, covenant or agreement contained herein or in any of the other Loan Documents (other than those specified elsewhere in this §14.1) for fifteen (15) days after written notice of such failure has been given to the Borrowers by the Agent;

(e)     any representation or warranty by the Borrowers or any of their Subsidiaries in this Credit Agreement or any of the other Loan Documents or in any other document or instrument delivered pursuant to or in connection with this Credit Agreement shall prove to have been false in any material respect upon the date when made or deemed to have been made or repeated;

(f)     Except to the extent permitted or required by the Bankruptcy Code, (i) any Borrower or any of its Subsidiaries shall (A) default in any payment with respect to any Indebtedness (other than the Obligations) beyond the period of grace, if any, applicable thereto or (B) default in the observance or performance of any agreements or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist

85

for such period of time as would permit (assuming the giving of appropriate notice if required) the holder or holders thereof or of any obligations issued thereunder to accelerate the maturity of such Indebtedness or (ii) any such Indebtedness of such Borrower or any of its Subsidiaries shall be declared to be due and payable, or required to be prepaid other than by a regularly scheduled amortization payment or regularly required mandatory prepayment, prior to the stated maturity thereof; provided that it shall not constitute an Event of Default unless the principal amount of any one issue of such Indebtedness exceeds $3,000,000 or the aggregate amount of all Indebtedness referred to in clauses (i) and (ii) above exceeds $3,000,000 at any one time;

     (g)    [intentionally omitted];

     (h)    [intentionally omitted];

     (i)    there shall remain in force, undischarged, unsatisfied and unstayed, for more than thirty (30) consecutive days any final judgment against any Borrower or any of its Subsidiaries that, with other outstanding final judgments, undischarged, against any Borrower or any of its Subsidiaries, exceeds in the aggregate, $1,000,000 and such judgments are not stayed by the Chapter 11 Cases;

     (j)    The holders of all or any part of the 2009 Senior Secured Debt shall be granted adequate protection other than as consented to by the Agent and as set forth in the DIP Orders, or the 2009 Senior Secured Debt or any Equity Interest in the Parent or any Subsidiary of the Parent shall be prepaid, redeemed or repurchased in whole or in part;

     (k)    if any of the Loan Documents shall be cancelled, terminated, revoked or rescinded or the Agent's security interests, mortgages or liens in a substantial portion of the Collateral shall cease to be perfected, or shall cease to have the priority contemplated by the Loan Documents and the DIP Orders, in each case otherwise than in accordance with the terms thereof or with the express prior written agreement, consent or approval of the Lenders, or any action at law, suit or in equity or other legal proceeding to cancel, revoke or rescind any of the Loan Documents shall be commenced by or on behalf of the Borrowers, any of their Subsidiaries party thereto, any of their respective stockholders, or any holder of all or any part of the Senior Secured Debt, any holder of all or any part of the 2009 Senior Secured Debt, or any court or any other governmental or regulatory authority or agency of competent jurisdiction shall make a determination that, or issue a judgment, order, decree or ruling to the effect that, any one or more of the Loan Documents is illegal, invalid or unenforceable in accordance with the terms thereof;

     (l)    any Borrower or any ERISA Affiliate incurs any liability to the PBGC (excluding requested insurance premiums payable in the ordinary course) or a Guaranteed Pension Plan pursuant to Title IV of ERISA in an aggregate amount exceeding $500,000, or any Borrower or any ERISA Affiliate is assessed withdrawal liability pursuant to Title IV of ERISA by a Multiemployer Plan requiring aggregate annual payments exceeding $500,000, or any of the following occurs with respect to a Guaranteed Pension Plan: (i) an ERISA Reportable Event, or a failure to make a required installment or other payment (within the meaning of §302(f)(1) of ERISA), provided that

the Agent determines in its reasonable discretion that such event (A) could be expected to result in liability of any of the Borrowers or their Subsidiaries to the PBGC or such Guaranteed Pension Plan in an aggregate amount exceeding $500,000 and (B) could constitute grounds for the termination of such Guaranteed Pension Plan by the PBGC, for the appointment by the appropriate United States District Court of a trustee to administer such Guaranteed Pension Plan or for the imposition of a lien in favor of such Guaranteed Pension Plan; or (ii) the appointment by a United States District Court of a trustee to administer such Guaranteed Pension Plan; or (iii) the institution by the PBGC of proceedings to terminate such Guaranteed Pension Plan;

(m) the Borrowers or any of their Subsidiaries shall be enjoined, restrained or in any way prevented by the order of any court or any administrative or regulatory agency from conducting any material part of the business of the Borrowers and their Subsidiaries taken as a whole and such order shall continue in effect for more than thirty (30) days;

(n) there shall occur any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty, which in any such case causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Borrowers or any of their Subsidiaries if such event or circumstance is not covered by business interruption insurance and would have a material adverse effect on the business or financial condition of the Borrowers and their Subsidiaries;

(o) there shall occur the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by the Borrowers or any of their Subsidiaries if such loss, suspension, revocation or failure to renew would have a material adverse effect on the business or financial condition of the Borrowers and their Subsidiaries taken as a whole;

(p) the Borrowers or any of their Subsidiaries shall be indicted for a state or federal crime, or any civil or criminal action shall otherwise have been brought against any such Person, a punishment for which in any such case could reasonably be expected to include the forfeiture of any assets of such Person having a fair market value in excess of $1,000,000;

(q) a Change of Control shall occur;

(r) Real Mex shall, at any time, own or control, directly or indirectly, less than one hundred percent (100%) of the Equity Interests of each of the other Borrowers;

(s) (i) the Parent shall incur any Indebtedness other than the Permitted Parent Debt and its guaranty of the 2009 Senior Secured Debt to the extent such guaranty is subject to the 2009 Intercreditor Agreement (2009 Senior Secured Debt), or (ii) the Parent, any Borrower or any of their Subsidiaries shall (A) materially amend, supplement or otherwise modify (pursuant to a waiver or otherwise) the terms and conditions of any

of the Permitted Parent Debt or (B) refinance, refund, extend, renew or replace any of the Permitted Parent Debt, in each case, without the prior written consent of the Agent, if the effect of such amendment, supplement or other modification or waiver or such refinancing, refunding, extension, renewal or replacement is to (u) increase the interest rate payable on the relevant Indebtedness thereunder, (v) increase the cash portion of any interest required to be paid thereon, (w) change (to earlier dates) any dates upon which payments of principal or interest are due thereon, (x) increase the obligations of the obligor or obligors thereunder, (y) increase the principal amount of such Indebtedness in excess of the amounts set forth in the definitions of the term "2009 Parent Debt" plus the amount of any accrued and unpaid interest thereon, or (z) confer any additional rights on the holders of the relevant Indebtedness thereunder which would be adverse to the Borrowers or any of the their Subsidiaries, the Agent or the Lenders;

(t)     the Parent shall engage is any business activities or has any other assets other than (i) its ownership of 100% of the capital stock and economic interest of Real Mex, (ii) performing its obligations and activities incidental thereto under the Loan Documents and under the terms and conditions of the Permitted Parent Debt, (iii) making or receiving Restricted Payments to the extent permitted by this Credit Agreement and (iv) its secured guaranty of the 2009 Senior Secured Debt to the extent the liens securing such guaranty are subordinated to the liens of the Agent pursuant to the 2009 Intercreditor Agreement (2009 Senior Secured Debt);

(u)     the Parent shall (i) consolidate with or merge with or into, or convey, transfer or lease all or substantially all assets to, any Person, (ii) sell or otherwise dispose of any capital stock of Real Mex, (iii) create or acquire any Subsidiary or make or own any Investment in any Person other than Real Mex, or (iv) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons;

(v)     the Parent shall (i) fail to perform any term, covenant or agreement contained in the Guaranty or (ii) create or incur or suffer to be created or incurred or to exist any lien, encumbrance, mortgage, pledge, charge, restriction or other security interest of any kind upon any of its property or assets of any character whether now owned or hereafter acquired, or upon the income or profits therefrom other than liens in favor of the Agent for the benefit of the Lenders and the Agent under the Loan Documents and Pre-Petition Loan Documents and, subject to the 2009 Intercreditor Agreement (2009 Senior Secured Debt), liens granted by Parent to secure its guaranty of the 2009 Senior Secured Debt; or

(w)     the occurrence of any of the following in the Chapter 11 Cases:

(i)     the payment by the Debtors of expenses (A) in excess of the variances permitted by §11.1(a), or (B) otherwise in violation of the terms and condition of §11.1(a);

(ii)     obtaining after the Petition Date credit or incurring Indebtedness that is (i) secured by a security interest, mortgage or other lien on all or any portion of Collateral which is equal or senior to any security interest, mortgage or

88

other lien of the Agent, or (ii) entitled to priority administrative status which is equal or senior to that granted to the Agent in the DIP Orders, unless used to refinance Obligations in full in cash;

(iii)　the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by the Debtors in the Chapter 11 Cases, or the entry of an order (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code from any Person other than the Lenders not otherwise permitted by this Credit Agreement, or (B) to authorize any Person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (C) except as provided in the Final Order or the Interim Order, to use cash collateral without the Agent's prior written consent under Section 363(c) of the Bankruptcy Code or (D) except as provided in the DIP Orders, to grant any lien other than Permitted Liens upon or affecting any Collateral;

(iv)　the dismissal of the Chapter 11 Cases or the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or examiner with expanded powers or other responsible person in the Chapter 11 Cases;

(v)　any failure by the Debtors to make adequate protection payments or other payments to the Prior Agent or Prior Lenders as set forth in the Interim Order or the Final Order when due;

(vi)　any failure by the Debtors to perform, in any respect, any of the material terms, provisions, conditions, covenants, or obligations under any DIP Order;

(vii)　the entry of an order which has not been withdrawn, dismissed or reversed (a) appointing an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner with expanded powers in the Chapter 11 Cases, (b) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral in excess of $250,000 or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, (in each case with a value in excess of $100,000), (c) amending, supplementing, staying, reversing, vacating or otherwise modifying any of the Interim Order, the Final Order, this Credit Agreement or any other Loan Document, or Agent's, any Lender's, Prior Agent's or Prior Lenders' rights, benefits, privileges or remedies under the Interim Order, the Final Order, this Credit Agreement, any other Loan Document or any Pre-Petition Loan Document or (d) approving a sale of any assets of any Debtor pursuant to section 363 of the Bankruptcy Code or approving bidding procedures therefor other than in each case as provided in the DIP Orders;

CH\1299468.13

(viii)    Debtors consolidating or combining with any other Person except pursuant to a confirmed plan of reorganization with the prior written consent of the Agent and Majority Lenders;

(ix)    reversal, vacatur, or modification (without the express prior written consent of the Agent, in its sole discretion) of any DIP Order;

(x)    the challenge by the Debtors (or the support by the Debtors of the challenge by any other Person) to the Agent's, any Lender's, the Prior Agent's, or any Prior Lenders' motion seeking confirmation of amount of Agent's, Lenders', Prior Agent's or Prior Lenders' claim or the validity, extent, perfection, priority or characterization of any obligations incurred or liens granted under or in connection with the Pre-Petition Credit Agreement;

(xi)    the challenge by the Debtors (or the support by the Debtors of the challenge by any other Person) to (a) disallow in whole or in part the claim of the Prior Agent or the Prior Lenders under the Pre-Petition Credit Agreement or the claim of the Agent or any Lender in respect of Obligations or to challenge the validity, perfection and enforceability of any of the liens in favor of any of them, or (b) equitably subordinate or re-characterize in whole or in part the claim of the Agent or any Lender in respect of the Obligations or the Prior Agent or Prior Lender in respect of the Pre-Petition Indebtedness, or in each case the entry of an order by the Bankruptcy Court granting the relief described above;

(xii)    the filing of a lawsuit, adversary proceeding, claim or counterclaim related to the Debtors or Collateral or pre-petition collateral against the Agent, any Lender, Prior Agent, or any Prior Lender by the Debtors;

(xiii)    the application by the Debtors for authority to make any Pre-Petition Payment without the Agent's prior written consent, other than pursuant to the First Day Orders;

(xiv)    the entry of an order in the Chapter 11 Cases avoiding or requiring disgorgement of any portion of the Pre-Petition Revolving Credit Loans;

(xv)    subject to any applicable cure periods contained in such DIP Order, the failure of the Debtors to perform its obligations under the Interim Order or the Final Order;

(xvi)    the use, remittance or the application of proceeds of Collateral in contravention of the terms of the Loan Documents or the DIP Orders or First Day Orders;

(xvii)    the entry of an order in the Chapter 11 Cases authorizing procedures for interim compensation of professionals that is not in form and substance customary for the District of Delaware or otherwise not in form and substance reasonably acceptable to the Agent;

90

(xviii) without the prior written consent of the Agent, the Debtors incur, create, assume, suffer to exist or permit any superpriority claim in the Chapter 11 Cases that is pari passu with or senior to the claims of the Lenders and Agent, other than the Carve-Out;

(xix) the marshaling of any Collateral;

(xx) the Debtors requesting or seeking authority for or that approves or provides authority to take any other action or actions adverse to the Agent or any Lender or its rights and remedies under the Loan Documents or its interest in the Collateral;

(xxi) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, other than a plan of reorganization that provides for payment in full in cash of all Obligations and Pre-Petition Obligations on or prior to March 31, 2012;

(xxii) violation of any of the Agent Affiliate Leases by any of the Debtors notwithstanding any provision of the Bankruptcy Code or other applicable law to the contrary.;

(xxiii) any Debtors shall seek to reject any Agent Affiliate Lease or seek to assume any Agent Affiliate Lease other than on terms set forth on Schedule 4 hereto;

then, and in any such event, so long as the same may be continuing, the Agent may, and upon the request of the Majority Lenders shall, by notice in writing to the Borrowers declare all amounts owing with respect to this Credit Agreement, the Notes and the other Loan Documents and all Reimbursement Obligations to be, and they shall thereupon forthwith become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each of the Borrowers.

**14.2    Termination Declarations.**  If any one or more of the Events of Default shall occur, the Agent may, and at the request of the Majority Lenders, shall (i) declare all Obligations to be immediately due and payable, (ii) declare any unused portion of the credit hereunder to be terminated, reduced or restricted, (iii) declare that each of the Lenders is relieved of all further obligations to make Loans to the Borrowers and that each L/C Issuer is relieved of all further obligations to issue, extend or renew any Letter of Credit, or (iv) declare a termination, reduction or restriction on the ability of the Debtors to use any cash collateral derived solely from the proceeds of Collateral (any such declaration shall be made in writing to the Debtors, the official committee(s) of creditors of the Debtors and the United States Trustee, and shall be referred to herein as a "Termination Declaration" and the date of delivery of such Termination Declaration being herein referred to as the "Termination Declaration Date").   No termination of the credit hereunder shall relieve any of the Borrowers or their Subsidiaries of any of the Obligations.

**14.3    Remedies.**  In case any one or more of the Events of Default shall have occurred and be continuing, and whether or not the maturity of the Loans shall have been accelerated

91

pursuant to §14.2, the Agent and each Lender, if owed any amount with respect to the Loans or the Reimbursement Obligations, may proceed to protect and enforce its rights by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Credit Agreement and the other Loan Documents or any instrument pursuant to which the Obligations to such Lender are evidenced, including as permitted by applicable law the obtaining of the ex parte appointment of a receiver, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of such Lender. No remedy herein conferred upon any Lender or the Agent or the holder of any Note or purchaser of any Letter of Credit Participation is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law. In addition, the Borrowers shall cooperate with the Agent in the transfer of any licenses or leases used in the business of the Borrowers and their Subsidiaries to the Agent or any other third party designated by the Agent. In addition, five (5) Business Days following the Termination Declaration Date (such 5 Business Day period, the "Remedies Notice Period"), the Agent shall have automatic relief from the automatic stay and may foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations, occupy the Debtors' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable nonbankruptcy law. During the Remedies Notice Period, the Debtors and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the Lenders and the Agent, shall automatically terminate at the end of the Remedies Notice Period, without further notice or order. During the Remedies Notice Period, the Debtors may not use the proceeds of Loans hereunder, cash collateral, or other Collateral proceeds except to pay payroll and other expenses critical to keep the business of the Debtors operating in accordance with the Approved Budget.

**14.4    Distribution of Collateral Proceeds.**  In the event that, following the occurrence or during the continuance of any Default or Event of Default, the Agent or any Lender, as the case may be, receives any monies in connection with the enforcement of any of the Loan Documents, or otherwise with respect to the realization upon any of the Collateral, such monies shall be distributed for application as follows:

(a)    First, to the payment of, or (as the case may be) the reimbursement of the Agent for or in respect of all reasonable costs, expenses, disbursements and losses which shall have been incurred or sustained by the Agent in connection with the collection of such monies by the Agent, for the exercise, protection or enforcement by the Agent of all or any of the rights, remedies, powers and privileges of the Agent under this Credit Agreement or any of the other Loan Documents or in respect of the Collateral or in support of any provision of adequate indemnity to the Agent against any taxes or liens which by law shall have, or may have, priority over the rights of the Agent to such monies;

(b)    Second, to all other Obligations in such order or preference as the Majority Lenders may determine; provided, however, that (i) distributions shall be made

(A) pari passu among Obligations with respect to the Agent's fee payable pursuant to the Fee Letter and all other Obligations and (B) with respect to each type of Obligation owing to the Lenders, such as interest, principal, fees and expenses, among the Lenders pro rata, and (ii) the Agent may in its discretion make proper allowance to take into account any Obligations not then due and payable;

(c)     Third, upon payment and satisfaction in full or other provisions for payment in full satisfactory to the Lenders and the Agent of all of the Obligations, to the payment of any obligations required to be paid pursuant to the Uniform Commercial Code of the State of Illinois; and

(d)     Fourth, the excess, if any, shall be returned to the Borrowers or to such other Persons as are entitled thereto.

## 15.     SETOFF.

**15.1     Setoff.**  Regardless of the adequacy of any collateral, during the continuance of any Event of Default, any deposits or other sums credited by or due from any of the Lenders to any of the Borrowers and any securities or other property of any of the Borrowers in the possession of such Lender may be applied to or set off by such Lender against the payment of Obligations and any and all other liabilities, direct, or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of any of the Borrowers to the Lenders.  Each of the Lenders agrees with each other Lender that (a) if an amount to be set off is to be applied to Indebtedness of any of the Borrowers to such Lender, other than Indebtedness evidenced by the Notes held by such Lender, such amount shall be applied ratably to such other Indebtedness and to the Indebtedness evidenced by all such Notes held by such Lender, and (b) if such Lender shall receive from any of the Borrowers, whether by voluntary payment, exercise of the right of setoff, counterclaim, cross action, enforcement of the claim evidenced by the Notes held by, such Lender by proceedings against such Borrower at law or in equity or by proof thereof in bankruptcy, reorganization, liquidation, receivership or similar proceedings, or otherwise, and shall retain and apply to the payment of the Note or Notes held by such Lender any amount in excess of its ratable portion of the payments received by all of the Lenders with respect to the Notes held by all of the Lenders, such Lender will make such disposition and arrangements with the other Lenders with respect to such excess, either by way of distribution, pro tanto assignment of claims, subrogation or otherwise as shall result in each Lender receiving in respect of the Notes held by it or its proportionate payment as contemplated by this Credit Agreement; provided that if all or any part of such excess payment is thereafter recovered from such Lender, such disposition and arrangements shall be rescinded and the amount restored to the extent of such recovery, but without interest.

**15.2     Consent to Setoff.**  Notwithstanding the foregoing §15.1, at any time that the Loans or any other obligation shall be secured by real property located in California, no Lender or the Agent shall exercise a right of setoff, lien or counterclaim or take any court or administrative action or institute any proceeding to enforce any provision of this Credit Agreement or any Note unless it is taken with the consent of the Majority Lenders, or approved in writing by the Agent, if such setoff or action or proceeding would or might (pursuant to California Code of Civil Procedure Sections 580a, 580b, 580d and 726 of The California Code of

93

Civil Procedure or Section 2924 of the California Civil Code, if applicable, or otherwise) affect or impair the validity, priority, or enforceability of the liens granted to the Agent pursuant to the Loan Documents or the enforceability of the Notes and other obligations hereunder, and any attempted exercise by any Lender or the Agent of any such right without obtaining such consent of the Majority Lenders or the Agent shall be null and void. This §15.2 shall be solely for the benefit of each of the Lenders and the Agent hereunder.

### 16. THE AGENT.

### 16.1 Authorization.

(a) The Agent is authorized to take such action on behalf of each of the Lenders and to exercise all such powers as are hereunder and under any of the other Loan Documents and any related documents delegated to the Agent, together with such powers as are reasonably incident thereto, provided that no duties or responsibilities not expressly assumed herein or therein shall be implied to have been assumed by the Agent.

(b) The relationship between the Agent and each of the Lenders is that of an independent contractor. The use of the term "Agent" is for convenience only and is used to describe, as a form of convention, the independent contractual relationship between the Agent and each of the Lenders. Nothing contained in this Credit Agreement nor the other Loan Documents shall be construed to create an agency, trust or other fiduciary relationship between the Agent and any of the Lenders.

(c) As an independent contractor empowered by the Lenders to exercise certain rights and perform certain duties and responsibilities hereunder and under the other Loan Documents, the Agent is nevertheless a "representative" of the Lenders, as that term is defined in Article 1 of the Uniform Commercial Code, for purposes of actions for the benefit of the Lenders and the Agent with respect to all collateral security and guaranties contemplated by the Loan Documents. Such actions include the designation of the Agent as "secured party", "mortgagee" or the like on all financing statements and other documents and instruments, whether recorded or otherwise, relating to the attachment, perfection, priority or enforcement of any security interests, mortgages or deeds of trust in collateral security intended to secure the payment or performance of any of the Obligations, all for the benefit of the Lenders and the Agent.

**16.2 Employees and Agents.** The Agent may exercise its powers and execute its duties by or through employees or agents and shall be entitled to take, and to rely on, advice of counsel concerning all matters pertaining to its rights and duties under this Credit Agreement and the other Loan Documents. The Agent may utilize the services of such Persons as the Agent in its sole discretion may reasonably determine, and all reasonable fees and expenses of any such Persons shall be paid by the Borrowers.

**16.3 No Liability.** Neither the Agent nor any of its shareholders, directors, officers or employees nor any other Person assisting them in their duties nor any agent or employee thereof, shall be liable for any waiver, consent or approval given or any action taken, or omitted to be taken, in good faith by it or them hereunder or under any of the other Loan Documents, or in

94

connection herewith or therewith, or be responsible for the consequences of any oversight or error of judgment whatsoever, except that the Agent or such other Person, as the case may be, may be liable for losses due to its willful misconduct or gross negligence.

### 16.4  No Representations.

16.4.1  **General.**  The Agent shall not be responsible for the execution or validity or enforceability of this Credit Agreement, the Notes, the Letters of Credit, any of the other Loan Documents or any instrument at any time constituting, or intended to constitute, collateral security for the Notes, or for the value of any such collateral security or for the validity, enforceability or collectability of any such amounts owing with respect to the Notes, or for any recitals or statements, warranties or representations made herein, in any of the other Loan Documents, or in any certificate or instrument hereafter furnished to it by or on behalf of any Borrower or any of their respective Subsidiaries, or be bound to ascertain or inquire as to the performance or observance of any of the terms, conditions, covenants or agreements herein or in any instrument at any time constituting, or intended to constitute, collateral security for the Notes or to inspect any of the properties, books or records of any Borrower or any of their respective Subsidiaries. The Agent shall not be bound to ascertain whether any notice, consent, waiver or request delivered to it by any Borrower or any holder of any of the Notes shall have been duly authorized or is true, accurate and complete.  The Agent has not made nor does it now make any representations or warranties, express or implied, nor does it assume any liability to the Lenders, with respect to the credit worthiness or financial conditions of any Borrower or any of their respective Subsidiaries.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender, and based upon such information and documents as it has deemed appropriate, made its own credit analysis and decision to enter into this Credit Agreement.

16.4.2  **Closing Documentation, etc.**  For purposes of determining compliance with the conditions set forth in §12, each Lender that has executed this Credit Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document and matter either sent, or made available, by the Agent to such Lender for consent, approval, acceptance or satisfaction, or required thereunder to be consented to or approved by or acceptable or satisfactory to such Lender, unless an officer of the Agent active upon the Borrowers' account shall have received notice from such Lender prior to the Closing Date specifying such Lender's objection thereto and such objection shall not have been withdrawn by notice to the Agent to such effect on or prior to the Closing Date.

### 16.5  Payments.

16.5.1  **Payments to Agent.**  A payment by any Borrower to the Agent hereunder or under any of the other Loan Documents for the account of any Lender shall constitute a payment to such Lender.  The Agent agrees promptly (but in no case later than two Business Days after the receipt of such payments by the Agent) to distribute to each Lender such Lender's pro rata share of payments received by the Agent for the account of

95

the Lenders except as otherwise expressly provided herein or in any of the other Loan Documents.

**16.5.2 Distribution by Agent.** If in the opinion of the Agent the distribution of any amount received by it in such capacity hereunder, under the Notes or under any of the other Loan Documents might involve it in liability, it may refrain from making distribution until its right to make distribution shall have been adjudicated by a court of competent jurisdiction. If a court of competent jurisdiction shall adjudge that any amount received and distributed by the Agent is to be repaid, each Person to whom any such distribution shall have been made shall either repay to the Agent its proportionate share of the amount so adjudged to be repaid or shall pay over the same in such manner and to such Persons as shall be determined by such court.

**16.5.3 Delinquent Lenders.** Notwithstanding anything to the contrary contained in this Credit Agreement or any of the other Loan Documents, any Lender that fails (i) to make available to the Agent its pro rata share of any Loan or to purchase any Letter of Credit Participation or (ii) to comply with the provisions of §15 with respect to making dispositions and arrangements with the other Lenders, where such Lender's share of any payment received, whether by setoff or otherwise, is in excess of its pro rata share of such payments due and payable to all of the Lenders, in each case as, when and to the full extent required by the provisions of this Credit Agreement, shall be deemed delinquent (a "Delinquent Lender") and shall be deemed a Delinquent Lender until such time as such delinquency is satisfied. A Delinquent Lender shall be deemed to have assigned any and all payments due to it from the Borrowers, whether on account of outstanding Loans, Unpaid Reimbursement Obligations, interest, fees or otherwise, to the remaining nondelinquent Lenders for application to, and reduction of, their respective pro rata shares of all outstanding Loans and Unpaid Reimbursement Obligations. The Delinquent Lender hereby authorizes the Agent to distribute such payments to the nondelinquent Lenders in proportion to their respective pro rata shares of all outstanding Loans and Unpaid Reimbursement Obligations. A Delinquent Lender shall be deemed to have satisfied in full a delinquency when and if, as a result of application of the assigned payments to all outstanding Loans and Unpaid Reimbursement Obligations of the nondelinquent Lenders, the Lenders' respective pro rata shares of all outstanding Loans and Unpaid Reimbursement Obligations have returned to those in effect immediately prior to such delinquency and without giving effect to the nonpayment causing such delinquency.

**16.6 Holders of Notes.** The Agent may deem and treat the payee of any Note or the purchaser of any Letter of Credit Participation as the absolute owner or purchaser thereof for all purposes hereof until it shall have been furnished in writing with a different name by such payee or by a subsequent holder, assignee or transferee.

**16.7 Indemnity.** The Lenders ratably agree hereby to indemnify and hold harmless the Agent and its affiliates from and against any and all claims, actions and suits (whether groundless or otherwise), losses, damages, costs, expenses (including any expenses for which the Agent or such affiliate has not been reimbursed by the Borrowers as required by §18), and liabilities of every nature and character arising out of or related to this Credit Agreement, the

96

Notes, or any of the other Loan Documents or the transactions contemplated or evidenced hereby or thereby, or the Agent's actions taken hereunder or thereunder, except to the extent that any of the same shall be directly caused by the willful misconduct or gross negligence of the Agent.

**16.8  Agent as Lender.**  In its individual capacity, GE Capital shall have the same obligations and the same rights, powers and privileges in respect to its Revolving Credit Commitment, and the Loans made by it, and as the holder of any of the Notes, as it would have were it not also the Agent.

**16.9  Resignation.**  The Agent may resign at any time by giving sixty (60) days prior written notice thereof to the Lenders and the Borrowers.  Upon any such resignation, the Majority Lenders shall have the right to appoint a successor Agent.  Unless a Default or Event of Default shall have occurred and be continuing, such successor Agent shall be reasonably acceptable to the Borrowers.  If no successor Agent shall have been so appointed by the Majority Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent's giving of notice of resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be a financial institution having a rating of not less than A or its equivalent by Standard & Poor's Ratings Group.  Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. After any retiring Agent's resignation, the provisions of this Credit Agreement and the other Loan Documents shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as Agent.

**16.10  Notification of Defaults and Events of Default; Other Notices.**  Each Lender hereby agrees that, upon learning of the existence of a Default or an Event of Default, it shall promptly notify the Agent thereof.  The Agent hereby agrees that upon receipt of any notice under this §16.10 it shall promptly notify the other Lenders of the existence of such Default or Event of Default.

**16.11  Duties in the Case of Enforcement.**  In case one of more Events of Default have occurred and shall be continuing, and whether or not acceleration of the Obligations shall have occurred, the Agent shall, if (i) so requested by the Majority Lenders and (ii) the Lenders have provided to the Agent such additional indemnities and assurances against expenses and liabilities as the Agent may reasonably request, proceed to enforce the provisions of the Loan Documents authorizing the sale or other disposition of all or any part of the Collateral and exercise all or any such other legal and equitable and other rights or remedies as it may have in respect of such Collateral.  The Majority Lenders may direct the Agent in writing as to the method and the extent of any such sale or other disposition, the Lenders hereby agreeing to indemnify and hold the Agent, harmless from all liabilities incurred in respect of all actions taken or omitted in accordance with such directions, provided that the Agent need not comply with any such direction to the extent that the Agent reasonably believes the Agent's compliance with such direction to be unlawful or commercially unreasonable in any applicable jurisdiction.

**16.12  Agent May File Proofs of Claim.**

(a)    In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial, administrative or like proceeding or any assignment for the benefit of creditors relative to the Borrowers or any of their Subsidiaries, the Agent (irrespective of whether the principal of any Loan, Reimbursement Obligation or Unpaid Reimbursement Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding, under any such assignment or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, Reimbursement Obligations or Unpaid Reimbursement Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel and all other amounts due the Lenders and the Agent under §§2.2, 5.6, 6.1, 6.2 and 18.1) allowed in such proceeding or under any such assignment; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

(b)    Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding or under any such assignment is hereby authorized by each Lender to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Lenders, nevertheless to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under §§2.2, 5.6, 6.1, 6.2 and 18.1.

(c)    Nothing contained herein shall authorize the Agent to consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations owed to such Lender or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding or under any such assignment.

## 17.    TREATMENT OF CERTAIN CONFIDENTIAL INFORMATION.

**17.1    Confidentiality.**  Each of the Lenders and the Agent agrees, on behalf of itself and each of its affiliates, directors, officers, employees and representatives, to keep confidential, in accordance with their customary procedures for handling confidential information of the same nature and in accordance with safe and sound banking practices, any non-public information supplied to it by any of the Borrowers or their Subsidiaries pursuant to this Credit Agreement, provided that nothing herein shall limit the disclosure of any such information (a) after such information shall have become public other than through a violation of this §17.1, or becomes

available to any of the Lenders or the Agent on a nonconfidential basis from a source other than the Borrowers, (b) to the extent required by statute, rule, regulation or judicial process, including in the Chapter 11 Cases, (c) to counsel for any of the Lenders or the Agent, (d) to bank examiners or any other regulatory authority having jurisdiction over any Lender or the Agent, or to auditors or accountants, (e) to the Agent, any Lender or any Financial Affiliate, (f) in connection with any litigation to which any one or more of the Lenders, the Agent or any Financial Affiliate is a party, or in connection with the enforcement of rights or remedies hereunder or under any other Loan Document, (g) to a Lender Affiliate or a Subsidiary or affiliate of the Agent, (h) to any actual or prospective assignee or participant or any actual or prospective counterparty (or its advisors) to any swap or derivative transactions referenced to credit or other risks or events arising under this Credit Agreement or any other Loan Document so long as such assignee, participant or counterparty, as the case may be, agrees to be bound by the provisions of §17.1 or (i) with the consent of the Borrowers. Moreover, each of the Agent, the Lenders and any Financial Affiliate is hereby expressly permitted by the Borrowers to refer to any of the Borrowers and its Subsidiaries in connection with any advertising, promotion or marketing undertaken by the Agent, such Lender or such Financial Affiliate and, for such purpose, the Agent, such Lender or such Financial Affiliate may utilize any trade name, trademark, logo or other distinctive symbol associated with the Borrowers or any of their Subsidiaries or any of their businesses.

**17.2    Prior Notification.**  Unless specifically prohibited by applicable law or court order, each of the Lenders and the Agent shall, prior to disclosure thereof, notify the Borrowers of any request for disclosure of any such non-public information by any governmental agency or representative thereof (other than any such request in connection with an examination of the financial condition of such Lender by such governmental agency) or pursuant to legal process.

**17.3    Other.**  In no event shall any Lender or the Agent be obligated or required to return any materials furnished to it or any Financial Affiliate by any of the Borrowers or their Subsidiaries.  The obligations of each Lender under this §17 shall supersede and replace the obligations of such Lender under any confidentiality letter in respect of this financing signed and delivered by such Lender to any of the Borrowers prior to the date hereof and shall be binding upon any assignee of, or purchaser of any participation in, any interest in any of the Loans or Reimbursement Obligations from any Lender.

**18.    EXPENSES AND INDEMNIFICATION**.

**18.1    Expenses.**  The Borrowers jointly and severally agree to pay (i) the reasonable costs of producing and reproducing this Credit Agreement, the other Loan Documents and the other agreements and instruments mentioned herein, (ii) the reasonable fees, expenses and disbursements of the Agent's Special Counsel or any local counsel to the Agent incurred in connection with the preparation, syndication, administration or interpretation of the Loan Documents and other instruments mentioned herein, each closing hereunder, any amendments, modifications, approvals, consents or waivers hereto or hereunder, or the cancellation of any Loan Document upon payment in full in cash of all of the Obligations or pursuant to any terms of such Loan Document for providing for such cancellation, (iii) the reasonable fees, expenses and disbursements of the Agent or any of its affiliates incurred by the Agent or such affiliate in connection with the preparation, syndication, administration or interpretation of the Loan

99

Documents and other instruments mentioned herein, including all title insurance premiums and surveyor, engineering and appraisal charges, (iv) any fees, costs, expenses and bank charges, including bank charges for returned checks, incurred by the Agent in establishing, maintaining or handling agency accounts, lock box accounts and other accounts for the collection of any of the Collateral; (v) all reasonable out-of-pocket expenses (including without limitation reasonable attorneys' fees and costs, which attorneys may be employees of any Lender or the Agent, and reasonable consulting, accounting, appraisal, investment banking and similar professional fees and charges) incurred by any Lender or the Agent in connection with (A) the enforcement of or preservation of rights under any of the Loan Documents against any of the Borrowers or their Subsidiaries or the administration thereof after the occurrence of a Default or Event of Default and (B) any litigation, proceeding or dispute whether arising hereunder or otherwise, in any way related to any Lender's or the Agent's relationship with any of the Borrowers or their Subsidiaries and (vi) all reasonable fees, expenses and disbursements of any Lender or the Agent incurred in connection with Uniform Commercial Code searches, Uniform Commercial Code filings or mortgage recordings.

**18.2** **Indemnification.** The Borrowers jointly and severally agree to indemnify and hold harmless the Agent, the affiliates of the Agent, and the Lenders from and against any and all claims, actions and suits whether groundless or otherwise, and from and against any and all liabilities, losses, damages and expenses of every nature and character arising out of this Credit Agreement or any of the other Loan Documents or the transactions contemplated hereby including, without limitation, (i) any actual or proposed use by any of the Borrowers or their Subsidiaries of the proceeds of any of the Loans or Letters of Credit, (ii) the reversal or withdrawal of any provisional credits granted by the Agent upon the transfer of funds from lock box, bank agency or concentration accounts or in connection with the provisional honoring of checks or other items, (iii) any actual or alleged infringement of any patent, copyright, trademark, service mark or similar right of any of the Borrowers or their Subsidiaries comprised in the Collateral, (iv) any of the Borrowers or their Subsidiaries entering into or performing this Credit Agreement or any of the other Loan Documents or (v) with respect to each of the Borrowers and their Subsidiaries and their respective properties and assets, the violation of any Environmental Law, the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release or threatened release of any Hazardous Substances or any action, suit, proceeding or investigation brought or threatened with respect to any Hazardous Substances (including, but not limited to, claims with respect to wrongful death, personal injury or damage to property), in each case including, without limitation, the reasonable fees and disbursements of counsel and allocated costs of internal counsel incurred in connection with any such investigation, litigation or other proceeding; provided that no Borrower shall be liable for any portion of such liabilities, losses, damages and expenses resulting from the gross negligence or willful misconduct of the Agent, or any affiliate thereof. In litigation, or the preparation therefor, the Lenders, the Agent, and the affiliates of the Agent shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Borrowers agree to pay promptly the reasonable fees and expenses of such counsel. If, and to the extent that the obligations of the Borrowers under this §18.2 are unenforceable for any reason, the Borrowers hereby agrees to make the maximum contribution to the payment in satisfaction of such obligations which is permissible under applicable law.

100

**18.3   Survival.**   The covenants contained in this §18 shall survive payment or satisfaction in full of all other Obligations.

## 19.   SURVIVAL OF COVENANTS, ETC.

All covenants, agreements, representations and warranties made herein, in the Notes, in any of the other Loan Documents or in any documents or other papers delivered by or on behalf of any of the Borrowers or their Subsidiaries pursuant hereto shall be deemed to have been relied upon by the Lenders and the Agent, notwithstanding any investigation heretofore or hereafter made by any of them, and shall survive the making by the Lenders of any of the Loans and the issuance, extension or renewal of any Letters of Credit, as herein contemplated, and shall continue in full force and effect so long as any Letter of Credit or any amount due under this Credit Agreement or the Notes or any of the other Loan Documents remains outstanding or any Lender has any obligation to make any Loans or the Agent has any obligation to issue, extend or renew any Letter of Credit, and for such further time as may be otherwise expressly specified in this Credit Agreement.   All statements contained in any certificate or other paper delivered to any Lender or the Agent at any time by or on behalf of any of the Borrowers or their Subsidiaries pursuant hereto or in connection with the transactions contemplated hereby shall constitute representations and warranties by such Borrower or such Subsidiary hereunder.

## 20.   ASSIGNMENT AND PARTICIPATION.

**20.1   Conditions to Assignment by Lenders.**   Except as provided herein, each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Credit Agreement (including all or a portion of its Revolving Credit Commitment Percentage and Revolving Credit Commitment and the same portion of the Revolving Credit Loans at the time owing to it, the Revolving Credit Notes held by it and its Letter of Credit Commitment Percentage and Letter of Credit Commitment and the same portion of participating interest in the risk and reimbursement obligation relating to Letters of Credit, provided that (a) except in the case of an assignment to another Lender, an affiliate of any Lender or an Approved Fund of any Lender, each of the Agent and, unless an Event of Default shall have occurred and be continuing, the Borrowers shall have given their prior written consent to such assignment, which consent will not be unreasonably withheld or delayed, (b) each such assignment shall be of a constant, and not a varying, percentage of all the assigning Lender's rights and obligations in respect of its Revolving Credit Commitment Percentage and Revolving Credit Commitment, the Revolving Credit Loans at the time owing to it and its Letter of Credit Percentage and Letter of Credit Commitment and its participating interest in the risk and its reimbursement obligations relating to Letters of Credit (it being understood and agreed and each assignment shall be consummated so that the Revolving Credit Commitment Percentage and the Letter of Credit Percentage of each Lender shall be the same), (c) each assignment shall be in a minimum amount of $3,000,000 (or if less, such Lender's entire Loans and Revolving Credit Commitment, or such lesser amount consented to by the Agent); and (d) the parties to such assignment shall execute and deliver to the Agent, for recording in the Register (as hereinafter defined), an Assignment and Acceptance, substantially in the form of Exhibit D hereto (an "Assignment and Acceptance"), together with any Notes subject to such assignment.   Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be at least five (5) Business Days after

the execution thereof, (y) the assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder, and (z) the assigning Lender shall, to the extent provided in such assignment and upon payment to the Agent of the registration fee referred to in §20.3, be released from its obligations under this Credit Agreement.

**20.2    Certain Representations and Warranties; Limitations; Covenants.**    By executing and delivering an Assignment and Acceptance, the parties to the assignment thereunder confirm to and agree with each other and the other parties hereto as follows:

(a)    other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim, the assigning Lender makes no representation or warranty, express or implied, and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Credit Agreement, the other Loan Documents or any other instrument or document furnished pursuant hereto or the attachment, perfection or priority of any security interest or mortgage,

(b)    the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any of the Borrowers or their Subsidiaries or any other Person primarily or secondarily liable in respect of any of the Obligations, or the performance or observance by any of the Borrowers or their Subsidiaries or any other Person primarily or secondarily liable in respect of any of the Obligations of any of their obligations under this Credit Agreement or any of the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto;

(c)    such assignee confirms that it has received a copy of this Credit Agreement, together with copies of the most recent financial statements referred to in §8.4 and §9.4 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance;

(d)    such assignee will, independently and without reliance upon the assigning Lender, the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Credit Agreement;

(e)    (e)    such assignee represents and warrants that it is an Eligible Assignee;

(f)    such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Credit Agreement and the other Loan Documents as are delegated to the Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto;

CH\1299468.13

(g)    such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Credit Agreement are required to be performed by it as a Lender;

(h)    such assignee represents and warrants that it is legally authorized to enter into such Assignment and Acceptance;

(i)    such assignee acknowledges that it has made arrangements with the assigning Lender satisfactory to such assignee with respect to its pro rata share of Letter of Credit Fees in respect of outstanding Letters of Credit;

(j)    such assignee, if organized under the laws of a jurisdiction outside the United States, shall provide the Agent and the Borrowers with the forms prescribed by §6.2.2(h) certifying as to its status for purposes of determining the applicability of any exemption from United States withholding taxes with respect to all payments to be made hereunder to such assignee. Unless the Borrowers and the Agent have received such forms or such documents validly indicating that payments hereunder are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Borrowers or the Agent shall withhold taxes from such payments at the applicable statutory rate in the case of payments to or for any assignee organized under the laws of a jurisdiction outside the United States in accordance with §6.2.2.

**20.3    Register.**  The Agent shall maintain a copy of each Assignment and Acceptance delivered to it and a register or similar list (the "Register") for the recordation of the names and addresses of the Lenders and the Revolving Credit Commitment Percentage of, and principal amount of the Loans owing to and Letter of Credit Participations purchased by, the Lenders from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and each of the Borrowers, the Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Credit Agreement. The Register shall be available for inspection by the Borrowers and the Lenders at any reasonable time and from time to time upon reasonable prior notice. Upon each such recordation, the assignee Lender agrees to pay to the Agent a registration fee in the sum of $3,500.

**20.4    New Notes.**  Upon its receipt of an Assignment and Acceptance executed by the parties to such assignment, together with each Note subject to such assignment, the Agent shall (a) record the information contained therein in the Register, and (b) give prompt notice thereof to the Borrowers and the Lenders (other than the assigning Lender). Within five (5) Business Days after receipt of such notice, the Borrowers, at their own expense, shall execute and deliver to the Agent, in exchange for each surrendered Note, a new Note to such Eligible Assignee in an amount equal to the amount assumed by such Eligible Assignee pursuant to such Assignment and Acceptance and, if the assigning Lender has retained some portion of its obligations hereunder, a new Note to the assigning Lender in an amount equal to the amount retained by it hereunder. Such new Notes shall provide that they are replacements for the surrendered Notes, shall be in an aggregate principal amount equal to the aggregate principal amount of the surrendered Notes, shall be dated the effective date of such Assignment and Acceptance and shall otherwise be substantially the form of the assigned Notes. Within five (5) days of issuance of any new Notes pursuant to this §20.4, the Borrowers shall deliver an opinion of counsel,

addressed to the Lenders and the Agent, relating to the due authorization, execution and delivery of such new Notes and the legality, validity and binding effect thereof, in form and substance satisfactory to the Lenders. The surrendered Notes shall be cancelled and returned to the Borrowers.

**20.5    Participations.** Each Lender may sell participations to one or more banks or other entities in all or a portion of such Lender's rights and obligations under this Credit Agreement and the other Loan Documents; provided that (i) each such participation shall be in an amount of not less than $1,000,000, or such lesser amount consented to by the Agent (ii) any such sale or participation shall not affect the rights and duties of the selling Lender hereunder to the Borrowers and (iii) the only rights granted to the participant pursuant to such participation arrangements with respect to waivers, amendments or modifications of the Loan Documents shall be the rights to approve waivers, amendments or modifications that would reduce the principal of or the interest rate on any Loans, extend the term or increase the amount of the Revolving Credit Commitment of such Lender as it relates to such participant, reduce the amount of any commitment fees or Letter of Credit Fees to which such participant is entitled or extend any regularly scheduled payment date for principal or interest.

**20.6    Disclosure.** Each of the Borrowers agrees that in addition to disclosures made in accordance with standard and customary banking practices any Lender may disclose information obtained by such Lender pursuant to this Credit Agreement to assignees or participants and potential assignees or participants hereunder; provided that such assignees or participants or potential assignees or participants shall agree (i) to treat in confidence such information unless such information otherwise becomes public knowledge, (ii) not to disclose such information to a third party, except as required by law or legal process and (iii) not to make use of such information for purposes of transactions unrelated to such contemplated assignment or participation.

**20.7    Assignee or Participant Affiliated with the Borrowers.** If any assignee Lender is an Affiliate of any Borrower, then any such assignee Lender shall have no right to vote as a Lender hereunder or under any of the other Loan Documents for purposes of granting consents or waivers or for purposes of agreeing to amendments or other modifications to any of the Loan Documents or for purposes of making requests to the Agent pursuant to §14.1 or §14.2, and the determination of the Majority Lenders shall for all purposes of this Credit Agreement and the other Loan Documents be made without regard to such assignee Lender's interest in any of the Loans or Reimbursement Obligations. If any Lender sells a participating interest in any of the Loans or Reimbursement Obligations to a participant, and such participant is a Borrower or an Affiliate of any Borrower, then such transferor Lender shall promptly notify the Agent of the sale of such participation. A transferor Lender shall have no right to vote as a Lender hereunder or under any of the other Loan Documents for purposes of granting consents or waivers or for purposes of agreeing to amendments or modifications to any of the Loan Documents or for purposes of making requests to the Agent pursuant to §14.1 or §14.2 to the extent that such participation is beneficially owned by a Borrower or any Affiliate of any Borrower, and the determination of the Majority Lenders shall for all purposes of this Credit Agreement and the other Loan Documents be made without regard to the interest of such transferor Lender in the Loans or Reimbursement Obligations to the extent of such participation. The provisions of this §20.7 shall not apply to an assignee Lender or participant which has disclosed to the other

104

Lenders that it is an Affiliate of any Borrower and which, following such disclosure, has been excepted from the provisions of this §20.7 in a writing signed by the Majority Lenders determined without regard to the interest of such assignee Lender or transferor Lender, to the extent of such participation, in Loans or Reimbursement Obligations.

**20.8    Miscellaneous Assignment Provisions.**  Any assigning Lender shall retain its rights to be indemnified pursuant to §18 with respect to any claims or actions arising prior to the date of such assignment. Anything contained in this §20 to the contrary notwithstanding, any Lender may at any time pledge all or any portion of its interest and rights under this Credit Agreement (including all or any portion of its Notes) to any of the twelve Federal Reserve Bank organized under §4 of the Federal Reserve Act, 12 U.S.C. §341.  No such pledge or the enforcement thereof shall release the pledgor Lender from its obligations hereunder or under any of the other Loan Documents.  Notwithstanding any other provision in this Credit Agreement, any Lender that is a fund that invests in bank loans may, without the consent of the Agent or the Borrowers, pledge all or any portion of any Loan or any Note held by it to any trustee for, or any other representative of, investors in, or holders of equity securities issued, by such fund, as security for such investment or securities; provided that any foreclosure or similar action by such trustee shall be subject to the provisions of this §20 concerning assignments.

**20.9    Assignment by Borrowers.**  None of the Borrowers shall assign or transfer any of its rights or obligations under any of the Loan Documents without the prior written consent of each of the Lenders.

**20.10    Special Purpose Funding Vehicle.**  Notwithstanding anything to the contrary contained in this §20, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPC") of such Granting Lender, identified as such in writing from time to time delivered by the Granting Lender to the Agent and the Borrowers, the option to provide to the Borrowers all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrowers pursuant to this Credit Agreement, provided that (a) nothing herein shall constitute a commitment to make any Loan by any SPC, (b) the Granting Bank's obligations under this Credit Agreement shall remain unchanged, (c) the Granting Lender should retain the sole right to enforce this Credit Agreement and to approve any amendment, modification or waiver of any provision of this Credit Agreement and (d) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by the Granting Lender.  Each party hereto hereby agrees that no SPC shall be liable for any expense reimbursement, indemnity or similar payment obligation under this Credit Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Credit Agreement) that, prior to the date that is one year and one day after the later of (i) the payment in full of all outstanding senior indebtedness of any SPC and (ii) the Maturity Date, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or similar proceedings under the laws of the United States of America or any State thereof.  In addition, notwithstanding anything to the contrary contained in this §20.10, any SPC may (A) with notice to, but (except as specified below) without the prior written consent of, the

105

Borrowers or the Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to its Granting Lender or to any financial institutions (consented to by the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrowers, which consents shall not be unreasonably withheld or delayed) providing liquidity and/or credit facilities to or for the account of such SPC to fund the Loans made by such SPC or to support the securities (if any) issued by such SPC to fund such Loans and (B) disclose on a confidential basis any non-public information relating to its Loans (other than financial statements referred to in §8.4) to any rating agency, commercial paper dealer or provider of a surety, guarantee or credit or liquidity enhancement to such SPC. In no event shall the Borrowers be obligated to pay to an SPC that has made a Loan any greater amount than the Borrowers would have been obligated to pay under this Credit Agreement if the Granting Lender had made such Loan. An amendment to this §20.10 without the written consent of an SPC shall be ineffective insofar as it alters the rights and obligations of such SPC.

21.  **NOTICES, ETC**.

Except as otherwise expressly provided in this Credit Agreement, all notices and other communications made or required to be given pursuant to this Credit Agreement or the Notes or any Letter of Credit Applications shall be in writing and shall be delivered in hand, mailed by United States of America registered or certified first class mail, postage prepaid, sent by overnight courier, or sent by telegraph, telecopy, facsimile or telex and confirmed by delivery via courier or postal service or, if approved in writing by Agent, by electronic means, addressed as follows:

(a)    if to the Borrowers, at 5660 Katella Avenue, Suite 100, Cypress, California, 90630, Attention: Chief Financial Officer, with a copy to Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York, 10178-0060, Attention: Richard S. Petretti, Esq., or at such other address for notice as the Borrowers shall last have furnished in writing to the Person giving the notice."

(b)    if to the Agent, at 8377 East Hartford Drive, Suite 200, Scottsdale, Arizona 85255, Attention: Syndication Servicing, with a copy to Latham & Watkins LLP, 5800 Sears Tower, Chicago, Illinois 60606, Attention: Jeffrey G. Moran, or such other address for notice as the Agent shall have last furnished to the Person giving such notice;

(c)    if to any Lender, at such Lender's address set forth on Schedule 1 hereto, or such other address for notice as such Lender shall have last furnished in writing to the Person giving the notice; and

(d)    if to the Parent, at 5660 Katella Avenue, Suite 100, Cypress, California, 90630, Attention: Steven L. Tanner, Chief Financial Officer, Anthony Polazzi, Vice President and Clarence E. Terry, Vice President, with a copy to Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017-5735, Attention: Mark Shinderman, Esq., or at such other address for notice as the Parent shall last have furnished in writing to the Person giving the notice.

106

Any such notice or demand shall be deemed to have been duly given or made and to have become effective (i) if delivered by hand, overnight courier or facsimile to a responsible officer of the party to which it is directed, at the time of the receipt thereof by such officer or the sending of such facsimile and (ii) if sent by registered or certified first-class mail, postage prepaid, on the third Business Day following the mailing thereof.

## 22. GOVERNING LAW; CONSENT TO JURISDICTION.

(A) THIS CREDIT AGREEMENT AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED THEREIN, EACH OF THE OTHER LOAN DOCUMENTS ARE CONTRACTS UNDER THE LAWS OF THE STATE OF ILLINOIS AND SHALL FOR ALL PURPOSES BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF SAID STATE OF ILLINOIS (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW); EXCEPT TO THE EXTENT ILLINOIS LAW IS SUPERSEDED BY THE BANKRUPTCY CODE.

(B) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS CREDIT AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS CREDIT AGREEMENT, EACH DEBTOR HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH DEBTOR HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE DEBTORS AT THEIR ADDRESS FOR NOTICES AS SET FORTH IN SECTION 21. EACH DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

CH\1299468.13

### 23. HEADINGS.

The captions in this Credit Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

### 24. COUNTERPARTS.

This Credit Agreement and any amendment hereof may be executed in several counterparts and by each party on a separate counterpart, each of which when executed and delivered shall be an original, and all of which together shall constitute one instrument. In proving this Credit Agreement it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

### 25. ENTIRE AGREEMENT, ETC.

The Loan Documents and any other documents executed in connection herewith or therewith express the entire understanding of the parties with respect to the transactions contemplated hereby. Neither this Credit Agreement nor any term hereof may be changed, waived, discharged or terminated, except as provided in §27.

### 26. WAIVER OF JURY TRIAL.

Each of the Borrowers hereby waives its right to a jury trial with respect to any action or claim arising out of any dispute in connection with this Credit Agreement, the Notes or any of the other Loan Documents, any rights or obligations hereunder or thereunder or the performance of which rights and obligations. Except as prohibited by law, each of the Borrowers hereby waives any right it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. Each of the Borrowers (i) certifies that no representative, agent or attorney of any Lender or the Agent has represented, expressly or otherwise, that such Lender or the Agent would not, in the event of litigation, seek to enforce the foregoing waivers and (ii) acknowledges that the Agent and the Lenders have been induced to enter into this Credit Agreement, the other Loan Documents to which it is a party by, among other things, the waivers and certifications contained herein.

### 27. CONSENTS, AMENDMENTS, WAIVERS, ETC.

Except as otherwise expressly provided in this Credit Agreement, any consent or approval required or permitted by this Credit Agreement to be given by the Lenders may be given, and any term of this Credit Agreement, the other Loan Documents or any other instrument related hereto or mentioned herein may be amended, and the performance or observance by any of the Borrowers or their Subsidiaries of any terms of this Credit Agreement, the other Loan Documents or such other instrument or the continuance of any Default or Event of Default may be waived (either generally or in a particular instance and either retroactively or prospectively) with, but only with, the written consent of the Borrowers and the written consent of the Majority Lenders. Notwithstanding the foregoing, (a) the rate of interest on the Notes may not be

decreased (other than interest accruing pursuant to §6.10.2 following the effective date of any waiver by the Majority Lenders of the Default or Event of Default relating thereto), (b) all or any portion of the Collateral with a book value equal to or greater than 50% of the aggregate book value of the Collateral prior to such release may not be released, (c) no Borrower or any Person that is liable, whether directly or contingently, for payment obligations hereunder may be released and (d) the term of the Notes, the timing or amount of any required payments of principal and interest hereunder, any rates of interest payable hereunder, the amount of the Revolving Credit Commitments of the Lenders, the amount of commitment fees or Letter of Credit Fees hereunder, the definition of Majority Lenders and this §27 may not be changed without the written consent of the Borrowers and the written consent of each of the Lenders affected thereby; and the amount of the Agent's fee under the Fee Letter, the Letter of Credit Fees or any other fees or amounts payable for the Agent's account, and §5 or §16 may not be amended without the written consent of the Agent. No waiver shall extend to or affect any obligation not expressly waived or impair any right consequent thereon. No course of dealing or delay or omission on the part of the Agent or any Lender in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto. No notice to or demand upon any Borrower shall entitle any Borrower to other or further notice or demand in similar or other circumstances. Notwithstanding anything in this §27 to the contrary, the Agent may terminate its security interest in and otherwise release any Collateral or any Borrower sold, transferred or otherwise disposed of by any Borrower or any Subsidiary of any Borrower if such disposition is in compliance with §10.5.2 and otherwise with the terms hereof.

## 28. SEVERABILITY.

The provisions of this Credit Agreement are severable and if any one clause or provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Credit Agreement in any jurisdiction.

## 29. RIGHT TO PUBLICIZE.

Each of the Borrowers hereby acknowledges that the Agent will have the right to publicize the transactions contemplated hereby by means of a tombstone advertisement or other customary advertisement in newspapers and other periodicals. The Agent agrees to provide the Borrowers with the opportunity to review any such tombstone advertisement prior to publication thereof and to provide reasonable comments as to the accuracy and contents thereof.

## 30. USURY.

All agreements between the Borrowers, the Agent and the Lenders are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity of the indebtedness evidenced hereby, by any Note or otherwise, shall the amount paid or agreed to be paid to the Lenders and the Agent for the use or the forbearance of the Indebtedness evidenced hereby or by the Notes exceed the maximum amount permissible under applicable law. As used herein, the term "applicable law" shall mean the law in effect as of the date hereof provided, however, that in the event there is a change in the law which results in a

higher permissible rate of interest, then this Credit Agreement, the Notes and the other Loan Documents shall be governed by such new law as of its effective date. In this regard, it is expressly agreed that it is the intent of the Borrowers, the Agent and the Lenders, in the execution, delivery and acceptance of the Notes, to contract in strict compliance with the laws of the State of Illinois from time to time in effect. If, under any circumstances whatsoever, performance or fulfillment of any provision of this Credit Agreement, the Notes or any of the other Loan Documents at the time such provision is to be performed or fulfilled shall involve exceeding the limit of validity prescribed by applicable law, then the obligation so to be performed or fulfilled shall be reduced automatically to the limits of such validity, and if under any circumstances whatsoever the Lenders and the Agent should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced by the Notes and not to the payment of interest. The provisions of this §30 shall control every other provision of this Credit Agreement and the Notes.

CH\1299468.13

31.    **BANKRUPTCY MATTERS**.

**31.1    Parties Including Trustees; Bankruptcy Court Proceedings.**    This Credit Agreement, the other Loan Documents, and all liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Debtor, the estate of each Debtor, and any trustee, other estate representative or any successor in interest of any Debtor in any Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Credit Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agent, the L/C Issuer and the Lenders and their respective assigns, transferees and endorsees. The liens created by this Credit Agreement, the DIP Orders and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Cases or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its liens under applicable law. No Debtor may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Agent, the L/C Issuer and the Lenders. Any such purported assignment, transfer, hypothecation or other conveyance by any Debtor without the prior express written consent of the Agent, the L/C Issuer and the Lenders shall be void. The terms and provisions of this Credit Agreement are for the purpose of defining the relative rights and obligations of each Debtor, the Agent, the L/C Issuer and Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Credit Agreement or any of the other Loan Documents.

**31.2    Pre-Petition Loan Documents.**    Each Debtor hereby agrees that (i) this Credit Agreement is separate and distinct from the Pre-Petition Credit Agreement and (ii) the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents are in full force and effect as of the date hereof. Each Debtor further agrees that by entering into this Credit Agreement, Lenders do not waive any Default or Event of Default under the Pre-Petition Loan Documents or any of their liens, claims, priorities, rights and remedies thereunder.

**32.    PATRIOT ACT.**    Each Lender that is subject to the Patriot Act hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

*[Remainder of Page Intentionally Left Blank]*

CH\1299468.13

IN WITNESS WHEREOF, the undersigned have duly executed this Credit Agreement as a sealed instrument as of the date first set forth above.

**REAL MEX RESTAURANTS, INC.**
**ACAPULCO RESTAURANTS, INC.**
**EL TORITO FRANCHISING COMPANY**
**EL TORITO RESTAURANTS, INC.**
**TARV, INC.**
**ACAPULCO RESTAURANT OF VENTURA, INC.**
**ACAPULCO RESTAURANT OF WESTWOOD, INC.**
**ACAPULCO MARK CORP.**
**MURRAY PACIFIC**
**ALA DESIGN, INC.**
**REAL MEX FOODS, INC.**
**ACAPULCO RESTAURANT OF DOWNEY, INC.**
**ACAPULCO RESTAURANT OF MORENO VALLEY, INC.**
**EL PASO CANTINA, INC.**
**CKR ACQUISITION CORP.**
**CHEVYS RESTAURANTS, LLC**

By: _____
Name:
Title:

**RM RESTAURANT HOLDING CORP.**

By: _____
Name:
Title:

Address for Wire Transfers:


Real Mex Restaurants, Inc.
Wells Fargo Bank
Long Beach, CA
ABA 121 000 248
Account 4121350482

**GENERAL ELECTRIC CAPITAL CORPORATION, as Agent**

By: _____
Name:
Title: Duly Authorized Signatory


Address for payments:

| | |
|---|---|
| Bank: | Deutsche Bank Trust Company |
| ABA#: | 021-001-033 |
| Acct Name: | GECC/FFC |
| Acct Number: | 50283061 |
| Reference: | Real Mex Restaurants, Inc. – FFC9523 |

**GE FRANCHISE FINANCE COMMERCIAL LLC,** a
Delaware limited liability company, as a Lender


By:___
Name:
Title:  Duly Authorized Signatory

## Schedule 1
## Lenders; Revolving Credit Commitments; Revolving Credit Commitment Percentages

### Part A          Prior to the Roll-Up Effective Time

| Lenders | Revolving Credit Commitments | Revolving Credit Commitment Percentages |
|---|---|---|
| GE Franchise Finance Commercial LLC 8377 East Hartford Drive, Suite 200, Scottsdale, Arizona 85255 | $11,500,000.00 | 100.00% |
| Totals: | $11,500,000.00 | 100.00% |

### Part B          From and after the Roll-Up Effective Time

| Lenders | Revolving Credit Commitments | Revolving Credit Commitment Percentages |
|---|---|---|
| GE Franchise Finance Commercial LLC 8377 East Hartford Drive, Suite 200, Scottsdale, Arizona 85255 | $29,000,000.00 | 100.00% |
| Totals: | $29,000,000.00 | 100.00% |

## Schedule 2
### Letter of Credit Commitments; Letter of Credit Commitment Percentages

<u>Part A</u>        <u>Prior to the Roll-Up Effective Time</u>

| Lenders | Letter of Credit Commitments | Letter of Credit Commitment Percentages |
|---|---|---|
| GE Franchise Finance Commercial LLC 8377 East Hartford Drive, Suite 200, Scottsdale, Arizona 85255 | $50,927 | 100.00% |
| Totals: | $50,927 | 100.00% |

<u>Part B</u>        <u>From and after the Roll-Up Effective Time</u>

| Lenders | Letter of Credit Commitments | Letter of Credit Commitment Percentages |
|---|---|---|
| GE Franchise Finance Commercial LLC 8377 East Hartford Drive, Suite 200, Scottsdale, Arizona 85255 | $20,000,000.00 | 100.00% |
| Totals: | $20,000,000.00 | 100.00% |

## EXHIBIT F

### Post-Closing Matters

1.    Debtors shall deliver or caused to be delivered to the Agent on or prior to October 18, 2011 good standing certificates in each jurisdiction where such Debtor is qualified to do business as a foreign entity.

2.    Debtors shall deliver or caused to be delivered to the Agent on or prior to October 21, 2011 (i) certificates of insurance from an independent insurance broker, in form and substance reasonably satisfactory to the Agent, identifying insurers, types of insurance, insurance limits, and policy terms, and otherwise describing the insurance obtained in accordance with the provisions of the Credit Agreement, (ii) loss payable endorsements relating to Debtors' property insurance policies or such other evidence reasonably satisfactory to the Agent that the Agent has been named lender loss payee thereunder, and (iii) additional insured endorsements relating to Debtors' liability insurance policies or such other evidence reasonably satisfactory to the Agent that the Agent and Lenders have been named additional insured threunder.